**UNITED STATES DISTRICT COURT**
~~FOR THE~~ **NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| **FEDERAL TRADE COMMISSION**, **STATE OF ILLINOIS** **and** **STATE OF MINNESOTA** | ~~Case No.~~No. 1:25-cv-02391 |
| *Plaintiffs*, | ~~COMPLAINT~~ |
| v. | ~~NON-PUBLIC VERSION~~FILED UNDER SEAL |
| **GTCR, LLC** **GTCR BC HOLDINGS, LLC** **and** **SURMODICS, INC.**, | |
| *Defendants*. | |

**AMENDED COMPLAINT FOR ~~TEMPORARY RESTRAINING ORDER AND~~ PRELIMINARY INJUNCTION PURSUANT TO SECTION 13(b) OF THE FEDERAL TRADE COMMISSION ACT AND SECTION 16 OF THE CLAYTON ACT**

Plaintiffs, the Federal Trade Commission ("FTC" or "Commission" ~~or "Plaintiff"~~), by its designated attorneys, and the States of Illinois and Minnesota (collectively, "Plaintiff States," and with the FTC, "Plaintiffs"), acting by and through their respective Attorneys General, petitions this Court ~~to enter a stipulated temporary restraining order and to grant~~for a a preliminary injunction enjoining Defendant GTCR, LLC, GTCR BC Holdings, LLC, and ~~its~~their affiliates and

subsidiaries (collectively, "GTCR") from consummating the proposed acquisition (the "Proposed Acquisition") of ~~Defendant~~ Surmodics, Inc. ("Surmodics") pending resolution of an administrative proceeding.[1] Plaintiffs seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26. Absent ~~action from this Court~~such relief, GTCR and Surmodics (collectively, "Defendants") will be free to consummate the Proposed Acquisition after 11:59 p.m. Eastern Time on November 11, 2025, or the third business day after the district court rules on the FTC's motion for a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, whichever occurs earlier in time.~~March 14, 2025.~~

The Commission initiated an administrative proceeding, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on March 6, 2025. Pursuant to FTC regulations, the administrative proceeding on the merits will begin on August 6, 2025. The administrative proceeding will determine the legality of the Proposed Acquisition and will provide all parties a full opportunity to conduct discovery and present testimony and other evidence regarding the likely competitive effects of the Proposed Acquisition.

Plaintiffs requires the aid of this Court to preserve the status quo and to protect competition during the pendency of the administrative proceeding. Allowing Defendants to consummate the Proposed Acquisition and combine their operations prior to a decision on the merits by the Commission through the administrative process would harm consumers and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is ultimately found unlawful after a full trial on the merits and any subsequent appeals.

---

[1] The Court entered a stipulated temporary restraining order on March 12, 2025. ECF No. 37.

**NATURE OF THE CASE**

1.     GTCR, LLC is a private equity firm based in Chicago, Illinois, which in late 2022 acquired a majority stake in Biocoat, Inc. ("Biocoat"), the second-largest provider of hydrophilic coatings in the United States. GTCR, LLC, through its affiliate, GTCR BC Holdings, LLC, now proposes to acquire Surmodics, the largest provider of hydrophilic coatings in the United States. The Proposed Acquisition, if consummated, would result in a combined company that controls over 50 percent of the market for outsourced hydrophilic coatings, which are critical inputs into lifesaving medical devices. The Proposed Acquisition may therefore lead to a substantial lessening of competition in an already concentrated market, as well as a loss of head-to-head competition, resulting in lower quality and service levels, diminished innovation, and higher prices for hydrophilic coatings sold to U.S. medical device customers.

2.     Hydrophilic coatings are applied to a wide range of interventional medical devices used inside the human body, such as catheters and guidewires, to perform high-stakes neurological, cardiovascular, and peripheral vascular procedures. These medical devices require hydrophilic coatings to reduce friction during use so that the devices function as intended. The coatings allow physicians to maneuver medical devices within the tight confines of the body—for example, within a blood vessel in the brain—without damaging sensitive tissue or vital structures.

3.     Hydrophilic coatings are primarily purchased by original equipment manufacturers ("OEMs") that design, develop, and manufacture medical devices. OEMs range from large, established companies with numerous commercialized devices to smaller startup companies with new and innovative devices in development. Though hydrophilic coatings can be manufactured by an OEM in-house, the vast majority of OEMs opt to purchase hydrophilic coatings produced by specialized third-party manufacturers, such as Surmodics and Biocoat.

4.      The Proposed Acquisition may be analyzed in a relevant market that is no broader than outsourced hydrophilic coatings. Specialized third-party hydrophilic coating providers are a distinct, critical, and growing part of the medical device ecosystem.

5.      Surmodics and Biocoat are the two leading providers in the outsourced hydrophilic coatings market. Surmodics describes itself as the █████████████████████████████ █████████ Biocoat likewise describes Surmodics as the ███████████████████ and the ██████████ ████████ while Biocoat's CEO has described Biocoat as the second-largest player in the ████████████████████████████████ OEMs also recognize Surmodics and Biocoat as the two most significant players in the market, noting that both companies have longstanding reputations for producing high performance coatings on FDA-approved medical devices.

6.      The Proposed Acquisition is presumptively illegal because it would significantly increase concentration in the already highly concentrated outsourced hydrophilic coatings market. The Proposed Acquisition would result in GTCR controlling more than 50 percent of the outsourced hydrophilic coatings market in the United States, well above the threshold to establish a prima facie case that the Proposed Acquisition is unlawful. Ordinary course documents, witness testimony, and economic analysis further confirm this strong presumption of illegality.

7.      This increase in market concentration is especially concerning because ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████

8.      Moreover, the Proposed Acquisition is unlawful because it would eliminate significant head-to-head competition between Biocoat and Surmodics. Biocoat and Surmodics target the same OEM customers and compete aggressively for their business. Biocoat has identified Surmodics as ███████████████     Biocoat executives have discussed ███████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████     Surmodics likewise views Biocoat as a ████ ███████████  and has sought to win customers from Biocoat, including ████████████████ ████████  The head of Surmodics' coatings business, upon learning of GTCR's purchase of Biocoat, declared ██████████████████  This vigorous head-to-head competition has led both Surmodics and Biocoat to offer higher quality coatings and service, better pricing terms, and more innovative products. The Proposed Acquisition is unlawful because it will eliminate this competition and its attendant benefits, harming OEM customers and, ultimately, patients.

9.      There are no countervailing factors sufficient to offset the likelihood of competitive harm from the Proposed Acquisition. The merging parties cannot demonstrate that new entry in the market would be timely, likely, or sufficient to offset these anticompetitive effects. Nor can they show cognizable, verifiable, or merger-specific efficiencies sufficient to offset the likely and substantial competitive harm from the Proposed Acquisition.

## JURISDICTION AND VENUE

10.     The Proposed Acquisition constitutes an acquisition subject to Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 5 of the FTC Act, 15 U.S.C. § 45.

11.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345. This is a civil action arising under Acts of

Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

12.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)   that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)   that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond. . . .

13.     In conjunction with the FTC, Plaintiff States bring this action for a preliminary injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain GTCR and Surmodics from violating Section 7 of the Clayton Act, 15 U.S.C. § 18, pending the Commission's administrative trial. Plaintiff States have the requisite standing to bring this action because the Proposed Acquisition would cause antitrust injury in each of the markets in their respective states for outsourced hydrophilic coatings.

13.14.  Defendants and each of their relevant operating affiliates and subsidiaries are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

14.15.  Plaintiff FTC maintains and operates a regional business office  headquartered in Chicago, Illinois. Plaintiff State of Illinois has a main office in Chicago, Illinois.

15.16.  Defendants are found, reside, and transact business in this State and District, and are subject to personal jurisdiction therein. Defendant GTCR, LLC's's principal place of business is Chicago, Illinois, and a substantial portion of the decision making regarding the Proposed Acquisition and the affected commerce described herein has been carried out in this State and District. ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

16.17.  The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute. Fed. R. Civ. P. 4(k)(1)(C). Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2) and 15 U.S.C. § 53(b).

## DEFENDANTS THE PARTIES AND THE PROPOSED ACQUISITION

18.     Plaintiff FTC is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, NW, Washington, DC 20580. The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

19.     Plaintiff State of Illinois brings this action by and through its Attorney General. The Attorney General is the chief law enforcement officer for the State and brings this action on behalf of the State and the people of the State of Illinois to protect the State, its general economy, and its residents from the anticompetitive effects of the Proposed Acquisition, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

20.     Plaintiff State of Minnesota brings this action by and through its Attorney General. The Attorney General is the chief legal officer for the State and brings this action on behalf of the State and the people of the State of Minnesota to protect the State, its general economy, and its residents from the anticompetitive effects of the Proposed Acquisition, pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

17.21.  Defendant GTCR BC Holdings, LLC, is an affiliate of Defendant GTCR, LLC, whichfounded in 1980, is a private equity firm founded in 1980 and headquartered in Chicago, Illinois. ██████████████████████████████████████████ GTCR owns a portfolio of companies in the medical technology, pharmaceutical, financial services, media, and telecommunications industries. Since 2000, GTCR has invested in approximately 125 portfolio companies and currently manages $40 billion in equity capital.

18.22.  On November 2, 2022, GTCR announced that it had made a majority investment in Biocoat. GTCR gained a controlling interest in Biocoat, and GTCR and its affiliate, Regatta Medical ████████████████████████████████████████ ████████████████████████████

19.23.  Biocoat, founded in 1991, is a hydrophilic coating provider headquartered in Horsham, Pennsylvania. Biocoat operates two different business segments: coating products and

coating services. Biocoat's coating products unit formulates and sells hydrophilic coatings directly to customers under the brand name "Hydak." Biocoat's coating services unit provides two distinct services: (1) application development, which assists medical device companies in optimizing Biocoat's coating chemistry for their products; and (2) commercial coating services, which coats customers' devices with the optimized coating.

20.24. Surmodics, founded in 1979 and headquartered in Eden Prairie, Minnesota, is a publicly traded company that sells medical devices, in-vitro diagnostics, and hydrophilic coatings. Like Biocoat, Surmodics offers both hydrophilic coating products and related services, such as application development, regulatory and commercialization support, and commercial coating services. Surmodics' hydrophilic coatings are generally marketed under the brand names "Serene" and "Preside." Surmodics also develops and markets its own interventional medical devices under the brand names "Pounce" and "Sublime."

21.25. Pursuant to a merger agreement dated May 28, 2024, GTCR, through its corporate affiliates and their subsidiaries, agreed to acquire Surmodics for $43 per share, for a total valuation of approximately $627 million.

**INDUSTRY BACKGROUND**

22.26. Hydrophilic coatings are applied to interventional medical devices such as catheters, guidewires, sheaths, and stents, that are inserted into confined spaces in the human body. These coated devices are used in a range of interventional procedures such as neurovascular, structural heart, coronary, and peripheral vascular procedures.

23.27. Although they are a relatively small part of the overall cost of a medical device, hydrophilic coatings are critical to a device's safety and performance. They increase the lubricity of the device, enabling physicians to navigate the device through small, sensitive structures, such

9

as blood vessels, without causing abrasions. Without a hydrophilic coating, excessive friction created by the medical device's movement could damage vital structures within the patient.

24.28.  A hydrophilic coating's performance primarily turns on three criteria:

   a. lubricity, a measure of the reduction in friction that occurs when a medical device has a hydrophilic coating;

   b. particulate count, which measures the amount of hydrophilic coating particles that are shed from the medical device during use; and

   c. durability, which measures the hydrophilic coating's ability to maintain its quality of performance, including its high lubricity and low particulate count, over time.

25.29.  The FDA tests the performance and safety of hydrophilic coatings during its review of the medical devices that use them. An OEM with a medical device that is rejected by the FDA due to poor hydrophilic coating performance can be set back by millions of dollars and multiple years. OEMs typically hedge against that risk by relying on hydrophilic coating providers with a reputation for high performance, good service, and a history of FDA approvals.

26.30.  Most hydrophilic coatings consist of both a base coat and a top coat. Like paint primer, the base coat is used to normalize and prepare the surface (referred to as the "substrate") of the medical device for coating. Typically, the base coat can better chemically bind to a wider range of substrates (e.g., different polymers, metals, and other surface materials) than the top coat and is itself a superior substrate for the top coat to bind to as well. The top coat is then applied onto the base coat, and it is the top coat which gives the medical device its lubricity.



[Fig. 1]

27.31.  Hydrophilic coatings are typically applied by either dipping the medical device in the coating liquid or by spraying the coating on. After the coating has been applied, it must then be cured. The method for curing will depend on the chemistry of the specific hydrophilic coating. The two most common ways to cure hydrophilic coatings are either by heating them in an oven (thermal curing) or by exposing them to UV light (UV curing).

28.32.  Competitors and OEMs that participate in the outsourced hydrophilic coatings market consistently report that *both* thermal and UV curing are suitable for the vast majority of medical devices. One hydrophilic coating competitor estimated that ███████████████ ███████████████████████████████████████ OEMs typically select a hydrophilic coating supplier based on overall performance and track record of FDA approval rather than the method of curing. For a small subset of devices, however, only one method is suitable: *either* thermal curing *or* UV curing. Thermal curing is generally required, for example, to coat the inner diameter of medical devices, where UV light may not be able to reach, and UV curing may be required for devices that react poorly to very high temperatures.

11

29.33.  OEMs often engage with hydrophilic coating providers very early in the process of developing a medical device—either a new device or the next generation of an existing product—to determine which hydrophilic coating might best serve their needs. First, the OEM conducts initial testing, also referred to as a feasibility study. As part of the feasibility study, the OEM sends samples and design specifications of their product to the hydrophilic coating provider, which then adjusts its hydrophilic coating formula and process based on the device substrate and the OEM's performance goals. As part of this process, OEMs may test each coating sequentially or conduct feasibility studies with multiple coating providers at the same time before selecting the provider and coating that offers the best mix of performance, service, and price.

30.34.  The next step in the coating selection process is optimization. Once an OEM has identified its preferred coating formulation, the OEM will continue to work with the coating provider to make further adjustments to the coating's formulation and application process. This iterative process occurs while the OEM continues to adjust the design of the medical device itself, as both the OEM and hydrophilic coating provider strive to achieve an optimal dynamic between the coating and device substrate.

31.35.  Once a hydrophilic coating is finally "locked in," the coating provider may also offer development and commercialization support, which includes a range of services to help prepare the OEM to launch the medical device. For example, the coating provider may itself apply the coating to the medical devices for pre-clinical or early commercial use. The coating provider may also work with the OEM on technology transfer issues to prepare the OEM to take over the coating application process. If the OEM plans to coat the devices itself, the coating provider will work out an arrangement to supply the proprietary reagents needed to do so. Finally, the coating provider may provide regulatory support to the OEM as it seeks FDA approval for its device.

Although the FDA does not require hydrophilic coatings on medical devices, if an OEM submits a device for review with a hydrophilic coating, the FDA will examine the safety and efficacy of the coating along with the rest of the medical device.

32.36.  Hydrophilic coating providers derive the vast majority of their revenue from sales of commercialized medical devices. Although hydrophilic coating providers typically do not start earning any revenue related to the sale of a commercialized medical device until two to four years after the beginning of feasibility testing, successful medical devices may be sold on the market with the same hydrophilic coating for over a decade. The coating provider generates some revenue by selling coating reagents to the OEM for the entire lifecycle of the device but typically earns more revenue from a licensing agreement between the coating provider and the OEM for continued use of the proprietary coating, under which the coating provider may receive various licensing fees and milestone payments and, more importantly, an additional payment for each unit of the medical device sold. This additional payment can take the form of a fixed amount per unit sold or a royalty (i.e., a percentage of the average sale price).

## THE RELEVANT ANTITRUST MARKET, MARKET STRUCTURE, AND THE PROPOSED ACQUISITION'S PRESUMPTIVE ILLEGALITY

33.37.  The Proposed Acquisition would significantly increase concentration in the already highly concentrated market for outsourced hydrophilic coatings in the United States. Surmodics and Biocoat are the top two competitors, and should the Proposed Acquisition be consummated, the merged entity would control over 50 percent of the market. The resulting level of market concentration and the increase in market concentration due to the merger make the Proposed Acquisition presumptively unlawful under the 2023 U.S. Department of Justice and Federal Trade Commission Merger Guidelines (the "Merger Guidelines") and controlling case law.

### A. The Relevant Product Market

34.38.  The relevant product market is no broader than outsourced hydrophilic coatings. Outsourced hydrophilic coatings have unique characteristics and serve specific customer needs. There are no reasonably interchangeable substitutes for hydrophilic coatings. Although other types of coatings, such as hydrophobic coatings—which repel water rather than attract it—can also provide some lubricity to a medical device, they have a much lower level of performance compared to hydrophilic coatings. Moreover, the most common hydrophobic coating material, polytetrafluoroethylene ("PTFE"), cannot be used to coat the outer diameter of certain medical devices (such as catheters) because PTFE can only be shaped and formed at extremely high temperatures. Coating the outer diameter of a medical device with PTFE at the end of the manufacturing process may damage the rest of the device. Safety and performance concerns related to the use of PTFE on medical devices have recently led some OEMs to switch from PTFE to hydrophilic coatings, but, for the same reasons, OEMs would not switch from hydrophilic coatings to PTFE, even if prices of hydrophilic coatings increased significantly.

35.39. Industry participants—including competitors, customers, and Defendants themselves—all recognize that the outsourced hydrophilic coatings market is a distinct market in which Surmodics and Biocoat are the largest players and frequent head-to-head competitors. Surmodics and Biocoat target many of the same large, small, and startup OEMs for business development.

36.40.  Hydrophilic coatings are complicated products that require specialized expertise, years of research, and millions of dollars to develop. As such, small and startup OEMs generally do not have the capabilities to produce their own in-house hydrophilic coatings and must therefore rely on the outsourced market for their coating needs. Moreover, because hydrophilic coatings are

a relatively small line item on the total cost of manufacturing a medical device, most larger OEMs also choose not to invest the time or resources into developing an in-house coating.

37.41. Outsourced hydrophilic coatings from the market leaders, Surmodics and Biocoat, have meaningfully better performance than in-house solutions. They are more lubricious, shed fewer particulates, and have greater durability. Thus, large and small OEMs alike depend on outsourced hydrophilic coatings when their devices have coating performance requirements above and beyond what in-house coatings can offer. Indeed, demand for outsourced hydrophilic coatings is expected to grow as the FDA implements increasingly stringent coating performance requirements, especially with regard to particulate count.

38.42. Outsourced hydrophilic coating providers also offer important development and commercialization support and services that many OEMs do not have the expertise, time, or resources to perform themselves. Simply having access to a base hydrophilic coating is insufficient; OEMs depend on feasibility testing and optimization services from hydrophilic coating providers to customize the coating so that it best fits their products. OEMs also depend on the product expertise and technical know-how from hydrophilic coating providers to get their manufacturing started and working smoothly. And OEMs may even depend on outsourced hydrophilic coating providers for contract coating services for their medical devices at all stages of the product's lifecycle, including pre-clinical, clinical, and commercialization.

39.43. For all these reasons, OEMs are unlikely to switch from outsourced hydrophilic coatings to in-house solutions in response to a small but significant price increase.

**B. The Relevant Geographic Market**

40.44. The relevant geographic area in which to analyze the effects of the Proposed Acquisition is the United States.

15

41.45.  Hydrophilic coatings are a key component of medical devices. The FDA regulates the production, development, testing, manufacture, marketing, and promotion of medical devices in the United States. A company must perform testing and obtain 510(k) clearance from the FDA, which requires demonstrating substantial equivalence to another legally U.S. marketed medical device, before marketing a medical device in the United States. Accordingly, hydrophilic coatings sold exclusively outside the United States, and not used on devices approved for sale in the United States, are not viable alternatives for U.S. medical device customers, even if the prices for hydrophilic coatings currently available in the United States increase significantly.

### C.    The Relevant Market is Highly Concentrated

42.46.  The Proposed Acquisition is presumptively illegal because it significantly increases concentration and results in a highly concentrated market for outsourced hydrophilic coatings. The impact of the Proposed Acquisition on market concentration is sufficient to establish a prima facie case that the Proposed Acquisition violates the antitrust laws.

43.47.  The market for outsourced hydrophilic coatings manufacturers is highly concentrated. Surmodics and Biocoat together account for over 50 percent of the outsourced hydrophilic coatings market. The remainder of the market is comprised of smaller hydrophilic coating providers that lack Surmodics' and Biocoat's reputation for high quality coatings and service and track record of coating successful FDA-approved medical devices.

a.   **#1: Surmodics**

44.48.  Surmodics is the acknowledged market leader, generating roughly ███ million in annual revenue from its U.S. hydrophilic coatings business in 2023. ███████████████████ ███████████████████████████  Its customers include large and small

16

OEMs that make devices for neurovascular, peripheral vascular, coronary, and structural heart procedures.

45.49.  Surmodics' hydrophilic coatings are UV-cured, and its products are sold under the brand names Serene and Preside. Surmodics launched Preside in October 2023, ███████

████████████████████████████████████████████████████████████████████

### b.  #2: Biocoat

46.50.  Biocoat is the second-largest competitor in the outsourced hydrophilic coatings market and earned approximately ███ million in U.S. coatings revenue in 2023. Like Surmodics, Biocoat's revenue is primarily driven by the provision of coatings and coating-related services to OEMs that manufacture neurovascular, coronary, peripheral vascular, and structural heart devices.

████████████████████████████████████████████████████████████████████

47.51.  Historically, Biocoat specialized in thermal-cured hydrophilic coatings sold under the brand name Hydak. In 2017, Biocoat hired Robert Hergenrother, Surmodics' former Senior Director of Hydrophilic Technologies, as its Senior Director of Research and Development. Under the direction of Dr. Hergenrother, Biocoat developed and launched its own UV-cured hydrophilic coating, called "Hydak UV," in 2020. This development allowed Biocoat to more closely compete with Surmodics for OEMs that had already invested exclusively in UV-curing equipment to apply coatings to their medical devices.

### c.  #3: Harland

48.52.  Harland is the third-largest player in the market, generating approximately ███ million in coatings-related revenue in 2023. Harland only sells UV-cured hydrophilic coatings, under the brand names Lubricent and Tylicent, which were launched in 2016. Before 2016,

Harland contracted with a smaller hydrophilic coating provider, Innovative Surface Technologies, Inc. (also known as "ISurTec"), to bundle ISurTec's coatings with Harland's equipment.

### d. #4: DSM

49.53. DSM, which also exclusively sells UV-cured hydrophilic coatings, is the fourth-largest competitor in the market for outsourced hydrophilic coatings, generating approximately ▮ million in coatings-related revenue in 2023. DSM is a division of dsm-firmenich, a Dutch company focused on health and nutrition.

### e. Fringe Competitors

50.54. Several smaller market participants, including Hydromer and ISurTec, collectively comprise the remainder of the outsourced hydrophilic coatings market. These companies do not offer the same level of performance, track record of success, or suite of services as Surmodics and Biocoat.

### D. The Proposed Acquisition Would Lead to a Presumptively Illegal Level of Market Concentration

51.55. Courts, federal and state agencies, and economists commonly employ market shares and a metric known as the Herfindahl-Hirschman Index ("HHI") to measure market concentration. The HHI for a given market is calculated by summing the squares of the individual firms' market shares. A perfectly competitive market has an HHI approaching zero, whereas a market consisting of a single monopolist (i.e., a pure monopoly) has an HHI of 10,000. A market is considered highly concentrated if it has an HHI of more than 1,800.

52.56. An acquisition is presumptively illegal under the Merger Guidelines and controlling case law if it increases the HHI of a relevant market by more than 100 points and either (a) produces

a post-acquisition HHI greater than 1,800 points or (b) creates a combined firm with a market share greater than 30 percent.

53.57.  Preliminary information indicates that the outsourced hydrophilic coatings market is already highly concentrated, with an HHI in excess of 1,800. The Proposed Acquisition would result in a merged entity with control of over 50 percent of the relevant market, a post-merger HHI exceeding 3,500 and a change in HHI of over 1,000—levels that substantially surpass the threshold for presumptive illegality. The Proposed Acquisition is therefore presumptively illegal under the Merger Guidelines and controlling case law.

**E.    GTCR's Plan to Consolidate the Outsourced Hydrophilic Coatings Market**

54.58.  The Proposed Acquisition is consistent with GTCR's acquisition strategy, dating back to its original Biocoat investment, for an ███████████████████ in the outsourced hydrophilic coatings market. In a presentation to its investment committee in August 2022, GTCR explained ███████████████████████████████████████████ ████████████████████████████████ and described the outsourced hydrophilic coatings market as having ████████████████████████ ████████

55.59.  To that end, GTCR ██████████████████████ ███████████████████████████████████████ A January 2023 Biocoat board of directors presentation noted that █████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████



56.60.  Before pursuing Surmodics, GTCR and Biocoat ████████████ ████████████  In January 2023, Biocoat's Executive Chairman wrote ████████████ ████████████ ████████████ ████████  An initial draft of this letter ████████████████████ in the medical biomaterials sector, though ████████████ ████████████  GTCR and Biocoat circled back in January 2024, ████████ ████████████ ████████████ GTCR began exploring an acquisition of the #1 player, Surmodics.

57.61.  ████████████████████████ On June 3, 2024, after the Proposed Acquisition was announced, GTCR ████████████████ ████████████ ████████████ ████████████ ████████

## ANTICOMPETITIVE EFFECTS OF THE PROPOSED ACQUISITION

58.62.  Internal documents from both companies, as well as competitor and customer testimony, recognize Surmodics and Biocoat as head-to-head competitors in the outsourced hydrophilic coatings industry. The Proposed Acquisition will eliminate this competition, removing a key driver of quality, competitive pricing, and innovation to the detriment of OEMs and patients that rely on interventional medical devices.

### A.     Surmodics and Biocoat Compete Head-to-Head

59.63.  Surmodics and Biocoat compete head-to-head for customers. The companies target many of the same OEM customers for business development, including both well-established and startup manufacturers.

60.64.  Surmodics and Biocoat consistently identify each other as key competitors in the outsourced hydrophilic coatings market. This mutual recognition is evident in numerous internal communications and strategic planning documents from both companies. ████████████████

████████████████████████████████████████

████████████████████████████ In a July 2022 internal email, ██████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

61.65.  Indeed, head-to-head competition between Surmodics and Biocoat accelerated after GTCR acquired Biocoat. For example, ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████ shortly after the Proposed Acquisition was announced, ██████████████

████████████████████████████████████████

████████████████████████████████

62.66.  Biocoat similarly views Surmodics as its primary competition. In an email from May 30, 2024, Biocoat's CFO ███████████████████████████ and Biocoat's CEO ████████████████████████ in a July 2022 email. A May 2024 Biocoat presentation to its board of directors in Chicago ████████████████████████████ ████████████████ Based on Surmodics' stature in the market, Biocoat CEO Jim Moran ████████████████████████████████ ██████████████████████████████ Mr. Moran also █████████████████████████████ ████████████████ In another email from July 2022, Mr. Moran ████████████ ███████████████████████████████ ████████████████████ And in February 2024, ███████ ███████████████████████████████ █████████████████

63.67.  Consistent with Defendants' internal communications, customers and competitors of Surmodics and Biocoat describe the two companies as regularly competing head-to-head for new opportunities. OEM customers consistently cite Surmodics and Biocoat as the top two coating providers they considered during medical device development. OEM customers further report that curing method is not a significant factor in choosing a coating provider and that Surmodics and Biocoat compete for their business based on performance, service, and price.

64.68.  Even for the small share of customers that prefer UV-cured coatings, Surmodics and Biocoat have become increasingly close competitors in recent years. As Biocoat's UV-cured hydrophilic coating, Hydak UV, has gained traction in the market, a significant number of OEMs have benefitted from competition between Hydak UV and Surmodics' hydrophilic coatings.

Today, ███████████████████████████████████████ Hydak UV, and Biocoat
███████████████████████ Indeed, Biocoat has estimated that Hydak UV ███████████████
███████████████████████████████

65.69. Surmodics and Biocoat have repeatedly competed head-to-head over the last several years for the same customers and devices, including competition for the following OEMs:

     a. ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████

     b. ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████

     c. ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ███████

     d. ██████████████████████████████████████
        ██████████████████████████████████████
        ██████████████████████████████████████
        ███████████████████████████████

e. 



**B.     The Benefits of Current Competition Between Surmodics and Biocoat Will Likely Be Eliminated Post-Acquisition**

66.70.  Defendants' internal documents show that Surmodics and Biocoat closely monitor each other's business strategy and routinely respond to each other's competitive decision-making. This fierce competition has driven Surmodics and Biocoat to improve coating quality and services, lower prices, and increase innovation. If the Proposed Acquisition is allowed to proceed, current competition between Surmodics and Biocoat will be eliminated, and the benefits of this competition will likely be lost.

**a.   Better Quality and Services**

67.71.  Current head-to-head competition between Surmodics and Biocoat incentivizes the companies to offer better quality and services than they would absent that competition. Unlike some of their competitors, both Surmodics and Biocoat offer full-service support, including testing, assistance with regulatory approval, and contract coating services, differentiating them

from other coating providers. The breadth and quality of their service offerings further differentiates them from other outsourced hydrophilic coating manufacturers in the market.

68.72.  For example, when ███████████ became concerned with the performance of Surmodics' hydrophilic coating ████████████████████████ testified that the competition between Surmodics and Biocoat ultimately helped produce a higher quality product offering from Surmodics at better terms.

69.73.  ███████████████ indicated that Surmodics and Biocoat were the two best options █████████████████████ and expressed concern that, if the companies merge and the new company reduces choices or services, ██████████████ ████████████████████████████████████████

████████████████████

**b. Competitive Pricing**

70.74.  Surmodics and Biocoat compete aggressively on price and pricing structure. ████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████ This price competition benefits customers and drives down costs.

71.75.  Price competition can occur in the early stages of development, feasibility testing, optimization, or pre-commercial services. For example, ████████████████████ ████████████████████████████████████████ ████████████████ Price competition may also occur later in the development process, including in licensing and royalty rates. ████████████████████████

26

████████████████████████████████████████████████████

██████

72.76.  Surmodics and Biocoat also compete on pricing structure. In a presentation to

Surmodics' board of directors, Surmodics executives ██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Biocoat ██████████████████

████████████████████████████████████████████████████

████  To that end, Biocoat has tried to win business ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

73.77.  Examples of competition for price and pricing structure between Surmodics and

Biocoat include:

    a.  ████████████████████████████████████████████

        ████████████████████████████████████████████

        ████████████████████████████████████████████

        ████████████████████████████████████████████

        ██████████████

    b.  ████████████████████████████████████████████

        ████████████████████████████████████████████

        ████████████████████████████████████████████

        ████████████████████████████████████████████

        ████████████████████████████████████████████

c. ████████████████████████████████

d. ████████████████████████████████

[REDACTED]

[REDACTED]

### c. Increased Innovation

74.78.  Surmodics and Biocoat have historically utilized different curing methods for their most popular hydrophilic coatings: Surmodics' Serene coating is UV-cured, while Biocoat's Hydak coating is thermal-cured. More recently, the keen competition between Surmodics and Biocoat has driven both companies to release innovative new products. Biocoat utilized the expertise of Surmodics' former Senior Director of Hydrophilic Technologies, Bob Hergenrother, to develop Hydak UV in 2020. Hydak UV allows Biocoat the opportunity to convert Surmodics customers that are reluctant to use thermal-cured coatings because they have already invested in UV-curing infrastructure. Hydak UV also enables Biocoat to compete for heat-sensitive medical devices that would not withstand thermal curing. Biocoat [REDACTED]

[REDACTED]

[REDACTED]

75.79.  Surmodics has similarly developed innovative new coatings to better compete with Biocoat. In late 2023, Surmodics released Preside, its next-generation hydrophilic coating, which was developed in part as a response to performance gains made by Biocoat's product offerings in recent years. Surmodics believes that Preside will enable it to more effectively compete with Biocoat [REDACTED]

76.80.  The time and expense Surmodics and Biocoat have invested to develop and market these new and improved coatings demonstrates the ongoing competitive pressure driving innovation in the outsourced hydrophilic coatings market.

## COUNTERVAILING FACTORS DO NOT OFFSET

## THE PROPOSED ACQUISITION'S THREAT TO COMPETITION

### A.    Entry And Expansion

77.81.  The Proposed Acquisition raises significant competitive concerns in the outsourced hydrophilic coatings market. Barriers to entry and expansion in the outsourced hydrophilic coatings market are high, and Defendants cannot demonstrate that new entry or expansion by existing firms would be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition.

78.82.  As an initial matter, there has not been meaningful new entry into the hydrophilic coatings market in at least five years, and expansion in the industry is slow.



79.83.  For a new entrant, the timeline from product development to revenue generation can average between four to seven years. Even for an established player, the development timeline for a new product is at least two years. This is because developing a new hydrophilic coating is a multi-year R&D effort, and once developed and launched, the sales cycle for hydrophilic coatings averages between one to two years and involves multiple rounds of feasibility testing and optimization. In addition, once the OEM has completed feasibility testing and selected a hydrophilic coating for its medical device, it can take at least several more months, if not years, depending on the novelty of the device, for the device to receive FDA approval and begin

generating commercial revenue. As such, the average timeline from the launch of a new hydrophilic coating product to the point at which it is ordered on a regular basis for a device is approximately two to five years. Biocoat estimates that reaching minimum viable scale could take an average of ██████ years.

80.84.  Two recent examples illustrate the difficulty of launching a new hydrophilic coating product, even for the largest and most sophisticated suppliers. Surmodics began developing its latest generation hydrophilic coating, Preside, ████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

81.85.  Likewise, Biocoat ████████████████████████

████████████████████████████████████

████████████████████████████████ launch the product in March 2020. Three years later, in March 2023, Biocoat announced that Hydak UV was being used on two FDA-cleared medical devices. Biocoat's May 2024 presentation to its board of directors in Chicago ████████████████████████████

████████████████████████████████████

████████████████

82.86.  The complexity of developing a hydrophilic coating is compounded by the stringent regulatory requirements of the FDA. For medium-risk (Class II) devices, such as catheters and guidewires, the FDA requires a 510(k) Premarket Notification, which involves testing to compare a submitted device to one or more legally marketed medical devices to support a claim of substantial equivalence. Higher-risk (Class III) novel or implantable devices require a Premarket

Approval (PMA) application, which involves extensive clinical trials and additional rigorous testing. Critically, both 510(k) and PMA applications must specify the exact hydrophilic coating used in testing. FDA approval is granted for the complete medical device, not individual components, effectively "locking in" the hydrophilic coating for the medical device's lifespan.

83.87.  Changing a hydrophilic coating after a device receives FDA approval requires a new round of development, testing, and FDA application. As a result, OEMs are unlikely to switch to another hydrophilic coating on existing devices unless they are already developing a next-generation version that requires new FDA approval. This "lock-in" effect means that new and existing hydrophilic coatings cannot readily displace existing coatings on commercialized devices.

84.88. New coating providers, especially those without existing reputations or relationships, face additional challenges in gaining market traction because OEMs are hesitant to adopt coatings without a proven track record. OEMs prioritize the stability and longevity of their coating providers because they rely on them for extended periods. Many customers are unwilling to be the first to use a new coating that has not previously received FDA approval on another device. Rather, large OEMs typically prefer to partner with full-service coating providers with a proven history of coating FDA-approved devices. Small medical device manufacturers likewise tend to rely on established hydrophilic coating providers because they do not have the resources or time to develop an in-house solution and do not want to jeopardize the launch of the device (and, by extension, the success of the company) by partnering with an unproven coating supplier.

### C.    Efficiencies

85.89. Defendants cannot demonstrate merger-specific, verifiable, and cognizable efficiencies sufficient to overcome the structural presumption of illegality or show that the Proposed Acquisition does not threaten to substantially lessen competition.

**VIOLATION**

**COUNT I – ILLEGAL ACQUISITION**

~~86.~~90.  The allegations of Paragraphs 1 through 8~~9~~5 above are incorporated by reference.

~~87.~~91.  The Proposed Acquisition, if fully consummated, may substantially lessen competition in outsourced hydrophilic coatings market throughout the country in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 and Section 5 of the FTC Act, 15 U.S.C. § 45. Plaintiff States would therefore suffer harm to their general economies and to their residents.

**LIKELIHOOD OF SUCCESS ON THE MERITS,**

**BALANCE OF EQUITIES, AND NEED FOR RELIEF**

~~88.~~92.  Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes ~~Plaintiff~~the FTC, whenever it has reason to believe that an acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative trial. Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes the States of Illinois and Minnesota to sue for and have injunctive relief to prevent threatened loss or damage from Defendants' consummation of the Proposed Acquisition. In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities. The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

~~89.~~93.  The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition in violation of Section 7 of the Clayton

Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45. In particular, the Commission is likely to succeed in demonstrating, among other things, that:

    a. The Proposed Acquisition would have anticompetitive effects in the outsourced hydrophilic coatings market;

    b. Substantial and effective entry or expansion is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition;

    c. Any efficiencies and procompetitive benefits asserted by Defendants do not justify the Proposed Acquisition.

~~90.~~94. Preliminary relief is warranted and necessary. Should the Commission rule, after the full administrative trial, that the Proposed Acquisition is unlawful, reestablishing the status quo ante if the parties have consummated the Proposed Acquisition and combined their operations in the absence of preliminary relief would be extremely difficult. Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim.

~~91.~~95. Accordingly, the equitable relief requested here is in the public interest. Wherefore, Plaintiff_s_ respectfully request~~s~~ that the Court:

    a. Enter a temporary restraining order;

    b. Preliminarily enjoin Defendants from taking any further steps to consummate the Proposed Acquisition, or any other acquisition of stock, assets, or other interests of one another, either directly or indirectly;

    c. Retain jurisdiction and maintain the status quo until the administrative proceeding initiated by the Commission is concluded; ~~and~~

    ~~c.~~d. Award costs of this action to the Plaintiff States, including attorneys' fees; and

~~d.~~c. Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: [April 16]~~March 6~~, 2025

Of counsel:

DANIEL GUARNERA
Director
Bureau of Competition

DAVID J. SHAW
Principal Deputy Director
Bureau of Competition

~~JORDAN ANDREW~~
~~Acting Assistant Director~~
~~Mergers I Division~~

~~JAMES WEISS~~
~~Deputy Assistant Director~~
~~Mergers I Division~~

Respectfully submitted,

*/s/ Maia Perez*
MAIA PEREZ
Lead Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) ~~322-8971~~326-3522
Email: mperez@ftc.gov

YAN GAO
R. TYLER SANBORN
EVELYN HOPKINS
DYLAN G. BROWN
WILLIAM M. MACCI
LAUREN GASKIN
ELIZABETH KLINGER
LILIANA P. VARGAS
NICHOLAS WIDNELL
LILY VERBECK
LEONARDO CHINGCUANCO
JESSICA WEINER

*Counsel for Plaintiff*
*Federal Trade Commission*

LE'ORA TYREE (IL Bar ID 6288669)
Federal Trade Commission
Midwest Regional Office
230 S. Dearborn Street, Room 3030
Chicago, IL 60604
Tel.: (312) 927-7660
Cell: (312) 960-5612
Email: ltyree@ftc.gov

*Local Counsel for Plaintiff*
*Federal Trade Commission*

FOR PLAINTIFF STATE OF MINNESOTA

KEITH ELLISON
Attorney General

/s/ Elizabeth Odette
ELIZABETH ODETTE
Manager, Assistant Attorney General
Antitrust Division
Email: elizabeth.odette@ag.state.mn.us

/s/ Zach Biesanz
ZACH BIESANZ (*pro hac vice* forthcoming)
Senior Enforcement Counsel
Antitrust Division
Email: zach.biesanz@ag.state.mn.us

Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101
Tel.: (651) 757-1257

*Counsel for Plaintiff State of Minnesota*

FOR PLAINTIFF STATE OF ILLINOIS

KWAME RAOUL
Attorney General

/s/ John Milligan
JOHN MILLIGAN
Assistant Attorney General

Office of the Illinois Attorney General
115 S. LaSalle Street, Floor 23
Chicago, IL 60603
Tel.: (773) 505-5937
Email: John.Milligan@ilag.gov

*Counsel for Plaintiff State of Illinois*