UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,
STATE OF ILLINOIS, and
STATE OF MINNESOTA,

          *Plaintiffs*,

v.

GTCR, LLC,
GTCR BC Holdings, LLC, and
SURMODICS, INC.,

          *Defendants*.

Case No. 1:25-cv-02391

District Judge Jeffrey I. Cummings
Magistrate Judge Gabriel Fuentes

**OPPOSED MOTION OF DEFENDANT GTCR BC HOLDINGS, LLC TO COMPEL HARLAND MEDICAL SYSTEMS, INC. TO COMPLY WITH SUBPOENA**

Pursuant to Federal Rule of Civil Procedure 45(d)(2)(B)(i), Defendant GTCR BC Holdings, LLC ("BC Holdings") moves to compel Harland Medical Systems, Inc. ("Harland") to comply with its discovery obligation and produce its Salesforce sales opportunity data—*i.e.*, the data that Harland maintains about coating sales opportunities. There is good reason this type of sales opportunity data is routinely requested by the FTC in merger reviews and private parties in antitrust litigation. Harland's Salesforce data are highly probative of the success of Harland's coatings business and its availability as an alternative supplier of lubricious coatings.

BC Holdings and Harland have agreed to the following briefing schedule: a deadline of July 22, 2025, for Harland's opposition and a deadline of July 25, 2025 for BC Holdings' reply.

**REQUEST FOR RELIEF**

1

BC Holdings requests that the Court grant this Motion and require Harland to produce, within seven (7) days, its Salesforce sales opportunity data in its full and unadulterated form from January 1, 2021, through the present ("Salesforce data").

## BACKGROUND

Harland is a lubricious coatings supplier that recently started manufacturing its own coatings with great success. Consequently, Harland possesses sales and opportunity data that are important to Defendants in demonstrating the procompetitive nature of the Proposed Transaction. Harland describes itself as "the industry's only comprehensive source for coatings, equipment, [and] production coating services" for medical devices.[1] Its coating solutions include "UV Curable Hydrophilic Coatings" for "catheters, sheaths, introducers, guide wires[,] and other medical devices[.]"[2] ██████████████████████████████████████████████████████████████████████████████████████████████████ Even the Amended Complaint describes Harland as the "third-largest player in the market." Dkt. 66, ¶ 52.

On April 1, 2025, BC Holdings served a subpoena on Harland seeking documents and data pertaining to the production, development, testing, and sale of lubricious coatings and other related competitive and strategic information. *See* Ex. A (the "Subpoena"). After more than three months of good faith efforts to address Harland's blanket, unsubstantiated, and shifting objections, BC Holdings now seeks only one additional piece of critical information: the ordinary course Salesforce data that Harland's own witness described as how Harland tracks and maintains sales opportunities.

---

[1] Harland Medical Systems, *About Harland Medical Systems,* (last visited July 9, 2025) https://harlandmedical.com/about-coating-for-medical-devices/.
[2] Harland Medical Systems, *Coating Solutions,* (last visited July 9, 2025) https://harlandmedical.com/products-and-services/coating-solutions/.

2

BC Holdings asked repeatedly about sales and testing opportunities both generally and at a device-level—beginning with the very first meet and confer on April 1, 2025 and a follow-up call on April 2, 2025. On April 15, 2025, BC Holdings requested a "specific articulation of what responsive data and documents Harland keeps," but Harland continued to restate its objections. Ex. B at 2. On April 16, 2025, Salesforce and CRM data were mentioned by both counsel for BC Holdings as well as a representative from Defendants' economic consulting firm as a way that Harland might record opportunities data. BC Holdings followed up on May 14, 2025 specifically about whether Harland kept sales opportunities in Salesforce or some sort of spreadsheet. BC Holdings asked about sales opportunities often and stated explicitly in its April 27, 2025 correspondence that "sales opportunity data, meaning data on both actual sales as well as sales opportunities" was BC Holdings number one priority. Ex. C at 1. During the course of their many meet and confers, counsel for Harland never acknowledged that Harland maintains a Salesforce database and represented on May 15, 2025 that it was not sure what "systematic information" he could provide. At the deposition that followed, Harland's designated 30(b)(6) witness revealed a Salesforce database of sales opportunities that Harland still refuses to produce.[3] This Motion follows.

BC Holdings met and conferred with Harland counsel on at least ten occasions and also corresponded electronically to attempt to get the information necessary and resolve Harland's confidentiality concerns and other objections. Appendix A details BC Holdings' extensive efforts to obtain the necessary materials without resorting to litigation and establishes BC Holdings' compliance with Local Rule 37.2.

---

[3] Ex. D - Deposition Transcript of Philip Ankeny, at 99:17-24 (June 25, 2025).

## ARGUMENT

**I.      The Subpoena Requests Relevant Materials Proportional to the Needs of the Case.**

In a merger litigation focused on competition in the marketplace, BC Holdings is plainly entitled to receive Harland's sales opportunity data to show the success of Harland's lubricious coatings business and its relevance as an alternative source of lubricious coatings for many customers. Under Rule 45, parties may seek any nonparty information that is subject to discovery under Rule 26—namely, "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." *SPS Techs., LLC v. Boeing Co.*, No. 19-cv-3365, 2019 WL 2409601, at *3 (N.D. Ill. June 7, 2019) (quoting Fed. R. Civ. P. 26(b)(1)). Courts address disputes over nonparty subpoenas by evaluating whether a subpoena's requests are "reasonable in the circumstances," *Gaines v. Chicago Bd. of Ed.*, No. 19-c-775, 2022 WL 1292248, at *2 (N.D. Ill. Apr. 29, 2022) (quoting *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003)), and consider factors such as "timeliness, good cause, utility, and materiality," *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 993 (7th Cir. 2002). "[T]he burden rests upon the objecting party to show why a particular discovery request is improper." *See McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-cv-6500, 2015 WL 13901027, at *2 (N.D. Ill. June 23, 2015) (citation omitted) (granting motion to compel in part and ordering third party to produce additional materials responsive to subpoena).[4] Harland cannot make this necessary showing.

---

[4] This Court has jurisdiction to hear this Motion under 15 U.S.C. § 23, which provides that in United States government-party actions, "subpoenas for witnesses who are required to attend a court of the United States in any judicial district in any [civil case] arising under the antitrust laws may run into any other district." *See also, e.g.*, Dkt. 71, CMSO, at 13 (providing for nationwide service of process for Rule 45 subpoenas under 15 U.S.C. § 23); *F.T.C. v. Kroger Co.*, No. 3:24-cv-00347, 2024 WL 3400098 at *3 (D. Or. July 12, 2024) ("15 U.S.C. § 23 confers nationwide enforcement power over subpoenas issued pursuant to that provision."); *F.T.C. v. Meta Platforms, Inc.*, No. 20-cv-3590, 2025 WL 985530 at *3 (D.D.C. Apr. 2, 2025) (same).

**A. The Subpoena Targets Information that Is Highly Relevant to the Claims and Defenses in this Case.**

Harland cannot credibly argue that sales opportunity data are not relevant to this merger litigation focused on competition including between Biocoat, Surmodics, Harland, and numerous other coating providers. Plaintiffs allege that BC Holdings' purchase of Surmodics, Inc. ("Proposed Transaction") is "unlawful because it will eliminate [] competition" in the alleged "outsourced hydrophilic coatings market." Dkt. 66, ¶¶ 6, 8. BC Holdings, in turn, seeks ordinary course sales opportunities data contained in Salesforce from Harland. Basic data depicting Harland's competitive presence and impact in this market are critical to testing Plaintiffs' allegations regarding the likelihood of anticompetitive effects stemming from the Proposed Transaction. Harland's sales opportunities information is particularly critical because the FTC alleges Harland is the "third-largest" competitor in the FTC's alleged market. Dkt. 66, ¶ 52. The devices for which Harland has competed and is competing, and with which coating, are plainly relevant to both the claims and defenses in this case.

Harland objects that its Salesforce information is "highly speculative and non-probative, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. E at 1. Even if true, this is not a valid basis for withholding relevant discovery. Moreover, whether or not a device is commercialized is not the test for relevance here, which instead encompasses which customers interact with Harland as a potential coating supplier for which coating, and to what degree of success. Simply, this not a case only about commercialized medical devices but about the competition to provide lubricious coatings for those medical devices—which, as Harland stated, ▮▮▮▮▮▮▮▮▮▮▮▮

---

[5] Ex. D - Deposition Transcript of Philip Ankeny, at 99:17-24 (June 25, 2025).

5

### B. Harland Cannot Demonstrate That The Request is Disproportionate Or Unduly Burdensome.

BC Holdings' Request for Salesforce data narrowly targets a single source of information relevant to the litigation's most important issue: Plaintiffs' alleged harms to future competition. *See* Fed. R. Civ. P. 26(b)(1) (proportionality includes the importance of the issues at stake, parties' relative access to relevant information, importance of the discovery in resolving the issues, and whether the burden of discovery outweighs the benefit); *see, e.g.*, *Bankers Life and Casualty Co. v. Alshoubaki*, No. 16-c-5975, 2016 WL 11940391, at *8 (N.D. Ill. June 27, 2016) (granting motion to compel nonparty responses to narrowed subpoena requests based on Rule 26's proportionality factors).

Harland insists that information about its own sales opportunities should be gathered elsewhere, but there is no equivalent or better source for Harland's opportunities data than Harland itself. Moreover, BC Holdings' simultaneous efforts to get sales opportunity information from other industry participants does not relieve Harland of its obligation to provide responsive, proportional information in response to a Rule 45 subpoena.

Harland's latest objections on burden grounds fare no better. Harland complains that it already produced information on sales opportunities and that those productions were made on the "assumption that doing so was a compromise that concluded [its] obligations with respect to GTCR's requests[.]" Ex. E at 1. But that is flatly undermined by the record. BC Holdings has continuously requested sales opportunity data from Harland, repeatedly asked how Harland may keep that data, and even suggested multiple times that it may be in Salesforce. Harland repeatedly provided shifting answers on whether such data existed and where. When asked specifically about the existence of Salesforce data prior to the deposition, Harland never directly responded. It was

only after its existence slipped during a deposition that BC Holdings knew to ask yet again for this data it has repeatedly requested and never abandoned.

Harland's boilerplate burden objections in its Responses and Objections are similarly unavailing. *See* Ex. F. Defendants requested that Salesforce data be exported; this is a routine function that thousands of businesses across America execute daily. Indeed, facilitating the export of information about sales opportunities is exactly what Salesforce is designed to do. Courts regularly reject unsupported burden assertions like those Harland raises here. *See, e.g.*, *Rossman v. EN Eng'g, LLC*, 335 F.R.D. 171, 173 (N.D. Ill. 2020) (holding that boilerplate objections have "little real meaning"); *Reed v. Illinois*, 318 F.R.D. 77, 79 (N.D. Ill. 2016) (finding third party did not meet burden to show the subpoena was unduly burdensome by "relying exclusively on unadorned assertions regarding … the subpoena"). "One claiming undue burden must do more than say it is so," *PsyBio Therapeutics, Inc. v Corbin*, No. 20-c-3340, 2021 WL 4459527, at *3 (N.D. Ill. Sep. 29, 2021) (*citing EEOC v. Aerotek, Inc.*, 815 F.3d 328, 334 (7th Cir. 2016)), and Harland has declined to do anything more. The Court should thus order Harland to produce its Salesforce data regarding sales opportunities that Harland maintains in the ordinary course of business.

### C. Harland's Confidentiality Concerns are Unsubstantiated and Unfounded.

Harland's principal objection to producing the sales opportunity data is that the information is highly confidential and that its disclosure would cause irreparable harm to Harland and its customers. *See* Ex. E. These concerns are solved by the Protective Order entered April 11, 2025, which provides for outside counsel only treatment. *See* Dkt. 61. Specifically, the Protective Order permits nonparty Harland to "designate any responsive Document or portion thereof as Confidential Material[,]" *id.* at 2-3, and only *outside* counsel and their retained experts may access materials designated confidential by nonparties—*in-house* counsel access is prohibited, *see id.* at 4-5. Courts

7

regularly compel parties and third parties to produce relevant information when an adequate protective order is in place, particularly one authorizing outside counsel-access only like the Protective Order does. *See* Dkt. 61, ¶ 7(e); *see, e.g.*, *Methodist Health Servs. Corp. v. OSF Healthcare Sys.*, No. 14-cv-7748, 2014 WL 5465401, at *2 (N.D. Ill. Oct. 27, 2014) (concluding that the case protective order limiting information to outside counsel and retained experts sufficiently addressed nonparty competitor's concerns regarding disclosure of its confidential information); *Meridian Labs., Inc. v. Oncogenerix USA, Inc.*, No. 18-cv-6007, 2021 WL 4768256, at *4 (N.D. Ill. Jan. 6, 2021) (Cummings, J.) (concluding that party's "concerns in handing over responsive documents to a company that it alleges is developing a competing product" would be alleviated by amending the case protective order to allow for outside counsel access only).

       In fact, Harland already produced information it viewed as "HIGHLY CONFIDENTIAL" pursuant to that very Protective Order. Ex. G at 3. Harland does not explain why the Protective Order is adequate for some of its highly confidential information, but not its sales opportunity data—which it simultaneously describes as inherently unreliable and incomplete. In any event, courts routinely compel the disclosure of similar information from third-party competitors in merger litigation. *See, e.g.*, *Fed. Trade Comm'n v. Thomas Jefferson Univ.*, No. CV 20-01113, 2020 WL 3034809, at *3 (E.D. Pa. June 5, 2020) (denying purported third-party competitor's Motion to Quash or Modify the Subpoenas on the basis of protecting trade secrets when a protective order is in place to safeguard confidential information); *United States v. Dean Foods Co.*, No. 10-CV-59, 2011 WL 382897, at *2–3, (E.D. Wis. Feb. 3, 2011) (granting motion to compel information from a third-party competitor in merger litigation where third party's claims of privilege were unsubstantiated and protective order could ensure confidentiality of disclosed customer data).

Harland has also objected that non-disclosure agreements protect the information. *See, e.g.*, Ex. E at 1. That objection is legally indefensible. This court has held that the "mere existence of a confidentiality agreement is not in itself a valid reason to object to discovery." *Glob. Material Techs., Inc. v. Dazheng Metal Fibre Co., LTD.*, 133 F. Supp. 3d 1079, 1087 (N.D. Ill. 2015). The Protective Order further undermines this basis for resisting production. *See JAB Distribs., LLC v. London Luxury, LLC,* 09-CV-5831, 2010 WL 4008193, at *4 (N.D. Ill. Oct. 13, 2010) ("Defendant proffers no case in support of its argument that a confidentiality agreement precludes a party from producing documents pursuant to a protective order.")

Finally, as the objecting party, Harland bears the burden to show why this discovery request for sales opportunities information from a leading competitor in a case about competition is improper. *See McDaniel*, 2015 WL 13901027, at *2 (citation omitted) (granting motion to compel in part and ordering third party to produce additional materials responsive to subpoena). Harland cannot do so.

The Salesforce data requested from Harland are not only highly relevant and proportional to the needs of the case, but critical to the Parties' ability to present a complete and accurate competitive landscape and to the Court's ability to make a predictive judgment of competitive impact. The Court should grant Harland's Motion.

## **CONCLUSION**

For the foregoing reasons, BC Holdings respectfully requests that the Court order Harland to produce the Salesforce data within seven (7) days.

| | |
|---|---|
| Dated: July 10, 2025 | */s/ Daniel Culley* |
| Sean M. Berkowitz<br>Gary Feinerman<br>LATHAM & WATKINS LLP<br>330 North Wabash Avenue, Suite 2800<br>Chicago, IL 60611<br>312-876-7700<br>sean.berkowitz@lw.com<br>gary.feinerman@lw.com | Daniel P. Culley (*pro hac vice*)<br>D. Bruce Hoffman (*pro hac vice*)<br>Blair West Matthews (*pro hac vice*)<br>Gabriel J. Lazarus (*pro hac vice*)<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>2112 Pennsylvania Ave., NW<br>Washington, D.C. 20037<br>202-974-1500<br>dculley@cgsh.com<br>bhoffman@cgsh.com<br>bmatthews@cgsh.com<br>glazarus@cgsh.com |
| Alfred Pfeiffer<br>Kelly S. Fayne (*pro hac vice*)<br>LATHAM & WATKINS LLP<br>505 Montgomery Street, Suite 2000<br>San Francisco, CA 94111<br>415-391-0600<br>al.pfeiffer@lw.com<br>kelly.fayne@lw.com | Heather S. Nyong'o (*pro hac vice*)<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>650 California St.<br>San Francisco, CA 94108<br>415-796-4400<br>hnyongo@cgsh.com |
| Ian Conner (*pro hac vice*)<br>Amanda P. Reeves (*pro hac vice*)<br>LATHAM & WATKINS LLP<br>555 Eleventh Street, NW<br>Washington, DC 20004<br>202-637-2200<br>ian.conner@lw.com<br>amanda.reeves@lw.com | Matthew M. Yelovich (*pro hac vice*)<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>1841 Mill Page Road<br>Palo Alto, CA 94304<br>650-815-4152<br>myelovich@cgsh.com |
| | Miranda Herzog (*pro hac vice*)<br>CLEARY GOTTLIEB STEEN & HAMILTON LLP<br>One Liberty Plaza<br>New York, NY 10006<br>212-225-2152<br>mherzog@cgsh.com |
| | *Counsel for GTCR BC Holdings, LLC* |

**Appendix A**

| Date | Discussion Topics |
|---|---|
| April 1, 2025 Meet and Confer | ▪ BC Holdings explained the importance of demonstrating that Harland is competing for and winning significant opportunities because the FTC's theory, in part, is based on the assertion that Harland is not a meaningful competitor.<br><br>▪ BC Holdings explicitly stated it was seeking information regarding sales, sales or testing opportunities, and any invitations to Harland to test its coating—all in whatever form that information is kept in the ordinary course.<br><br>▪ Harland claimed that information is not stored in a centralized way. |
| April 2, 2025 Meet and Confer | ▪ BC Holdings offered further context on the importance of showing Harland is going to be successful at picking up new platforms and revenue based on current and recent opportunities data.<br><br>▪ BC Holdings stated it would be open to receiving that information by deposition or through opportunities data.<br><br>▪ Harland expressed its confidentiality concerns and requested that any responses be treated outside counsel only, which BC Holdings agreed to work on. |
| April 15, 2025 Meet and Confer | ▪ Harland acknowledged it reviewed the Protective Order and that it had strong protections but maintained its confidentiality concerns.<br><br>▪ Harland explained that it viewed the information as competitively sensitive and as, in some cases, not belonging to Harland but to its customers.<br><br>▪ Harland inquired about relevance, and BC Holdings explained that understanding which coatings are used on which devices is critical to both market definition and the competitive impact of the Transaction.<br><br>▪ BC Holdings confirmed it needs to know the customer relevant to each device opportunity to use the information and that further detailed information such as blueprints and specifications for devices were not focus areas. |

11

| | |
|---|---|
| | ▪ BC Holdings noted that the information received was most likely to be aggregated in an expert report.<br><br>▪ BC Holdings confirmed that it had received and reviewed Harland's FTC production, but that this did not cover the sales opportunities adequately.<br><br>▪ Harland noted that it would be willing to discuss anonymization and aggregation in further meet and confers and that they would serve Responses and Objections. |
| April 15-22, 2025 Correspondence Between BC Holdings and Harland; *See* Ex. B. | ▪ BC Holdings requested a specific articulation of responsive data and documents Harland keeps in order to discuss how to minimize the areas of concern while still receiving the critical information.<br><br>▪ BC Holdings explained that the Protective Order provides for outside counsel only treatment of documents and data Harland designates as confidential and assured Harland any such materials would receive the highest level of protection possible.<br><br>▪ BC Holdings explained it cannot commit to requesting the Court close the courtroom unless the information being shared is truly confidential, which BC Holdings could not know at that time.<br><br>▪ Harland agreed to discuss the confidentiality issue further. |
| April 16, 2025 Meet and Confer | ▪ BC Holdings further discussed Harland's confidentiality objections and explained that they expected economic reports to use Harland's data at a high level for diversion ratios and to understand substitution, but that it could not promise which opportunities would or would not get discussed in more detail.<br><br>▪ Harland claimed it would have to notify any affected customers and voiced continued confidentiality concerns.<br><br>▪ BC Holdings suggested Salesforce or other CRM data as a device-level opportunity tracking information source multiple times. |
| April 27, 2025 Correspondence between BC Holdings and Harland; *See* Ex. C. | ▪ BC Holdings provided a list of priorities for Harland, including: "(1) sales opportunity data, meaning data on both actual sales as well as sales opportunities, for coatings and services that Harland provides, from 2021 through the present—at a device level; (2) testing data—information on any opportunities, if different from above, where Harland was invited to test coatings on new or existing devices;" |

12

| | |
|---|---|
| | - BC Holdings noted that the information received was most likely to be aggregated in an expert report.<br>- BC Holdings confirmed that it had received and reviewed Harland's FTC production, but that this did not cover the sales opportunities adequately.<br>- Harland noted that it would be willing to discuss anonymization and aggregation in further meet and confers and that they would serve Responses and Objections. |
| April 15-22, 2025 Correspondence Between BC Holdings and Harland; *See* Ex. B. | - BC Holdings requested a specific articulation of responsive data and documents Harland keeps in order to discuss how to minimize the areas of concern while still receiving the critical information.<br>- BC Holdings explained that the Protective Order provides for outside counsel only treatment of documents and data Harland designates as confidential and assured Harland any such materials would receive the highest level of protection possible.<br>- BC Holdings explained it cannot commit to requesting the Court close the courtroom unless the information being shared is truly confidential, which BC Holdings could not know at that time.<br>- Harland agreed to discuss the confidentiality issue further. |
| April 16, 2025 Meet and Confer | - BC Holdings further discussed Harland's confidentiality objections and explained that they expected economic reports to use Harland's data at a high level for diversion ratios and to understand substitution, but that it could not promise which opportunities would or would not get discussed in more detail.<br>- Harland claimed it would have to notify any affected customers and voiced continued confidentiality concerns.<br>- BC Holdings suggested Salesforce or other CRM data as a device-level opportunity tracking information source multiple times. |
| April 27, 2025 Correspondence between BC Holdings and Harland; *See* Ex. C. | - BC Holdings provided a list of priorities for Harland, including: "(1) sales opportunity data, meaning data on both actual sales as well as sales opportunities, for coatings and services that Harland provides, from 2021 through the present—at a device level; (2) testing data—information on any opportunities, if different from above, where Harland was invited to test coatings on new or existing devices;" |

13

| | |
|---|---|
| May 14, 2025 Meet and Confer | ▪ BC Holdings further explained that market shares in this case are based on opportunities won long ago, so Harland's information about opportunities won more recently is critical to understanding the current competitive state.<br><br>▪ BC Holdings explained that they do not need technical drawings or trade secret information, but just enough information to match opportunities information with what is received from other sources.<br><br>▪ Harland claimed it was not sure what systematic information it could possibly provide and that it did not think such information was available. Harland stated it had said the same to the FTC, which accepted it.<br><br>▪ ███████████████████████████████████<br><br>▪ BC Holdings emphasized that it needs to understand exactly how Harland keeps its coating services information.<br><br>▪ Harland asserted it did not know what sales opportunity data was or what Harland had sold to particular companies. |
| May 14-15, 2025 Correspondence between BC Holdings and Harland; *See* Ex. G. | ▪ BC Holdings wrote to confirm Harland would be checking with its client to confirm, inter alia, the existence and form of "customer pipeline and opportunity information" for "coating products, coating services, and development services in whatever form it may be kept, whether a formal database or an informal spreadsheet that is passed around internally." BC Holdings confirmed its willingness to "tailor this request depending upon what form Harland keeps this information."<br><br>▪ Harland confirmed it understood the requests and was searching for the described documents and speaking to the client about the other topics.<br><br>▪ Harland reiterated its request for a further supplemented Protective Order and its view that information it had already provided was adequate and "HIGHLY CONFIDENTIAL." |
| May 19, 2025 Meet and Confer | ▪ Harland said it thought it could provide 2023 revenue information by customer by device.<br><br>▪ Harland stated it does not have device-level invoice data. |

14

|  | |
|---|---|
|  | <ul><li>Harland said its pipeline and opportunities information is sporadically kept and not completely reliable—and asserted that this called into question its relevance.</li><li>BC Holdings stated it would gladly take that pipeline and opportunities data in the form it existed.</li><li>Harland stated that it just does not have good data on sales opportunities, that it is sloppy and disorganized, and that BC Holdings can rest assured they do not have a good system.</li></ul> |
| May 22, 2025 Meet and Confer | <ul><li>Harland stated that it would provide some revenue information.</li><li>Harland said it was not worried about economists accessing the data, but was worried about a potential industry expert doing so. BC Holdings responded that it had no current plans to provide the Harland information to any such person.</li></ul> |
| June 18, 2025 Meet and Confer | <ul><li>BC Holdings expressed a concern that deposition discussion would reveal unproduced responsive documents and that this would require an additional deposition which Harland acknowledged wanting to avoid.</li></ul> |
| July 7, 2025 Meet and Confer | <ul><li>BC Holdings requested the Salesforce data that the deponent testified about Harland creating and maintaining.</li><li>Harland stated they would have to go back and look.</li></ul> |
| July 8, 2025 Email from Harland to BC Holdings; *See* Ex. E. | <ul><li>Harland refused to produce the information and stated its objections to doing so.</li></ul> |

15

## CERTIFICATE OF SERVICE

I hereby certify that, on July 10, 2025, I caused a copy of the foregoing document to be served on counsel listed below and on counsel of record via email or through the court's cm/ecf system:

Nicci J. Warr (nicci.warr@stinson.com)
Jeetander T. Dulani (jeetander.dulani@stinson.com)
Alexander P. Stanley (alexander.stanley@stinson.com)

Dated: July 10, 2025

Daniel P. Culley

*Counsel for GTCR BC Holdings, LLC*