UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FEDERAL TRADE COMMISSION,
STATE OF ILLINOIS, and
STATE OF MINNESOTA,

*Plaintiffs*,

v.

GTCR, LLC,
GTCR BC HOLDINGS, LLC, and
SURMODICS, INC.,

*Defendants*.

Case No. 1:25-cv-02391

Honorable Jeffrey I. Cummings
Magistrate Judge Gabriel Fuentes

### NON-PARTY HARLAND MEDICAL SYSTEMS, INC.'S OPPOSITION TO DEFENDANT GTCR BC HOLDINGS, LLC'S MOTION TO COMPEL

The Court should deny Defendant GTCR BC Holdings, LLC's ("GTCR") Motion to Compel against non-party Harland Medical Systems, Inc. ("Harland"). Harland has already incurred great time and expense to provide the parties a large amount of documents and information related to Harland's competitive presence in the relevant market. GTCR has provided no compelling reason that Harland, as a non-party, should have to undertake the immense burden to produce the voluminous but minimally probative (at best) information that GTCR seeks in light of the large amount of more probative information that Harland has already produced. Contrary to GTCR's assertions, GTCR has been aware for several months that Harland maintains (though not in a systematic and well-organized manner) "opportunity information," but that Harland refused to produce that information (or any other details about Harland's work with customers on in-development medical devices). Now, after Harland agreed to produce other competitively sensitive

1

information about its own operations and to sit for a full-day deposition as a compromise to fulfill GTCR's wildly overbroad subpoena to Harland, GTCR is backing out of that compromise and asking this Court to order Harland to expend more than 1,000 man hours to provide information of questionable value. GTCR's motion is a last-minute attempt to force a competitor to waste an immense amount of time and resources to produce information unnecessary to GTCR's defense of the case, but the production of which will reveal Harland's customers' most closely held product-development information and harm Harland's relationship with its customers.

The Court should not countenance GTCR's massive overreach and should deny GTCR's motion to compel.

## **BACKGROUND**

Harland is a hydrophilic medical device coatings company. Harland was founded over 22 years ago and has worked tirelessly to become the company that it is today—a trusted supplier of hydrophilic coatings and services to medical device manufacturers. Harland has several business lines including (1) selling hydrophilic coatings by the liter to medical device manufacturers (or their contract manufacturing partners); (2) selling coating services (applying hydrophilic coatings to medical devices on customers' behalf); and (3) working with customers to develop the most effective coating for their in-development medical devices (including testing and support in advance of obtaining FDA approval). Declaration of Philip Ankeny at ¶¶ 9–10. Harland also sells coatings equipment that customers use to apply and test hydrophilic coatings that they apply themselves to their medical devices. *Id*. at 10.

Harland was contacted by the Federal Trade Commission ("FTC") in late 2024 during the agency's investigation of the proposed transaction. The FTC sought, and Harland provided, extensive information about Harland's business, including detailed information about Harland's place as a competitor in the hydrophilic coatings market and Harland's plans for future growth. *Id*.

2

at ¶¶ 31–32. As a part of responding to a Civil Investigative Demand ("CID") from the FTC, Harland produced comprehensive information about   As a part of responding to the FTC's CID, Harland further provided written responses to questions and Harland's Chief Financial Officer, Phil Ankeny, answered questions by the FTC under oath. *Id*. GTCR's counsel is in possession of all the materials Harland produced to the FTC pursuant to the CID, as well as Harland's written responses to the FTC's CID and the transcript of Mr. Ankeny's under-oath testimony.

On April 1, 2025, GTCR served a subpoena on Harland indiscriminately seeking 116 categories of documents and information (including subparts) that contain Harland's (and its customers') confidential and proprietary information. Despite the facial overbreadth of the subpoena and Harland's concerns about revealing competitively sensitive information to two of its largest competitors, Harland engaged in good faith negotiations with GTCR to attempt to narrow the requests and to provide GTCR the most relevant information while minimizing Harland's burden as a non-party.

Harland's counsel had at least eight meet and confer sessions with counsel for GTCR from the time Harland was served with the subpoena through the filing of GTCR's motion. Harland's

3

counsel also had numerous email interactions with GTCR's counsel. Early in the process, Harland made it known to GTCR's counsel that Harland kept opportunity information, though Harland's counsel accurately explained that the information is often incomplete, vague, and potentially inaccurate in many respects. Harland's counsel also explained that Harland would not produce *any* details about ongoing development work with customers (i.e., work on medical devices that have yet to gain FDA approval and enter the market) regardless of where that information was housed because of the tremendous confidentiality issues related to customers' device-specific information for products still in development. Harland remained steady in this position throughout negotiations with GTCR's counsel.

Rather than produce customer's development information, Harland agreed to provide its own highly sensitive information that would allow GTCR's counsel to better evaluate Harland's competitive position. Ankeny Decl. ¶ 33–34. Harland also agreed to sit for a corporate deposition by GTCR's counsel on relevant topics. Harland understood that its agreement to provide this information (which does not include customer's most sensitive information) and to sit for deposition would satisfy GTCR's requests. *Id.* at 33.

On top of the detailed information already provided to the FTC during its investigation, Harland ultimately produced to GTCR ███████████████████████████████████████████████████████████████████████████████. In addition to gathering information directly from known sources at Harland, Harland's counsel conducted searches within over 150,000 emails from pertinent Harland employees to help identify relevant information that Harland could not easily locate in files or shared sources. These documents provided GTCR in-depth information about Harland's current operations ████████████████████████████████████████████████████████████████████████████████████████.

4

*Id.* at 33–35. Mr. Ankeny also sat for a full-day deposition as Harland's corporate representative on June 25, 2025, answering detailed questions about Harland's operations, its presence as a competitor in the hydrophilic coatings market, and its future plans.

Harland has spent innumerable man hours to provide information to the FTC and GTCR related to this case (including a huge number of man hours of Harland's senior executives), taking away from Harland's operation of its business. Harland has expended at least ███████ in attorneys' fees dealing with requests from the FTC and GTCR—a substantial sum for a company of Harland's size. Harland has provided more than enough information to comply with its obligations as a non-party to this litigation and should not be further burdened by GTCR's unnecessary and indiscriminate request.

## LEGAL STANDARD

Federal Rule of Civil Procedure 45 protects non-parties by giving courts discretion to quash subpoenas that seek disclosure of "confidential research, development, or commercial information," and mandating that courts quash unduly burdensome subpoenas. Fed. R. Civ. P. 45(d)(3)(B)(i), (d)(3)(A)(iv). Non-parties are entitled to greater protection than parties in the discovery context. *Allstate Ins. Co. v. Electrolux Home Prods., Inc.*, No. 16-cv-4161, 2017 WL 5478297, at *2 (N.D.Ill. Nov. 15, 2017). That is because third parties, unlike litigants, have not willingly entered into the discovery process. *See In re Subpoena to Creeden & Assocs., Inc.*, No. 12 C 5573, 2012 WL 4580841, at *1 (N.D.Ill. Sept. 28, 2012).

The Seventh Circuit applies a balancing test to determine whether the subpoena is unduly burdensome, including (1) the entity's status as a non-party; (2) the relevance of the discovery sought; (3) the subpoenaing party's need for the documents; (4) the breadth of the request; and (5) the burden imposed on the subpoenaed party. *Am. Soc. of Media Photographers, Inc. v. Google, Inc.*, No. 13 C 408, 2013 WL 1883204, at *2 (N.D.Ill. May 6, 2013). "[T]he court should be

5

particularly sensitive when weighing the probative value of the information sought against the burden of production on the non-party." *Martin v. United States*, No. 13-cv-3130, 2015 WL 7783516, at *2 (C.D.Ill. Dec. 3, 2015). The "possibility of mere relevance" is not enough to compel a non-party to produce information. *Am. Soc. of Media Photographers*, 2013 WL 1883204, at *2 (citing *Patterson v. Burge*, No. 03-dv-4433, 2005 WL 43240, at *1 (N.D.Ill. Jan. 6, 2005)).

What is more, courts must be especially vigilant in guarding against overbroad requests for confidential material where, as here, discovery involves direct competitors. *See Concord Boat Corp. v. Brunswick Corp.*, No. 96-cv-6026, 1996 WL 705260, at *3 (N.D.Ill. Dec. 4, 1996) (disclosure of financial information from competitors "raises antitrust issues of a different sort"). "[I]n a circumstance involving direct competitors, caution must be used . . . to limit the potential that discovery directed to non-parties is used for the improper purpose of obtaining proprietary information of the competitor." *Suture Express, Inc. v. Cardinal Health 200, LLC*, No. 14–cv–04737, 2014 WL 6478077, at *6 (N.D.Ill. Nov. 18, 2014) (citation omitted).

## ARGUMENT

I.  **The Information That GTCR Seeks Is Largely Irrelevant and Less Probative Than the Information Already in Its Possession.**

A party seeking confidential information from a non-party has the burden of establishing that the information is "sufficiently relevant and necessary . . . to outweigh the harm disclosure would cause to the person from whom he is seeking the information." *Stanley Works v. Newell Co.*, No. 92-cv-20157, 1992 WL 229652, at *2 (N.D.Ill. Aug. 27, 1992) (citation omitted). GTCR has failed to meet its burden to establish that the requested material is sufficiently relevant and necessary.

A.   **The requested information is not relevant or necessary.**

GTCR seeks to compel Harland to produce the entirety of "its Salesforce sales opportunity data in its full and unadulterated form from January 1, 2021, through the present" for the ostensible purpose of demonstrating "the success of Harland's coating business and its availability as an alternative supplier of lubricious coatings." Dkt. 169 at 2. According to GTCR, "basic data depicting Harland's competitive presence and impact in this market are critical." *Id.* at 5. But Harland has already provided plenty of such data, including information that shows Harland's status as a supplier of hydrophilic coatings for medical devices and the relative success of Harland's business. The additional information that GTCR now seeks to force Harland to produce—at great expense to Harland—will add nothing in terms of probative value.

As relevant here, Harland already produced . Harland has also provided information about Harland's view of its own place in the hydrophilic coatings market, its competitors in that market, and Harland's future plans in the market, . GTCR has done nothing to explain why the voluminous information that Harland has already provided is insufficient to explain Harland's "competitive presence and impact in this market."

Indeed, the information that GTCR seeks at the very last minute is largely irrelevant and certainly less probative than the information already in GTCR's possession. As with its initial wildly overbroad subpoena to Harland, GTCR has not attempted to appropriately tailor its request to minimize the burden on Harland; instead, GTCR seeks the ***entirety*** of Harland's Salesforce

7

database for almost half a decade. The database contains entries about products (equipment for hydrophilic coatings application and testing) that are simply not at issue in this case. But even the information in Salesforce that relates to coatings products, services, and development work—which are at issue—is largely spotty, vague, and uncertain.

Although Harland attempts to collect information about opportunities, that information is not sound and robust, like Harland's financial information is. 

By far the vast majority of the information in Harland's Salesforce database is early-stage contacts with customers or potential customers where there is very little information logged, if it is logged at all. *Id.* at ¶ 20. That information does not provide any non-speculative insight into Harland's competitive status. . *Id.* at ¶ 16–21.

Due to the long timelines for development of new medical devices, Harland's development-stage work with device manufacturers is often several years. *Id.* Consequently, the Salesforce information that GTCR seeks from 2021–2023 is not necessary because it relates to either (1) opportunities that Harland is no longer pursuing or working on or (2) projects for which the client's medical device has already moved out of development (*i.e.*, it received FDA approval)

8

and, therefore, the ongoing revenue appears in Harland's financial information already in GTCR's possession. *Id*. at ¶ 26. Because of the way FDA approval affects future revenue from projects, Harland's past and current revenue—along with its other financials provided to the parties—is the best source of information about Harland's current (and to a large extent, its future) place in the hydrophilic coatings market. GTCR does not need the Salesforce data when it already has more fulsome and accurate information related to Harland's current status as a competitor.

Even as to Harland's potential for growth, GTCR is already in possession of the best evidence Harland has. For more recent Salesforce data (from 2024 to the present), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at ¶ 16–27. The Salesforce information about development-stage work is not a reliable means to project on what FDA-approved devices Harland's coatings may appear in the future, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, due to any number of issues into which Harland has little to no insight, such as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* Indeed, Harland does not keep, because it does not have, information sufficient for anyone to accurately determine the likelihood the project will continue past the development stage or that Harland will be awarded any specific development project. *Id*. at ¶ 22.[1]

---

[1] Unlike Harland, the device manufacturer customers of Harland (and Biocoat and Surmodics) almost certainly have more fulsome and accurate records of which hydrophilic coatings company is competing on any given development project, as well as information that may be able to help someone more accurately predict whether the specific device being developed is likely to proceed to FDA approval and the most likely hydrophilic coating provider that will be chosen. Ankeny Decl. ¶ 23. By seeking Harland's opportunities data to demonstrate Harland's competitive position—instead of insisting that the device manufacturers provide their own information—GTCR is essentially asking a blind man to describe an elephant rather than simply asking the elephant.

9

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

GTCR has not provided any compelling reason why it needs even less probative information about Harland's future business prospects when it already has the best evidence available on the issue.[2] *See Suture Express, Inc.*, 2014 WL 6478077, at *5 (information regarding specific customers and pricing was unnecessary where the non-party agreed to provide aggregate sales information to calculate market share). This is a classic case of "discovery overkill" where counsel seeks irrelevant and non-probative information under "the view that if a belt is good, adding suspenders is even better." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 365 F. Supp. 3d 916, 923 (N.D.Ill. March 15, 2019).

---

Harland understands that GTCR sent wide-ranging subpoenas to at least tens of medical device manufacturers and that many OEMs sat for corporate depositions. To the extent GTCR received the information it seeks from Haland from the OEMs in response to its subpoenas, that information undermines GTCR's claimed need for Harland's less fulsome, more speculative information. *See Concord Boat Corp.*, 1996 WL 705260, at *3 (denying motion to compel production from a competitor where requested information was available through other means). To the extent the OEMs refused to provide such information to GTCR, it validates Harland's immense concern about providing GTCR highly confidential device-specific information that belongs to Harland's customers.

[2] GTCR baldly asserts that the FTC "routinely requests" opportunity information. Dkt. 169 at 1. The FTC may request opportunity information in any given matter for any number of reasons (and it may or may not receive it). Notably, the FTC does not seem to think that ***Harland's*** opportunity information is important to this case as it has not expressed any issue with Harland not producing it. In any event, a blanket assertion that the FTC "routinely requests" some type of information is insufficient to meet GTCR's burden. The Court must assess whether the specific information requested meets the standards for burdening a non-party like Harland, including looking at the type and scope of the information requested, whether it is relevant or probative (particularly in light of the other information already provided by Harland), and the burden on Harland of production. These factors show that GTCR is not entitled to the information.

### B. GTCR's assertion that the information is critical is belied by its own delay.

GTCR asserts—with no supporting explanation as to how—that Harland's largely incomplete, unorganized, and speculative opportunity data is key to this case. Yet GTCR did not file its motion to compel until late in the evening on the last day of discovery. In an attempt to overcome this basic fact, GTCR patches together an excuse for its delay, alleging that it was unaware Harland maintained a Salesforce database until the deposition of Harland's Chief Financial Officer. Dkt. 169 at 3. That is simply not true. Harland, from early in the negotiation process with GTCR, made clear that it collects opportunity data. Harland never denied that such data existed. Harland simply made clear that it would not produce any details about development work for its customers (*i.e.*, work on devices not yet approved by the FDA)—whether that information is stored with Harland's opportunity data or anywhere else—due to the highly speculative nature of the information and customer confidentiality concerns. Ankeny Decl. ¶ 34. Rather than immediately moving to compel the information, GTCR continued to negotiate with Harland, and Harland agreed to provide other highly sensitive information about its own operations and future product development, as well as deposition testimony about Harland's business, in exchange for not providing details about non-contracted development work with customers.[3]

Contrary to GTCR's assertions, the deposition of Harland's CFO did not reveal any more substantive information about Harland's opportunity information than Harland had already provided through its counsel.[4] In fact, the deposition confirmed what Harland's counsel had

---

[3] GTCR asserts that the fact that Harland provided other competitively sensitive information means that it must provide its opportunity information. That is nonsense. Agreeing to a compromise to avoid producing more sensitive and burdensome information does not require a party to then turn around and produce the information the party objected to producing. What is more, Harland agreed to provide its *own* highly confidential information in order to protect is *customers'* most closely held confidential information.

[4] The name of the software used to house the information at issue is not relevant. Regardless of whether Harland told GTCR that the information was housed in a Salesforce database, GTCR knew the information

11

repeatedly told GTCR in its many meet and confers—*i.e.*, that the opportunity data is not a systematic and well-organized source of information. Dkt. 169, Ex. D, 100:1–102:2. Even after the deposition of Harland's corporate representative, GTCR waited 12 days to walk back the previous compromise and request Harland's opportunity information.

GTCR's delay in seeking information that it knew for months existed makes its motion to compel untimely. *See In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 331, 333 (N.D.Ill. 2005) (motion to compel filed on the day of the close of discovery untimely); *see also Ridge Chrysler Jeep, LLC v. Daimler Chrysler Servs. N. Am., LLC*, No. 03-cv-760, 2004 WL 3021842, at *4 (N.D.Ill. Dec. 30, 2004); *Feit Elec. Co., Inc. v. CFL Techs. LLC*, No. 13-cv-9339, 2023 WL 3436346, at *5 (N.D.Ill. May 12, 2023). "Discovery deadlines do not grant the parties carte blanche rights to demand sizeable discovery requests up to the last possible minute." *Feit Elec. Co.,* 2023 WL 3436346, at *8 (citation omitted). GTCR's attempt to seek judicial intervention at the eleventh hour to circumvent its previously negotiated discovery parameters should be rejected as untimely. Even if GTCR's motion is considered timely, GTCR's delay in bringing its motion undermines its newfound claim of necessity.

## II. GTCR's Subpoena Imposes an Undue Burden On Harland.

While the value of Harland's Salesforce data to the issues in this case is negligible at best, the burden on Harland to produce the information is huge. Within the vast amounts of disjointed and speculative information Harland collects in Salesforce is certain device-specific information about development projects with device manufacturers. This information, though of no additional probative value to the case, is of the utmost sensitivity for medical device manufacturers. Device manufacturers spend ██████████████████████████ to develop a new medical device, and

---

existed, knew the faults with the information, and knew that Harland was refusing to provide the information to GTCR for a number of reasons.

they keep any information about devices in development tightly under wraps to prevent their competition from having an unfair peek at their expensive investment. Ankeny Decl. ¶ 16. Harland is under strict confidentiality obligations to protect the OEM's sensitive development information. *Id.* ¶ 29.  *Id.* at ¶¶ 29, 36. Harland estimates that it would take over 1,000 man hours to review the Salesforce data, ascertain Harland's notice obligations, confer with customers, and produce the requested material. *Id.* at ¶ 36. This immense burden is plainly not proportional to the needs of the case, particularly given Harland's status as a non-party and the vast amounts of more probative information Harland has already produced.

In addition to the tremendous time and resource burden, producing the requested information will almost certainly harm Harland's reputation and relationships with customers. *Id.* at ¶ 37. Burden means "more than mere administrative hardship" and "encompasses the interests that enforced production would compromise or injure." *Patterson*, 2005 WL 43240, at *1. Medical device manufacturers trust Harland to protect their most sensitive proprietary information, and Harland's perceived failure to do so (even pursuant to a court order), will likely cause medical device manufacturers to hesitate before engaging Harland in the future. *See Nw. Mem'l Hosp. v.*

13

*Aschroft*, 362 F.3d 923, 929–30 (7th Cir. 2004) (forced production of medical records would create a "potential cost in lost goodwill to the hospital" by causing the hospital to "lose the confidence of its patients" who "may be inclined to turn elsewhere for medical treatment"). In such a small, highly competitive industry, the distrust and hesitation created by a forced production of customer information could be disastrous for Harland.

In its motion, GTCR misstates the basis for Harland's objections to the production of information subject to confidentiality agreements. Harland objects to the production of information that is subject to confidentiality agreements, not only because such agreements exist (and the protected information is Harland's customers, not Harland's), but because of the extra burden associated with compliance. The existence of confidentiality agreements informs the court's burden analysis. *See Suture Express*, 2014 WL 6478077, at *7 (recognizing burden associated with need to obtain consent pursuant to confidentiality agreements). The Protective Order's existence (which does not fully address Harland's general confidentiality concerns) does not negate the burden of having to comply with Harland's contractual duties.

### III. The Protective Order Does Not Sufficiently Protect Harland's (Or Its Customers') Interests.

Harland recognizes that there is a Protective Order in place. The Protective Order does not, however, give GTCR a free hand to demand any or all of Harland's information. "[I]t is established that even when a protective order has been entered, a party requesting disclosure of confidential material must make a strong showing of need, especially when confidential information from a nonparty is sought." *Concord Boat Corp.*, 1996 WL 705260, at *3 (internal citations omitted).

In any event, Harland has made clear to GTCR that the Protective Order does not adequately protect Harland's or its customers' interest in protecting extremely competitively sensitive information from disclosure to competitors or the public. In a highly specialized market

with few major competitors, Harland takes great measures to safeguard its sales opportunity information. Ankeny Decl. ¶ 28. ███████████████████████████████

███████████████████████ *Id.*

Courts have recognized that disclosure of confidential information can occur even where a protective order is in place. *Greater Rockford Energy and Tech. Corp. v. Shell Oil Co.*, 138 F.R.D. 530, 538 (C.D.Ill. 1991) ("There is a constant danger inherent in disclosure of confidential information pursuant to a protective order.") (citation omitted). Indeed, there have been inadvertent disclosures of non-party's competitively sensitive information by the Defendants in a number of recent merger hearings.[5] In addition, the nature of this industry and the sensitivity of the information requested heightens the risks of disclosure over the run-of-the-mill case.

Harland's confidentiality concerns—which are not addressed by the current parameters of the proactive order—drove Harland to seek additional protections from GTCR. Ankeny Decl. ¶ 38–39. Harland stopped pursuing these additional protections based on its understanding that its productions and testimony, which would not include Harland's opportunity information, satisfied GTCR's requests. If this Court orders the production of any sales opportunity information, Harland respectfully requests the opportunity to provide additional briefing on modifications to the Protective Order to protect Harland and its customer's most competitively sensitive information.

## CONCLUSION

For the foregoing reasons, Harland respectfully requests that the Court deny GTCR's motion to compel.

---

[5] *See, e.g.*, Google, Apple, and Snap Aren't Happy About Beta's Poorly-redacted Slides, the Verge (April 16, 2025) (available at https://www.theverge.com/news/649834/meta-redactions-apple-google-snap-angry-ftc-antitrust-trial); Sony's Confidential PlayStation Secrets Just Spilled Because of a Sharpie, the Verge (June 28, 2023) (available at https://www.theverge.com/2023/6/28/23777298/sony-ftc-microsoft-confidential-documents-marker-pen-scanner-oops).

15

Dated: July 22, 2025    Respectfully submitted,

/s/ *J. Nicci Warr*

J. Nicci Warr (*pro hac vice pending*)
STINSON LLP
7700 Forsyth Blvd., Suite 1100
St. Louis, MO 63105
Telephone: (314) 259-4570
nicci.warr@stinson.com

Raymond A. Jacobsen, Jr. (*pro hac vice forthcoming*)
MCDERMOTT WILL & EMERY LLP
The McDermott Building, 500 North Capital Street, NW
Washington, DC 20001
Telephone: (202) 756-8028
rayjacobsen@mwe.com

Alexandra P. Stanley (*pro hac vice forthcoming*)
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
alexandra.stanley@stinson.com

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 22, 2025, I caused a copy of the foregoing document to be filed using the Court's CM/ECF system and a copy of the under-seal documents to be served on counsel of record via email:

Daniel Culley (dculley@cgsh.com)
Matthew Yelovich (myelovich@cgsh.com)
Miranda Herzog (mherzog@cgsh.com)

Elizabeth Klinger (eklinger@ftc.gov)

          __*J. Nicci Warr*_____
          J. Nicci Warr

          *Counsel for non-party Harland Medical Systems, Inc.*