**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, STATE OF ILLINOIS, and STATE OF MINNESOTA, <br><br>*Plaintiffs*, <br><br>v. <br><br>GTCR, LLC, GTCR BC HOLDINGS, LLC, and SURMODICS, INC., <br><br>*Defendants*. | Case No. 1:25-cv-02391 <br><br>Honorable Jeffrey I. Cummings <br>Magistrate Judge Gabriel Fuentes <br><br>**DECLARATION OF PHILIP ANKENY IN SUPPORT OF NON-PARTY HARLAND MEDICAL SYSTEMS, INC.'S OPPOSITION TO PLAINTIFF GTCR BC HOLDINGS, LLC'S MOTION TO COMPEL** |

Pursuant to 28 U.S.C. § 1746, I, Philip Ankeny, hereby declare as follows:

**Personal Background**

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The facts set out in the foregoing Declaration are based on my personal knowledge.

2. I am the Chief Financial Officer ("CFO") of Harland Medical Systems, Inc. ("Harland"), and I submit this Declaration in support of Harland's opposition to Plaintiff GTCR BC Holdings, LLC's ("GTCR") Motion to Compel.

3. I have over 15 years of experience in senior leadership and executive teams of medical device coating companies, including as Senior Vice President, CFO, and interim Chief Executive Officer of companies in this industry. In my career, I have acquired significant knowledge of the medical device coating business, including from 2003 to 2011, when I served as the Senior VP & CFO of Surmodics, Inc ("Surmodics").

1

4. In my capacity as CFO of Harland, a position I have held for over six years, I oversee the financial operations of the company and counsel on key strategic decisions of Harland, and I oversee contracting and other matters with customers and suppliers. I am personally knowledgeable about Harland's operations, policies, practices, activities, and strategy.

**Harland Background**

5. Harland is a medical device hydrophilic coatings company. Our customer base is medical device companies (otherwise referred to as original equipment manufacturers—"OEMs"), and we provide coating products, coating services, and coating development for those OEMs and the contract manufacturers ("CMOs") that produce the OEM's devices.

6. Harland is a relatively small company, headquartered in Eden Prairie, Minnesota. Its 2024 revenues were roughly ███████ and it has about ███████. In addition to its headquarters in Minnesota, Harland has offices in Ireland, Israel, and Costa Rica. Currently, over ███████ of Harland's business is conducted from its Minnesota headquarters.

7. Harland's products and services are essential for patients that rely on the cutting-edge, life-saving medical devices that our customers develop. Hydrophilic coatings make the surface of a device more slippery, enabling the physician to thread the device through the blood vessels and place the device exactly where it is needed in the body (e.g., heart, brain, etc.). Without the coatings, the devices cannot perform as effectively as the OEMs, physicians, and patients desire, and sometimes not at all. Without these critical devices that are used in the treatments of patients suffering from cardiac, vascular, urinary, and brain problems, these patients would face adverse health consequences.

8. Medical device coating is a highly specialized, niche industry. Harland and the merging parties, Surmodics and Biocoat (already owned by GTCR), are the three main companies that compete for most of the OEMs' hydrophilic coating needs in the United States. Based on its publicly available revenue for hydrophilic coatings, Surmodics is the biggest hydrophilic coating provider in the industry ████████████████████████████. Although Biocoat is private, based on comments from OEMs I believe that ████████████████████████████████████. While there are other hydrophilic coating companies, to my knowledge Harland rarely competes against them. To the extent OEMs use other companies, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

9. Although Harland is a small company, it has become a premier medical device hydrophilic coating company and successfully bids for contracts from the largest medical device manufacturers in the world. However, this success is not a given and relies both on the quality of Harland's products and technical capabilities, as well as the trusting partnerships between Harland and the medical device manufacturers. Harland and its employees have worked tirelessly for more than two decades to continue to innovate and produce results for Harland's customers, all to the benefit of patients that receive health care dependent on these life-saving technologies.

10. Harland has three main business lines: (1) coating solutions sales, where Harland manufactures and sells by the liter coatings that OEMs apply themselves in-house or via contract manufacturers, (2) coating services, where OEMs send their devices to Harland, who then applies the coating to the devices and returns them to the OEM, and (3) development services, where Harland collaborates with OEMs to identify which coating is best suited to a given device in development and to refine and iterate on the coating and device, culminating with filing for

CORE/2061722.0034/230024463.6

regulatory approval from the United States Food and Drug Administration ("FDA"). Harland also sells coatings equipment that allows OEMs (or their contract partners) to apply hydrophilic coatings to their devices and to test the applied coatings.

**Medical Devices and Hydrophilic Coatings**

11. For more than 30 years, the medical device industry has evolved rapidly, particularly with regard to the catheter technologies in which we are heavily involved. In the 1980s, balloon angioplasty enabled doctors to unblock obstructed arteries and veins. Then these balloons were coupled with stents that could provide a longer lasting solution. Next came drug-eluting stents that could release medication into the affected blood vessel to prevent/minimize deleterious inflammatory responses.

12. In the rapidly changing catheter market, the medical device companies are constantly looking for new ways to use catheters, guidewires, stents, and other emerging technologies to avoid more invasive and risky surgeries. For example, in recent years OEMs have developed devices to repair or replace a patient's heart valve using catheter-based technologies rather than cracking the patient's chest to perform open heart surgery. Coatings are an enabling technology in these minimally invasive heart valve devices.

13. However, catheters and other medical devices are only one side of the equation. The device manufacturers need coatings to work hand-in-glove with their new catheter, guidewire, and stent technologies in order to bring these devices to market and make an impact on patients' lives. When a new device goes to the FDA for approval, it does so with the coating as part of its application. When the device finally goes to market, the coating has gone through years of development and testing to make sure that the device-coating pair is as effective and safe as

CORE/2061722.0034/230024463.6

possible. Changing from one coating to another generally involves an additional filing to the FDA, ███████████████████████████████████████

14. The development timeline for a new medical device to go from planning to market is many years. Every device of our customers is built with a specialized purpose, and they test and iterate to perfect the device for that purpose. Harland does the same for coatings, and medical device manufacturers expect a perfect pair. There is no one-size coating that fits all. Harland has continued to develop new coatings to meet the needs of our customers and the novel materials they are incorporating into their devices.

15. Our discussions with device manufacturers typically begin in the early stages of their product development, and they trust that their engagement with Harland will not result in information about their development of new products or our work for them being accessible to their competitors. Harland signs detailed confidentiality agreements with all its medical device manufacturer customers and potential customers to safeguard their information, and these agreements are also designed to safeguard Harland's information.

16. Harland's development work with OEMs involves identifying the best coating solution from Harland's portfolio and refining the coating process as the customer iterates the design of its medical-device product. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ At this stage of development, the OEM's device has not gained approval from the FDA and is not for sale in the market. OEMs' confidentiality concerns are at their peak—they have invested substantial time and money developing the product, and any disclosure of device information at this stage could alert their

competitors and create substantial competitive harm. Furthermore, many projects within Harland's development services business do not go to completion. ███████████ ███████████████████████████████████████████████████████████. Such fallout happens for a variety of reasons, including ███████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████ Additionally, a frequent reason an opportunity might be lost is when the OEM merely decides to stay with the incumbent coatings provider.

17. For Harland, the development of coating chemistries is also highly sensitive. OEMs often work with multiple coating suppliers during the product development stage. A competitor with access to the details of the products in development and the coatings being specified for the products could use that information to better compete against Harland. Given the size of the hydrophilic coatings market, it is highly likely that Surmodics, Biocoat, and Harland are competing to provide coatings for many of the same devices in development.

**Opportunity Data Confidentiality Concerns**

18. Harland uses a standard CRM software tool, a Salesforce database, to house information about potential leads. ███████████████████████████████████████████ ████████████████████████████████████ █████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████

19. There are ██████████ entries in Harland's Salesforce database ██████████ ████████████████████████████████████████████████████████████████████

6

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████. In addition, Harland's Salesforce database includes a large number of entries related to equipment sale opportunities, which are distinct from Harland's sales of coatings chemistry, coatings services, and development work.

20.     ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████. Despite the fact that there are ████████████████████ in Harland's Salesforce database (the vast majority containing minimal information that is not organized in a systematic manner), the number of new projects (what Harland calls programs) that Harland is awarded in any given year is ████████████████████.

21.     Although I know of instances of competition between Harland and Biocoat and Surmodics, the information about any instances in the Salesforce database is frequently informal and incomplete, if it exists at all. ████████████████████████████████

██████████████████████████████████████████████████████████

████████ Even when the competitive information is put into Harland's database, Harland does not have any way to verify the veracity of the information. ████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

22.     Harland's Salesforce database does not contain (because Harland does not know) information that would allow anyone to determine with any accuracy whether Harland is likely to

7

"win" any particular development project (or whether that project will even be carried to completion by the OEM).

23. On the other hand, I believe that OEMs have full records and complete details of every competition for every device in their portfolio. They necessarily should be able to provide data at the device-specific level with substantially greater accuracy and fidelity than Harland can. Unlike Harland, the OEMs would know for any given medical device all the coatings suppliers that are being evaluated. Unlike Harland, the OEMs would also know whether Harland is likely to win any particular project (to the extent the OEMs are at the stage of making a decision). This is not information the OEMs would be inclined to provide to Harland as it would weaken their leverage and negotiating position with Harland. Unlike Harland, the OEMs would also know whether there are other circumstances ███████████████████████████████████████ that would make the project more or less likely to continue to FDA approval.

24. To the extent there is information in Harland's database about OEM development projects on which Harland has worked in the past or is currently working, as I described above, such information is extremely sensitive and OEMs wish to strongly guard its confidentiality.

25. As CFO of Harland, I do not consider the data in the Salesforce database to be the type of data that can accurately predict Harland's future revenue or market share. ███████████
███████████████████████████████████████████████████████████████████████████████
███████████████████ ████████████████████████
████████████████████
███████████████████ ████████████████████████
██████████

8

26. Projections of future revenue from currently non-contracted (i.e., in development) projects cannot be made with any degree of accuracy, in any event. To the extent that GTCR seeks opportunity data from 2021 forward, most, if not all, of the opportunities that existed from 2021 to 2023 at this point are either (1) no longer being worked on by Harland and therefore irrelevant or (2) for a few, moved from the development to the contracted-revenue phase and, therefore, encompassed in Harland's revenue figures that are in GTCR's possession.

27. ███████████████████████████████████████████
███████████████████████████████████████████
██████████████████████████ have already been provided as a part of the Federal Trade Commission's ("FTC") Civil Investigative Demand, and they are in the possession of GTCR's counsel as I was asked questions about them by GTCR's counsel at my deposition in June. ████
███████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████ █████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████

28. Due to the sensitivity of development services information, Harland restricts internal access to the type of information GTCR is requesting and only grants access to a select number of employees with a need for the information. Employees enter into confidentiality agreements that preclude dissemination of this information. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

29. Harland has confidentiality agreements with its customers that prohibit dissemination of the type of information that GTCR is seeking, and Harland cannot share this information without the countersigning party's notice and/or consent. Harland does not disclose this information to third parties and has never disclosed this type of information to competitors, such as the Defendants in this lawsuit.

30. Harland has built its reputation of trust over decades, and forcing Harland to disclose the customer development pipelines will necessarily reveal the closely held information of Harland's device manufacturing customers and their products in development. This would tarnish Harland's reputation for respecting confidentiality, irreparably harm Harland's ability to compete for medical device manufacturers' business and harm the development of new medical device products.

**Prior Productions**

31. I have been personally responsible for preparing materials and responses in connection with the FTC's initial investigation into GTCR's acquisition of Surmodics, including participating in several hours of investigative hearing testimony with the FTC and producing

10

documents and information, all in response to an FTC subpoena. I have also been involved in the additional investigation and fact finding by the FTC, GTCR, and Surmodics in the FTC's lawsuit in the United States District Court for the Northern District of Illinois and the production of documents and information to the Defendants. I sat for another deposition by GTCR and the FTC as a part of this process as well. Responding to information requests and subpoenas in this matter already has cost Harland at least ▮▮▮▮ in legal fees, which presents significant financial burden for a company of Harland's size, in addition to the dedication of substantial amounts of time from senior management.

32. In response to the FTC's investigation, Harland has already produced a significant amount of information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As I testified during my 30(b)(6) deposition, this data is Harland's estimate of top opportunities that Harland has a chance of winning. Consequently, GTCR already has Harland's best estimate of its projected future revenue based on what Harland knows about its current operations and pipeline. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Finally, the materials also included many of Harland's strategic plans and counsel for GTCR asked questions about these plans at my June deposition.

33. Harland has also produced, pursuant to the subpoenas issued by the Parties to Harland, additional materials that respond to the priorities for information that the Parties identified during conversations between Harland's outside counsel and the Parties' outside counsel and FTC counsel. These materials include, in relevant part, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ This information is highly sensitive and confidential, but Harland agreed to produce it with the understanding that such information, along with my deposition, would satisfy the Defendants' requests.

34. These productions took considerable time and effort by the staff at Harland and by me, and they disclosed a significant amount of highly confidential, competitively sensitive information and data, which Harland did not want to disclose but reluctantly did in order to reach a compromise. I did not and would not authorize the indiscriminate production of information about all future sales opportunities (whether in Salesforce or in any other form) due to the inability of any such information to accurately predict future revenue, the extreme amount of time and money it would require to ensure that Harland provided accurate notice to all current and potential customers over the large period of time for which GTCR is seeking information, as well as the fact that Harland does not have consent from its counterparties to provide their most closely held and competitively sensitive information.

35. Based on what Harland has produced to the Parties during the FTC investigation and this lawsuit, I believe, as the CFO of Harland, that GTCR's counsel is already in possession of the most pertinent information about Harland's hydrophilic coatings business, Harland's competitive presence in the industry, and Harland's future plans for its business.

**Burden of Complying with GTCR's Request**

36. In addition to confidentiality and other concerns, preparing the sales opportunity information requested by GTCR would be a costly and time-consuming effort. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. I anticipate that there are ██████ different customers/potential customers that Harland will have to reach out to if it must produce pipeline information. In total, I estimate that it would take Harland over 1,000 man hours to engage in the review and notice process that would be required before any Salesforce information could be produced and to produce the information.

37. In addition to the time and money required, producing Salesforce information will harm Harland's reputation and customer relationships, as customers may believe that Harland is not adequately protecting their information.

CORE/2061722.0034/230024463.6

38. I understand that there is a protective order that generally does not allow the parties to the litigation to share Harland's information with others without Harland's consent. Despite the protective order, Harland has substantial concerns about the protection of its and its customers' information in this case. Due to the small number of hydrophilic coatings companies, Harland is concerned that even aggregated data (which does not appear to be subject to the same protections as Harland's underlying information), could be used by Biocoat or Surmodics to hurt Harland competitively or to reverse engineer the aggregated information to isolate Harland's information.

39. Further exacerbating Harland's confidentiality concerns is that some of Harland's previous employees or advisors recently began to work at or associate with the transacting parties. I believe that their knowledge of Harland's products and services would easily allow the Parties to glean competitively sensitive information even from aggregated data, let alone the product- and customer-specific data the Parties requested. For this reason, Harland requested, through its counsel, additional protections for its information to attempt to prevent such a result. I understand that the transacting parties would not agree to those additional protections.

40. Harland is also very concerned about inadvertent disclosure of its and its customers' information, whether during the current process or at the trial. Even if any disclosure of Harland's or its customers' information was inadvertent, that disclosure could have devastating effects on the participants in this small and highly confidential industry. To attempt to prevent even inadvertent disclosure, Harland requested, through its counsel, liquidated damages for any inadvertent disclosure. I understand that the transacting parties would not agree to that additional protection.

CORE/2061722.0034/230024463.6

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of July 2025 in Eden Prairie, Minnesota.

Philip Ankeny
Chief Financial Officer
Harland Medical Systems, Inc.