# Exhibit A

# The FTC's Merger Remedies 2006-2012

## A Report of the Bureaus of Competition and Economics

_____

January 2017



**FEDERAL TRADE COMMISSION**

# THE FTC'S MERGER REMEDIES 2006-2012
## A REPORT OF THE BUREAUS OF COMPETITION AND ECONOMICS

| | |
|---|---|
| Edith Ramirez | Chairwoman |
| Maureen K. Ohlhausen | Commissioner |
| Terrell McSweeny | Commissioner |
| | |
| Deborah L. Feinstein | Director, Bureau of Competition |
| Ginger Zhe Jin | Director, Bureau of Economics |

The study was a joint project of the FTC's Bureaus of Competition and Economics. The team included: Daniel P. Ducore, Assistant Director; Naomi Licker, Angelike Mina, Jeffrey Dahnke, Kelly Signs, Elizabeth Jex, and Andrea Zach, Attorneys; Jacqueline Tapp, Compliance Specialist; Taylor Colwell, Haydn Forrest, Benjamin Hayes, Eleanor Hudson, Antoinetta Kelly, Sarah Margulies, Phillip McSpadden, Michael Pesin, and Brittney Wilson, Honors Paralegals, Bureau of Competition; and Peter Aun, Jonathan Baer, Stephanie Block-Guedez, Marianela Bosco, Maurice Hicks, Parker Kobayashi, Christian Kruger, Jordan Rosman, Martin Sicilian, Eric Yde, and Amy Zhang, college interns.

Alison Oldale, Deputy Director for Antitrust; Timothy Deyak, Associate Director; J. Elizabeth Callison, Senior Advisor to the Director; Matthew Chesnes, Economist; Stephanie Aaron, Kathryn MacAdam, and Jennifer Snyder, Research Analysts, Bureau of Economics.

Lisa Harrison, Deputy General Counsel, and Gary Greenfield, attorney, Office of the General Counsel; and Russell W. Damtoft, attorney, Office of International Affairs provided valuable assistance throughout the study.

The following attorneys and economists conducted the interviews and participated in the analysis: Stephen Antonio, Michael Barnett, Roberta Baruch, Stephanie Bovee, Peter Colwell, Jessica Drake, Michael Franchak, Paul Frangie, James Frost, Jill Frumin, Yan Gao, Benjamin Gris, Susan Huber, Sean Hughto, Meghan Iorianni, Lynda Lao, Steven Lavender, Jennifer Lee, Kenneth Libby, Joseph Lipinsky, Victoria Lippincott, Sebastian Lorigo, Jacqueline Mendel, Stephen Mohr, David Morris, Joseph Neely, Christina Perez, Noah Pinegar, Elizabeth Piotrowski, Jonathan Platt, Jonathan Ripa, Eric Rohlck, Jasmine Rosner, Catherine Sanchez, Anne Schenof, Mark Seidman, Danielle Sims, Arthur Strong, Brian Telpner, Terry Thomas, Cathlin Tully, David Von Nirschl, Kari Wallace, James Weiss, John Wiegand, Steve Wilensky, Erika Wodinsky, Sarah Wohl, and Theodore Zang, Attorneys.

Jesse Bishop, Julie Carlson, Viola Chen, Malcolm Coate, Jay Creswell, Yi Deng, Christopher Garmon, Arindam Ghosh, David Glasner, Daniel Greenfield, Peter Gulyn, Dan Hanner, Mark Hertzendorf, Jason Hulbert, Thomas Iosso, Thomas Koch, Nicholas Kreisle, Roy Levy, John McAdams, Christopher Metcalf, David Meyer, David Osinski, Paolo Ramezzana, Seth Sacher, Elizabeth Schneirov, Lawrence Schumann, Shawn Ulrick, and Mark Williams, Economists.

Inquiries should be addressed to:
| | |
|---|---|
| Daniel P. Ducore, Assistant Director, Bureau of Competition | dducore@ftc.gov |
| Timothy A. Deyak, Associate Director, Bureau of Economics | tdeyak@ftc.gov |

# Contents

Executive Summary ................................................................................................. 1

I.    Introduction ................................................................................................. 3

II.   Overview ....................................................................................................... 7

    A.   Case Studies ................................................................................................. 9
    B.   Questionnaires ............................................................................................. 9
    C.   Orders Affecting the Pharmaceutical Industry .......................................... 9

III.  The 1999 Divestiture Study ..................................................................... 10

IV.  FTC Orders Evaluated Using the Case Study Method ....................... 11

    A.   Overview ................................................................................................... 11
    B.   Description of the Orders .......................................................................... 13
    C.   Determining Whether a Remedy Succeeded ............................................ 14
        1.   The Standard for Judging Success ...................................................... 15
        2.   The Method Used to Determine Whether a Remedy Was a Success .... 16
        3.   Measuring Results .............................................................................. 17
        4.   Remedy Outcomes ............................................................................. 17
        5.   Anticompetitive Effects of Consummated Mergers Can Be Successfully Remedied under Limited Circumstances ............................................................ 18
        6.   Identifying Remedy Process Concerns .............................................. 19
        7.   Relationship between Remedy Process Concerns and Outcomes ....... 20
    D.   Specific Concerns Regarding the Remedy Process ................................... 21
        1.   Defining the Asset Package ............................................................... 21
        2.   Selecting the Buyer ............................................................................ 24
        3.   Implementing the Remedy ................................................................. 24
        4.   Communication ................................................................................. 28

V.   Orders Examined Using Reponses to Questionnaires ......................... 29

**VI. Pharmaceutical Orders Examined Using Information Already Available to the Commission** ....................................................................................................**30**

**VII. Best Practices**..............................................................................................**31**

    A.    Defining the Asset Package ...................................................................... 32
        1.    Scope of Asset Package................................................................. 32
        2.    Transfer of Back-Office Functions ............................................... 33
    B.    Reviewing the Proposed Buyer ................................................................ 33
    C.    Implementing the Remedy........................................................................ 34
        1.    Due Diligence............................................................................... 34
        2.    Customer and Other Third-Party Relationships......................... 35
        3.    Transition Services Agreements................................................... 35
        4.    Supply Agreements ...................................................................... 36
        5.    Hold Separates............................................................................. 36
    D.    Orders in the Pharmaceutical Industry ................................................... 36
    E.    Communication ........................................................................................ 37

# Executive Summary

One of the Federal Trade Commission's primary tasks is to enforce Section 7 of the Clayton Act, 15 U.S.C. § 18, which prohibits mergers when their effect may be to lessen competition.[1] Most mergers do not raise competitive concerns, but some raise sufficiently significant competitive concerns that the Commission seeks to block them outright. For most of the mergers in which the Commission finds a competitive problem, harm to competition is likely to occur in only a subset of the markets in which the merging parties operate. In those situations, appropriate remedies may protect competition while allowing the merger to proceed. Recognizing that the efficacy of its remedies is critical to its antitrust mission, the Commission conducted a broad study of all of its merger orders from 2006 through 2012. This study expanded on the divestiture study the FTC completed in 1999.[2] This staff report summarizes the findings and provides best practices reflecting the learning of the study.

The current study evaluated the success of each remedy and examined the remedy process more generally. Staff used three methods to conduct the study. First, staff examined 50 of the Commission's orders using a case study method.[3] Similar to the method used in the 1999 Divestiture Study, staff interviewed buyers of divested assets and the merged firms. Staff also interviewed other market participants and analyzed seven years of sales data gathered from significant competitors. Second, staff evaluated an additional 15 orders affecting supermarkets, drug stores, funeral homes, dialysis clinics, and other health care facilities by examining responses to questionnaires directed to Commission-approved buyers in the relevant transactions. Finally, staff evaluated 24 orders affecting the pharmaceutical industry using both internal and publicly available information and data. In all, staff reviewed 89 orders and conducted more than 200 interviews, analyzed sales data submitted by almost 200 firms, examined responses to almost 30 questionnaires, and reviewed significant additional information related to the pharmaceutical industry.

In evaluating the 50 orders in the case study component, Commission staff considered a merger remedy to be successful only if it cleared a high bar—maintaining or restoring competition in the relevant market.[4] Using that standard, all of the divestitures involving an ongoing business succeeded. Divestitures of limited packages of assets in horizontal, non-consummated mergers fared less well, but

---

[1] This report uses the term "mergers" throughout, even though the specific transactions may be acquisitions, mergers, or other forms of combination.

[2] "A Study of the Commission's Divestiture Process," Bureau of Competition (August 1999) (hereinafter "1999 Divestiture Study"), https://www.ftc.gov/sites/default/files/attachments/merger-review/divestiture.pdf.

[3] The case study method of research accumulates case histories and analyzes them with a view toward formulating general principles. This method is used often in social science research. *See, e.g.,* Robert K. Yin, Case Study Research: Design and Methods (2009).

[4] Commission staff's assessment of the success or failure of the divestiture depended on whether competition in the relevant market remained at its pre-merger level or returned to that level within a short time. However, competition in a market is affected by many factors, and it is possible that competition might have lessened in certain markets even if the merger had not happened. Section IV.C. discusses the method for evaluating outcomes, including the standard by which Commission staff defined success, and the achieved outcomes.

still achieved a success rate of approximately 70%. Remedies addressing vertical mergers also succeeded. Overall, with respect to the 50 orders examined, more than 80% of the Commission's orders maintained or restored competition.

For the remedies involving supermarkets, drug stores, funeral homes, dialysis clinics, and other health care facilities evaluated as part of the questionnaire portion of the study, the vast majority of the assets divested under those 15 orders are still operating in the relevant markets. And, with respect to the 24 orders affecting the pharmaceutical industry, the majority of buyers that acquired products on the market at the time of the divestiture continued to sell those products. Additionally, all of the divested assets relating to products that were in development and not available on the market at the time of the divestiture were successfully transferred to the approved buyers.

The study also confirmed that the Commission's practices relating to designing, drafting, and implementing its merger remedies are generally effective, but it identified certain areas in which improvements can be made. Specifically, some buyers expressed concerns with the scope of the asset package, the adequacy of the due diligence, and the transfer of back-office functions. While the concerns raised may not have interfered with buyers' ability to compete in the relevant markets over the long term, they may have resulted in additional challenges that buyers had to work around or otherwise overcome. Staff has already taken various steps to address these concerns. They include asking additional targeted questions about remedy proposals to divest limited asset packages, asking more focused questions about financing, and monitoring the due diligence process even more carefully. Staff is also more closely scrutinizing buyers' back-office needs, and, in some cases, is considering additional order language. Finally, the study surprisingly revealed that there continued to be a reluctance among buyers to raise concerns with staff and independent monitors when they arose. Staff is increasing efforts to remind buyers of the benefits of reaching out to staff or monitors when issues arise.

Staff concludes this report with best practices, based on learning from the study.

# I.  Introduction

In the late 1990s, FTC staff embarked on what, at the time, was the first effort by an antitrust enforcement agency to evaluate systematically its merger remedy program. Staff evaluated 35 horizontal merger orders that the Commission issued from 1990 through 1994, relying on a case study method. In 1999, the Bureau of Competition issued its report concluding that "most divestitures appear to have created viable competitors in the market of concern to the Commission."[5] Although there was some criticism at the time that the 1999 Divestiture Study had not gone far enough in assessing the competitive effectiveness of the remedies, the idea of evaluating past orders was generally well received. Since then, antitrust enforcement agencies in other jurisdictions have conducted similar studies with largely similar results.[6]

The Commission made several changes in its merger remedy policies and practices in large part due to the findings of the 1999 Divestiture Study. For example, the Commission began requiring upfront buyers[7] for divestitures of less than an ongoing business[8] or assets that raised particular risks of deterioration pending divestiture. The Commission also shortened the default divestiture period for post-

---

[5] 1999 Divestiture Study at 8. "The Study was not designed to conduct a complete competitive analysis of the relevant markets or draw definitive conclusions about how any of the markets are performing. Instead, it attempted to draw conclusions about whether the buyer of the divested assets was able to enter the market and maintain operations." *Id.* at 9.

[6] DG Competition of the European Commission, MERGER REMEDIES STUDY (2005), http://ec.europa.eu/competition/mergers/legislation/remedies_study.pdf; UK Competition & Markets Authority, UNDERSTANDING PAST MERGER REMEDIES: REPORT ON CASE STUDY RESEARCH (updated July 2015), https://www.gov.uk/government/uploads/system/uploads/attachment_data/file/448223/Understanding_past_merger_remedies.pdf; and Competition Bureau of Canada, COMPETITION BUREAU MERGER REMEDIES STUDY (2011), http://www.competitionbureau.gc.ca/eic/site/cb-bc.nsf/vwapj/cb-merger-remedy-study-summary-e.pdf/$FILE/cb-merger-remedy-study-summary-e.pdf.

[7] The "buyer" is the entity that the Commission approves under its order to acquire divested assets. An "upfront buyer" is a buyer named in the proposed order after that buyer has negotiated a transaction agreement with the respondent and the Commission has approved that buyer and the terms of the transaction.

[8] The 1999 Divestiture Study described assets comprising an "ongoing business" as follows:

> [T]he assets include most typically an established customer base, a fully staffed facility of some sort (a manufacturing facility or a retail operation) or an otherwise self-contained business unit that may have product contract packed, a manufacturing and/or sales force, perhaps a research and development team, and other assets that are included in the business, including ancillary agreements and third-party contracts. This type of divestiture should result in the almost immediate transfer of market share from respondent to buyer. Most of the packages of assets labeled as "on-going businesses" had not, however, actually been operated as autonomous businesses before the divestiture; nevertheless, they were characterized this way because the market share attributed to the assets could be transferred immediately and potentially for the long-term. A buyer could buy and be operational the next day, selling to all of the same customers.

1999 Divestiture Study at 11. The present study uses the same criteria to define an ongoing business.

order buyers,[9] from a year or more to six months or less, and started appointing independent third parties more often to monitor complex remedies or those in highly technical industries. In addition, the Commission staff began interviewing buyers of divested assets six months to a year after the divestitures to discuss their progress and any issues that might have arisen.

Early in 2015, the Commission decided to evaluate the impact of the changes implemented since the 1999 Divestiture Study and to conduct another merger remedy study. The Commission designed the study to be more comprehensive in scope and broader in analysis than the 1999 Divestiture Study. As required by the Paperwork Reduction Act, 44 U.S.C. § 3501 *et seq*., the Commission sought public comment and approval from the Office of Management and Budget ("OMB"). OMB approved the project in August 2015.[10]

The study relied in large part on the willingness of market participants—respondents,[11] buyers of divested assets, other competitors, and customers—to share their experiences with the Commission's remedies and their impact on competition in the relevant market. During the study, over 200 market participants shared with staff their thoughts and observations.[12] To protect the confidentiality of the information discussed during those interviews and submitted to the Commission, this report does not contain any confidential information or identify the parties from whom information was received.

This study encompassed all 89 orders issued by the Commission from 2006 through 2012 in order to remedy the anticompetitive effects of a proposed or consummated merger.[13] For purposes of analysis, staff divided these 89 orders into three groups based, in large part, on the degree of experience the Commission has with the affected industry.

- Commission staff evaluated 50 of the orders—involving the broadest range of industries—using a case study method that relied on interviews of market participants and sales data. Staff

---

[9] A "post-order buyer" is a buyer of divested assets approved by the Commission following the issuance of a divestiture order. As with upfront buyers, the Commission will set a deadline by which the divested assets must be transferred.

[10] Office of Management and Budget Control No. 3084-0166.

[11] This report uses the term "respondent" to refer to the parties to a merger order. Although the FTC also has the authority to obtain merger remedies in federal court, where a party to the merger would be referred to as the "defendant," *see, e.g., St. Alphonsus Med. Ctr.-Nampa, Inc., et al. v. St. Luke's Health Sys., et al.*, 778 F.3d 775 (9th Cir. 2015), all of the merger orders included in the study were issued by the Commission.

[12] Participation in the interviews was voluntary, and the rate of participation was high. Staff interviewed 193 market participants, including 42 respondents, 46 buyers, 49 additional competitors, and 56 customers. Staff also interviewed 14 monitors. Overall, about two-thirds of the proposed interviewees agreed to an interview: 80% of the merged firms, nearly 90% of the buyers, 80% of other competitors, and 45% of customers. In addition, well over half of the buyers that received questionnaires responded to them. The study relied, in large part, on the information obtained in these interviews and from the responses to the questionnaires. The staff appreciates the willingness of all parties who agreed to participate in the interviews and who responded to the questionnaires.

[13] Ninety-two merger orders were first identified, and that number was used in the Federal Register Notice, dated January 16, 2015, requesting comments on the proposed study. Upon further examination, however, staff determined that three of those 92 orders related to mergers that were abandoned for business or other reasons and were thus dropped from the study.

interviewed not only buyers and respondents, as had been done in the 1999 Divestiture Study, but also selected competitors and customers. For these orders, the Commission also went beyond the 1999 Divestiture Study by requesting seven years of sales data from significant market competitors and by compiling market shares based on that data.

- Staff evaluated another 15 orders involving industries with which the Commission is well familiar—supermarkets, drug stores, funeral homes, dialysis clinics, and other health care facilities—using responses to voluntary questionnaires sent to the buyers. The questionnaires focused on several issues that had arisen in prior divestitures in these industries, such as the scope of the asset package and the due diligence process.

- The final 24 orders reviewed involved the pharmaceutical industry, another industry about which the Commission is knowledgeable. These orders were evaluated based on internal expertise, information, and data, as well as information obtained from publicly available sources.

This report focuses primarily on the learning from the case studies, which delved more deeply into the implementation and outcome of the remedies reviewed than the other two parts of the study.[14] The study concluded that most of the remedies in the case studies successfully maintained or restored competition in the identified relevant markets. Section IV.C. explains the criteria for evaluating success and discusses the results of that analysis. The study also identified the concerns interviewees raised about certain aspects of the remedy process, which the Commission has already begun to address. This report summarizes those concerns below and discusses them in more detail in Section IV.D.

The study found that all remedies involving divestitures of assets comprising ongoing businesses succeeded, confirming that such divestitures are most likely to maintain or restore competition. The study also revealed that buyers of less than an ongoing business—buyers of "selected assets"—did not always succeed at maintaining competition, suggesting that the more limited scope of the asset package increases the risk that a remedy will not succeed. The study showed that, even with an upfront buyer, the Commission has not always eliminated the risk associated with divestiture of more limited asset packages.[15] Therefore, proposals to divest selected assets generally warrant more detailed Commission examination.

The 1999 Divestiture Study revealed that respondents sometimes may have proposed buyers that, though marginally acceptable, were less likely to provide robust competition. The new study showed that respondents in most cases proposed buyers likely to fully satisfy the Commission's criteria for strong, viable competitors. But because the success or failure of a divestiture depended, in part, on whether the buyer had adequate funding commitments to ensure success, the Commission will examine more closely, among other things, the source of the buyer's financing, its plans if the transaction does not

---

[14] The case study findings are consistent with the findings of the other two parts of the study. The results compiled from responses to the questionnaires and review of pharmaceutical orders are summarized in Sections V and VI, respectively.

[15] The reason, of course, that the Commission is concerned about the success of a remedy in restoring or maintaining competition is to protect customers and ultimately end consumers. If a divestiture remedy fails, customers and consumers would likely be harmed.

meet its financial goals, what it has done in other instances when acquisitions have not met financial goals, and related issues.

For their part, most buyers appeared to understand the Commission's remedy process and expressed satisfaction with how it transpired. Some buyers, however, raised concerns about the limited time available for due diligence and the lack of access to respondents' facilities and employees. Although upfront buyers raised this concern more frequently than post-order buyers, several post-order buyers raised it as well. In some cases, the lack of access to facilities and employees during the due diligence process may have delayed the buyers' ability to compete in the relevant markets or increased the buyers' costs.

Some buyers identified unforeseen complexities in transferring "back-office" functions related to the divested assets,[16] regardless of whether the divested assets included those functions or the buyers developed them internally or obtained them from third parties. When respondents did provide those functions on a transitional basis until buyers could perform them on their own, some buyers believed the length of the transition services agreements was too short. In several cases, buyers took longer to transition away from respondents' information technology systems than anticipated, requiring a longer period of transition services than specified in, or available via, the orders.

In addition, some buyers raised questions about the length of supply agreements. Although extensions of supply agreements may not always be warranted, providing mechanisms for extending them may be helpful to accommodate unanticipated complexity in the limited cases where buyers need a temporary extension. Both respondents and buyers raised concerns about the operation of assets that respondents are sometimes required to hold separate from the remainder of their operations pending their divestiture and the role of the hold separate managers typically appointed in orders to hold separate.

Finally, despite the Commission's efforts since the 1999 Divestiture Study to encourage buyers to reach out to staff if they encounter difficulties, it appeared that buyers continue to be reluctant to bring issues to the attention of staff or the monitors when they arise.

The concerns identified by buyers did not necessarily affect the ability of any particular buyer in the study to maintain or restore competition, but they represent potential gaps and risks that may adversely affect merger remedies. Addressing these concerns does not require a change in the Commission's overall approach to remedies. It does, however, necessitate enhanced staff scrutiny, including asking additional questions of respondents and proposed buyers, and, in some instances, increased monitoring of the overall divestiture process. In certain cases, addressing these concerns may also require different order language. The Best Practices section at the end of this report describes the additional steps staff is now taking as part of the Commission's remedy process and provides information to respondents and buyers regarding additional issues they should consider during the course of the remedy process.

---

[16] "Back-office" functions refer to a variety of support functions such as legal, finance, accounting and tax, risk, insurance, environmental services, and human resources (and includes related personnel and books and records). They also encompass information technology systems and databases, used in connection with warehousing, sales, production, and inventory databases, as well as controls, processing, and operations software.

# II.   Overview

This study included 89 Commission merger orders from 2006 through 2012, affecting over 400 markets.[17] All of these were consent orders, although the Commission had begun litigation with respect to three of the mergers before the parties ultimately settled with a divestiture. The vast majority of the orders addressed horizontal concerns; only four involved vertical concerns. *See* Figure 1. Seventy-five of the underlying mergers were reportable under the Hart-Scott-Rodino ("HSR") Act, 15 U.S.C. § 18a; 14 were not. Of the 75 HSR-reported transactions, two were consummated before negotiations of a consent agreement began. Of the 14 that were not HSR-reported, 11 were consummated prior to consent negotiations.

**FIGURE 1: Percent of Orders by Merger Type and Consummation Status**



The 89 orders covered an array of remedies, but most imposed structural relief. As shown in Figure 2, 76 of the 89 orders required structural relief, 74 of those required divestitures to remedy competitive effects in all affected markets, and two required restructuring of the underlying merger so that the acquirer did not purchase the overlapping assets. Five other orders addressed effects in multiple markets with divestitures in some markets, and non-structural relief in others. Six orders, of which four were vertical, required only non-structural relief. Two required relief other than divestiture that was designed to facilitate entry.

---

[17] The Commission explained how it selected this time period in the Federal Register Notice, dated January 16, 2015, requesting comments on the proposed study. The Commission initiated another 54 enforcement actions from 2006 through 2012, which did not result in a Commission order. These actions included preliminary injunction actions, administrative complaints, and actions with respect to transactions that were abandoned or restructured. *See* www.ftc.gov/competition-enforcement-database.



**FIGURE 2: Type of Remedy**

* "Mixed" represents an order with both structural and non-structural relief across different markets

As shown in Figure 3, 58 of the 79 orders requiring divestitures called for upfront buyers, 19 consisted of post-order divestitures, and two involved both an upfront buyer and a post-order divestiture in different markets. Under these 79 orders, the Commission approved 121 buyers; 79 of them were upfront, and 42 were post-order. The majority of the divestitures to upfront buyers were of selected assets; the majority of the post-order divestitures were of ongoing businesses.

**FIGURE 3: Orders by Buyer Timing**

The orders were divided into three groups based on staff's experience with the affected industries, and were evaluated using three different methods: a case study method for 50 orders, questionnaire responses for 15 orders affecting certain industries, and an assessment of 24 orders affecting the pharmaceutical industry using internal and publicly available information and data.

## A. Case Studies

FTC staff reviewed 50 orders using a case study method consisting of interviews of market participants and analysis of limited sales data obtained from almost all significant competitors in each market. The orders covered 184 relevant markets, the widest range of markets of the three parts of the study, including chemicals, medical devices, databases, manufacturing products, consumer goods, oil and gas pipelines and terminals, satellites, road salt, and batteries. The goal of this part of the study was to interview each respondent, the buyers of divested assets (if divestiture was required), and various other competitors and customers in each relevant market. All told, FTC staff interviewed almost 200 market participants.

In addition, the Commission issued nearly 200 orders under Section 6(b) of the FTC Act, 15 U.S.C. § 46(b), requesting information from significant competitors in each of the relevant markets covered by most of the 50 orders.[18] The Section 6(b) orders sought annual sales data, in dollars and units, for each relevant market over a seven-year period—three years before the remedy, the year of the remedy, and three years after the remedy. Nearly all significant competitors in each market for which information was sought provided data. Staff analyzed all data obtained and calculated market shares before and after the transactions. The evolution of these shares provided another source of information about the effect of the remedy on competition in the affected markets and, for divestitures, the success of the buyers. Section IV discusses this analysis in more detail.

## B. Questionnaires

Staff examined another 15 orders by requesting responses to focused questionnaires. These orders involved divestitures of supermarkets, drug stores, funeral homes, dialysis clinics, and other healthcare facilities. The Commission has conducted numerous investigations involving these industries and has imposed merger remedies in many of these investigations. As a result, the Commission understands the way competitors operate and what a viable divestiture package needs to include. Additionally, in a number of these industries, it was not practical to interview customers, many of whom are individual consumers. Instead of interviewing buyers and other market participants, staff sent questionnaires to the 43 buyers that acquired assets under these orders, focusing on several areas in which questions have arisen in the past about remedies in these industries: the due diligence process, the scope of the asset package, transitional services, and post-divestiture operations. Compliance with the questionnaire was voluntary. Twenty-seven buyers responded to the questionnaire either in writing or through an interview. Section V summarizes staff's findings.

## C. Orders Affecting the Pharmaceutical Industry

The remaining 24 orders involved mergers in the pharmaceutical industry, most of which concerned prescription generic drugs. Other product markets covered were prescription branded drugs, over the

---

[18] The FTC did not send 6(b) requests where staff determined that sales data would not add in a meaningful way to staff's analysis.

counter drugs, and animal health drugs. The Commission has developed significant expertise in the pharmaceutical industry and follows a standard approach for evaluating these mergers and designing relief. In pharmaceutical orders, the Commission typically appoints an interim monitor to oversee the transfer of technology and production assets and to provide periodic reports to the Commission. The monitors' confidential reports contain information on how the respondents have complied with their obligations under the order, as well as updates on the buyers' progress securing FDA approval with the divested assets. Staff reviews these reports and frequently contacts monitors and buyers for additional information. Publicly available industry information, including FDA publications, also helps staff monitor FDA approval of buyers' drug products post-divestiture.

For this part of the study, staff compiled all relevant publicly available information, interviewed various highly experienced divestiture monitors, and conducted an in-house evaluation of the 24 pharmaceutical orders. Section VI summarizes the information reviewed and staff's conclusions.

# III.   The 1999 Divestiture Study

The 1999 Divestiture Study evaluated Commission merger orders from 1990 through 1994 that required a divestiture to remedy the anticompetitive effects of unlawful horizontal mergers. It excluded orders in vertical mergers, non-structural remedies in horizontal mergers, and several industry-specific orders. Staff employed a case study method for the 35 orders it evaluated, and sought to interview on a voluntary basis all buyers of the divested assets, respondents, and monitors. The overall goal was to determine whether the buyers of the divested assets had successfully acquired the assets subject to the divestiture order and were operating in the relevant markets. Thirty-seven of the 50 buyers agreed to talk to Bureau of Competition and Bureau of Economics staff, who also interviewed eight respondents and two Commission-ordered monitors. Staff requested sales data and limited financial information from buyers on a voluntary basis, but few participants submitted the requested data or information.

Through that study, staff determined that "most divestitures appear to have created viable competitors" in the relevant markets.[19] Staff also concluded that reliance on prospective buyers of divested assets to assist in determining the scope of the assets to be divested, though important, was sometimes misplaced. Buyers were not always knowledgeable enough about the market to reliably inform the proper scope of assets. In addition, a prospective buyer was often unwilling to ask for additional assets or assistance it might need out of fear of losing the deal or appearing less desirable as a buyer. Staff also learned that respondents often recommended marginally acceptable buyers and, on some occasions, engaged in post-divestiture strategic behavior aimed at minimizing the competitive impact of the buyer's entry into the market. Finally, the study highlighted that buyers frequently chose not to bring issues to the attention of FTC staff until it was too late to effectively resolve them, if they brought them to the attention of staff at all.

Based on this learning, the Bureau of Competition recommended changes to the divestiture process even before it had completed its study. The Commission began imposing a shorter divestiture period—reducing the amount of time from a year or more to four to six months—to reduce the time respondents

---

[19] 1999 Divestiture Study at 8.

held the assets to be divested; requiring upfront buyers more frequently to ensure that there were buyers for the package of assets to be divested; and, in technical markets or in orders that raised complex questions, more frequently requiring the appointment of an independent third party to monitor compliance.

FTC staff broadened its own due diligence so as not to rely principally on input from prospective buyers as to the scope of the divestiture package, by also soliciting input from other market participants, customers, and suppliers. Staff also began a more in-depth review of proposed buyers, including requiring prospective buyers to submit detailed written business and financial plans for the divested assets. In addition, the Bureau of Competition posted guidance concerning the remedy process on the FTC's website in an effort to make the process more transparent. Staff also ensured that they were accessible to buyers and encouraged them to reach out if issues arose. Finally, staff began conducting informal follow-up interviews with buyers of divested assets after the divestiture to see how the buyer was doing.

The improvements implemented as a result of the 1999 Divestiture Study continue to be a part of the Commission's remedy process today.

# IV.  FTC Orders Evaluated Using the Case Study Method

In this study, Commission staff evaluated 50 of the 89 Commission merger orders from 2006 through 2012 using the case study method, which compiled information obtained from interviews of respondents and other significant participants in each relevant market, including buyers if assets were divested, other competitors, and customers. Staff corroborated that information with market share information derived from the sales data obtained from significant competitors.

## A. Overview

Commission staff evaluated the 50 case study orders in two ways. As described in more detail below, staff evaluated the competitive success of each remedy by determining whether the remedy had maintained or restored competition in the relevant market. The Commission's remedial goal for all merger actions is to prevent or eliminate the likely anticompetitive effects of a merger, maintaining the competition that would have been lost, or restoring the competition that was lost, from the merger.[20] Determining the success of an order, therefore, began with the broad question of whether the Commission's remedy had maintained or restored competition. Answering that question required understanding how market participants, including major customers, the respondent, the buyer of divested assets, and other competitors viewed the market post-divestiture. Staff used the information

---

[20] In vertical mergers, because the effects are not due to the actual loss of a competitor, the goal is to remedy the likely anticompetitive effects that would occur due to the vertical relationship that results, including the respondent's ability to foreclose competitors' access to a critical input or its ability to obtain confidential information about a competitor.

obtained in interviews together with market shares calculated using sales data to evaluate the success of the remedies.

The study showed that most of the Commission's remedies succeeded. Buyers typically acquired the assets needed to compete in the market and, with those assets, replaced the competition that would have been lost or had been lost as a result of the underlying merger. Customers told staff that buyers represented viable competitive alternatives to the respondents, and competitors confirmed that the buyers were competing in the relevant markets. The data corroborated their views.

That most remedies succeeded supports the Commission's general approach to merger remedies.[21] The Commission most often addresses the horizontal effects of mergers that harm competition in one or more relevant markets by ordering a divestiture. The study showed that the divestiture of assets comprising an ongoing business, which the Commission prefers, poses little risk. It also showed that it may be possible to remedy anticompetitive consummated mergers under certain, limited circumstances although the difficulties inherent in separating commingled assets to recreate a viable competitor are always a concern. Moreover, the four- to six-month divestiture period for post-order buyers introduced following the 1999 Divestiture Study—in contrast to the pre-1999 one-year or longer divestiture period—did not appear to have undercut respondents' ability to find approvable buyers. The appointment of independent third parties to monitor compliance with technical orders or those involving complex industries also appeared to have helped limit risks.

As part of its inquiry, staff also asked questions focusing on the process used to implement merger remedies. First, did the buyer of the divested assets obtain the assets required to be divested and all the ancillary rights and assistance required by the order? Second, did the buyer, or other market participants, have concerns about the process itself that staff should address in future matters? Staff explored these and related questions in the interviews with buyers and other market participants and examined whether the concerns raised may have affected the remedies' success. Although the interview responses supported the overall effectiveness of the Commission's remedy process, there were several significant findings, which are discussed in more detail in Section IV.D. and addressed in the Best Practices discussion in Section VII.

---

[21] The Bureau of Competition has provided guidance as to these policies on the Commission's website, and Commissioners and BC representatives have made speeches, written articles, and issued statements reflecting these policies over the years. *See, e.g.*, Fed. Trade Comm'n, Bureau of Competition, *Frequently Asked Questions About Merger Consent Order Provisions*, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/mergers/merger-faq; Fed. Trade Comm'n, Bureau of Competition, *Statement on Negotiating Merger Remedies* (Jan. 2012), https://www.ftc.gov/tips-advice/competition-guidance/merger-remedies; "Retrospectives at the FTC: Promoting an Antitrust Agenda," Remarks of Chairwoman Edith Ramirez, ABA Retrospective Analysis of Agency Determinations in Merger Transactions Symposium, George Washington University Law School, Washington, DC, June 28, 2013; "The Significance of Consent Orders in the Federal Trade Commission's Competition Enforcement Efforts," Remarks of Deborah L. Feinstein, Director, Bureau of Competition, GCR Live, Sept. 17, 2013.

## B. Description of the Orders

Table 1 summarizes the number and percent of orders by the type of merger and remedy imposed in the order.[22]

### TABLE 1: Orders by Merger and Remedy Types

|  |  | Remedy Type | |
|---|---|---|---|
|  |  | Structural | Non-Structural |
| Merger Type | Horizontal (46) | 87% | 13% |
|  | Vertical (4) | 0% | 100% |
|  | All (50) | 80% | 20% |

As Table 1 shows, 80% of the 50 mergers were horizontal and remedied with structural relief.[23] All the vertical mergers were remedied with non-structural relief, while 13% of the horizontal mergers were also remedied with primarily non-structural relief. As will be discussed in more detail below, of the 46 horizontal mergers, ten were consummated; all of the vertical mergers involved non-consummated mergers.

Table 2 lists the characteristics discussed in this study, and, for the 40 structural remedies, shows the number of orders in which those characteristics occurred with respect to at least one market remedied by the order.[24] For some orders that cover multiple markets, there was an upfront buyer for some markets and a post-order buyer for other markets. Those orders are counted as having both an upfront buyer and a post-order buyer; therefore, the percentages in the table add up to more than 100%. The same was true for the type of asset package. Various orders covered multiple markets and required divestiture of an ongoing business in some markets and selected assets in others, resulting in the percentages in the table adding up to more than 100%.

---

[22] Many orders involved multiple markets, and sometimes also involved different types of remedies in the different markets covered by the order. Thus, categories may contain fractional orders; for example, for an order with two markets and a structural remedy in one market and a non-structural remedy in the second, the category count of structural and non-structural remedies will each be 0.5. *See* Section IV.C.3. for a more complete description of this order measure.

[23] Two instances where the parties restructured the underlying merger before an order issued are classified as structural remedies, and two orders that required respondents to take steps to facilitate entry are classified as non-structural remedies. Table 1 shows that 80% of orders required structural relief, and all of these were horizontal.

[24] These characteristics are present in the orders, but the Commission may not have necessarily implemented them. For instance, 74% of the orders allowed the Commission to appoint a monitor, but the Commission did not appoint one in cases where it ultimately determined a monitor was unnecessary.

**TABLE 2: Characteristic Counts and Percentages for Structural Remedies**

| Buyer Timing | % |
|---|---|
| Upfront Buyer | 69% |
| Post Order Buyer | 33% |
| Package Type | |
| Ongoing Business | 40% |
| Selected Assets | 67% |
| Other Characteristics | |
| Supply Agreement | 48% |
| Transition Services | 57% |
| Monitor | 74% |
| Hold Separate Order | 24% |
| Asset Maintenance Order | 52% |

About two-thirds of the 40 orders involving structural remedies had an upfront buyer. Merging parties divested selected asset packages in 67% of orders compared to 40% in which they divested ongoing businesses. About one-half of orders included a supply agreement provision that required the respondent to supply the buyer of the divested assets with a product (or input into production) at agreed-upon terms for a certain period. Nearly 60% of the orders included provisions requiring transition services, i.e., provisions in the order requiring the respondent to provide certain defined services to the buyer for a specified period.[25]

Table 2 shows that 74% of orders in the case study group included an option to appoint an independent third party to monitor certain provisions of the order.[26] The Commission issued hold separate orders and asset maintenance orders in 24% and 52% of the orders, respectively.[27]

## C. Determining Whether a Remedy Succeeded

As discussed above, staff evaluated each remedy in two ways. The first was competitive outcome: whether the Commission successfully restored competition to, or maintained competition at, its pre-merger state. The second was procedural: whether interviewees revealed concerns about the

---

[25] It is important to note that many of the characteristics in Table 2 were not independent of each other. For example, 82% of orders involving selected assets were in remedies that required an upfront buyer, while 63% of orders involving ongoing businesses were divested to post-order buyers.

[26] Most of these characteristics were not applicable to non-structural remedies. One characteristic that often appears in non-structural remedies, however, is the use of monitors. The option to appoint a monitor was included in 97% of orders that involved non-structural remedies.

[27] Hold separate orders may also include asset maintenance obligations.

Commission's remedy practices. In addition, staff combined these analyses to determine whether remedy process concerns affected outcomes. Discussed below are the standard used for judging success and the resulting analysis.

## 1. The Standard for Judging Success

The goal of any remedy is to preserve fully the existing competition in the relevant markets at issue, and each remedy was assessed based on the extent to which it achieved this goal.[28] The study assessed whether the remedy achieved the Commission's goal based on the following standards: success, qualified success, and failure.

- A remedy was rated as a success if competition in the relevant market remained at its pre-merger level or returned to that level within a short time (two to three years) after the Commission issued the order.

- A remedy was rated as a qualified success if it took more than two to three years to restore competition to its pre-merger state, but ultimately did so. Qualified successes also included markets in which buyers of assets were relatively quickly competitive, but for whom continuing success was difficult because of market shocks or situations in which the market evolved in a way not anticipated by the order.[29]

- A remedy that did not maintain or restore competition in the relevant market was rated as a failure. Failures happened either because the buyer of the assets never produced the product, or because the buyer (or possibly an expanded fringe competitor or a new entrant in the case of a non-structural order) never attained the competitive effectiveness of the pre-merger owner of the divested assets.

---

[28] The Commission has broad discretion to impose remedies for acquisitions that are likely to substantially lessen competition in violation of Section 7 of the Clayton Act. *See, e.g.*, Polypore Int'l, Inc. v. FTC, 686 F.3d 1208, 1218-19 (11th Cir. 2012); Chicago Bridge & Iron Co. N.V. v. FTC, 534 F.3d 410, 441 (5th Cir. 2008); Olin Corp. v. FTC, 986 F.2d 1295, 1307 (9th Cir. 1993); Ekco Prods. Co. v. FTC, 347 F.2d 745, 753 (7th Cir. 1965).

[29] This assumes that the original owner of the assets would have been better able to anticipate and attend to these market changes. This but-for assumption cannot be tested.

## 2. The Method Used to Determine Whether a Remedy Was a Success

Evaluating a remedy's success required a comparison of competition (the competitive dynamic) in the pre-merger period with that in the post-remedy period.[30] Information from the underlying investigation of the matter allowed for assessing pre-merger competition in the relevant markets.

To gauge changes in competition post-order, staff identified significant customers and competitors for each matter and market, relying in part on the customers and competitors that the investigative team had identified and interviewed in the underlying investigation. Staff re-interviewed a select number of them, focusing on the competitive dynamics in the relevant market and, for those remedies involving a divestiture buyer, whether the buyer competed as effectively as the previous owner of the divested assets.[31] Staff focused on many of the same topics on which the investigative team had focused, including how firms competed in the relevant markets and customers' views on the strength and weaknesses of the various competitors. Staff also obtained sales information from significant market competitors, calculated market shares for many of the matters and markets, and used those market shares in conjunction with the information garnered in the interviews to evaluate the success of the remedy.

The method for evaluating success differed slightly for horizontal and vertical mergers, and for structural and non-structural remedies, because of the differing remedial approaches taken by the Commission to restore competition. For horizontal mergers with a structural remedy, the focus was the competitive significance of the buyer of the divested assets (i.e., the new competitor created by the Commission's order). The principal question was whether the buyer maintained the competition that existed in the market before the merger. For horizontal mergers with a non-structural remedy, staff attempted to determine whether the conditions created by the order to enhance the possibility of growth by smaller market incumbents or to promote entry appeared to work by evaluating both incumbent growth and new entry. Finally, for vertical mergers, where non-structural remedies, such as firewalls, were designed to inhibit behavior that could facilitate vertical foreclosure or the sharing of confidential business information, staff focused on, among other questions, whether respondents effectively monitored and enforced them. Despite these differences across order types, in all cases staff compared post-order competition to that in the pre-order period to determine whether the order maintained competition.

---

[30] The correct comparison for evaluating the success of the remedy entails comparing the post-order period with the remedy to the but-for world of the post-order period without the merger, i.e., the merging parties both competing. Interview techniques do not allow for construction of that but-for world; therefore, staff assumed that competition would remain generally the same as in the pre-merger period had the merger not occurred. That is, for purposes of the study, the pre-merger world is treated as the but-for world.

[31] Topics covered during interviews with competitors and customers are available on the FTC's website, https://www.ftc.gov/policy/studies/remedy-study.

## 3. Measuring Results

For orders that addressed competitive harm in multiple markets, the characteristics and ultimate success of a remedy may differ across the affected markets. To account for this, staff used two different measures to count remedies when classifying them.[32]

- **Orders.** The first measure was to count the number of orders, referred to as the order measure. Some orders involved multiple markets where the classification of the order differed across markets. In these cases the category count was increased by the share (or fraction) of markets belonging to the particular classification. For example, if an order covered two markets, one where the remedy was structural and one where it was non-structural, staff counted this as half a structural order and half a non-structural order. Staff used the same approach when the success of a remedy varied across the different markets covered by the order.[33]

- **Buyers.** The second way, applicable only to remedies involving divestitures, counted the number of buyers, referred to as the buyer-outcome measure. In the forty orders requiring divestitures, the Commission approved 46 different buyers. Two were counted twice, however, because each acquired two different asset packages to remedy two different markets, with different results in each. Counting them twice brought the total number of buyer-outcomes to 48. Other buyers that acquired different asset packages to remedy effects in different markets were counted only once because the outcome was the same in each market.

## 4. Remedy Outcomes

Table 3 presents the remedy outcomes.[34] The first row includes all 50 orders, while the second row includes the 46 orders involving horizontal mergers. Because there are no buyers for non-structural orders or for orders involving restructured transactions, for these groups the results are reported using only the order measure. Overall, the results show that 83% of orders were at least a qualified success, while 17% failed because they did not maintain the level of pre-merger competition.[35]

---

[32] A third alternative would have been to measure results at the remedied market level. For orders that remedy competitive harm in multiple markets, however, the characteristics and ultimate success of any remedy are likely similar across the different markets within the same matter, especially when the same product is involved but there are different geographic markets. Presenting results at the level of the relevant market would, therefore, overstate the impact of matters involving multiple markets.

[33] For example, if an order involved three markets, two of which were rated as successes and the third was rated as a qualified success, the count of orders that were successful increased by 2/3 while that for qualified successes increased by 1/3. This ensured that each order was counted only once and that all markets within the order were represented; however, it led to fractional counts in some tables.

[34] All vertical merger orders were judged successful.

[35] Twenty-four of the 50 orders were issued between 2006 and 2009, overlapping with the financial downturn in the economy. It is notable that 94% of the orders issued during this period were successes or qualified successes.

TABLE 3: Remedy Outcomes[36]

Remedy Outcome

| Type | Success | Qualified Success | Failure |
|---|---|---|---|
| All (50) | 69% | 14% | 17% |
| Horizontal (46) | 66% | 15% | 19% |
| Horizontal, Structural (40, 48)* | 66%, 65% | 15%, 15% | 19%, 20% |
| Horizontal, Structural, Non-Consummated (32.3, 39)* | 75%, 74% | 6%, 7% | 19%, 18% |

(*orders, buyers)

The last two rows of Table 3 show outcomes for horizontal mergers with structural remedies and horizontal non-consummated mergers with structural remedies. For these subsets, the results reflect the order measure followed by the buyer-outcome measure. For horizontal mergers remedied with structural relief, the order measure shows that 66% of the remedies successfully maintained competition at pre-merger levels, while another 15% were qualified successes. The remedy failed in 19% of the orders evaluated. When measuring success by buyer-outcome, 65% of the buyer-outcomes were successful; 15% were a qualified success; and 20% failed. The last row of Table 3 excludes consummated mergers. While the subset of orders excluding consummated orders has a higher percent of orders judged a success than other subsets, the percent of orders judged at least a qualified success (81%) is similar.

## 5. Anticompetitive Effects of Consummated Mergers Can Be Successfully Remedied under Limited Circumstances

When a merger is consummated prior to antitrust review, the Commission may face significant challenges in crafting a remedy to resolve competitive concerns, depending on the status of the assets already combined into a single entity. It may be particularly difficult to restore the pre-merger state of competition if the merging parties have commingled, sold, or closed assets; integrated or dismissed employees; transferred customers to the merged entity; or shared confidential information. In these situations, remedial options may be severely limited, irrespective of whether the Commission accepts a consent order or seeks a remedy in court or in an administrative proceeding. Despite the challenges, the

---

[36] When evaluating the effectiveness of the Commission's remedy policy, results for "All" and "Horizontal" should be treated with caution because they may pool together mergers requiring remedies with different characteristics. For example, vertical mergers raise distinct concerns and require different remedies compared to horizontal mergers. Also, the remedy options for consummated mergers can be more limited than for unconsummated ones, as is discussed later in the report.

Commission required remedies for anticompetitive consummated mergers included in the case studies, and staff examined whether those remedies succeeded. Given the differences in remedying consummated versus non-consummated mergers, staff analyzed results separately for consummated mergers. Table 4 shows the results for all horizontal mergers remedied with structural relief, separately for consummated and non-consummated mergers.

Ten orders involved situations where the remedies were imposed post-consummation. Eight of these ten orders required divestitures, and nine buyers were approved under those eight orders. The two remaining orders did not require divestiture but required respondents to eliminate restrictions in their contracts with customers and employees that had prevented entry; in both of these orders, entry subsequently occurred, restoring lost competition.

**TABLE 4: Remedy Outcomes for Horizontal Mergers with Structural Relief**

| | Remedy Outcome | | |
|---|---|---|---|
| Type | Success | Qualified Success | Failure |
| Horizontal, Structural, Non-Consummated (32.3, 39) * | 75%, 74% | 6%, 7% | 19%, 18% |
| Horizontal, Structural, Consummated (7.7, 9)* | 26%, 22% | 52%, 44% | 22%, 33% |

(*orders, buyers)

For consummated horizontal mergers, 26% were a success, 52% were a qualified success, and 22% failed, when using the order measure. When analyzing results by the buyer-outcome measure, 22% of buyers were successful, 44% were a qualified success, and 33% were failures in consummated structural orders.

Factors that contributed to the success of some remedies in consummated mergers included the lack of integration of the assets post-merger and the ability to alter contracts to facilitate the buyer's entry. In contrast, resurrecting a business when the assets were commingled post-merger was much more difficult and the remedy often failed.

## 6. Identifying Remedy Process Concerns

During the interviews, buyers of divested assets and occasionally other market participants discussed concerns that arose during the process. In most cases, the concerns did not prevent a buyer from competing in the market, although, in some cases, they may have delayed the buyer's entry or increased its costs. In evaluating the process with respect to each remedy, concerns were considered significant if they affected or could have affected the remedy's success in meeting the remedial goals of the order.

Table 5 presents the percentage of orders that had remedy process concerns for the different subsets of orders.[37] The first row includes all 50 orders. The results show that remedy process concerns arose in fewer than half of the orders.[38]

### TABLE 5: Remedy Process Concerns

| | Remedy Process Concerns | |
|---|---|---|
| Type | No | Yes |
| All (50) | 58% | 42% |
| Horizontal (46) | 54% | 46% |
| Horizontal, Structural (40) | 54% | 46% |
| Horizontal, Structural, Non-Consummated (32.3) | 59% | 41% |

# 7. Relationship between Remedy Process Concerns and Outcomes

Staff categorized every market in each remedy by combining the evaluation of the competitive success with the presence or absence of significant process concerns. Accordingly, there were six possible categories for each remedy:

- Success/no significant process concerns

- Success/process concerns

- Qualified success/no significant process concerns

- Qualified success/process concerns

- Failure/no significant process concerns

- Failure/process concerns

---

[37] Vertical merger remedies raised no reported process concerns.

[38] Staff does not know the extent to which such concerns arise in more typical arm's length transactions in which the FTC is not involved.

Table 6 presents remedy outcomes for all 50 orders combined with the presence or absence of significant remedy process concerns using the order measure. Specifically, these results address the frequency of remedy outcomes given that the matter either had, or did not have, remedy process concerns. Table 6 shows that for matters for which there were no remedy process concerns, 85% of orders were successes or qualified successes. These results show that, although the failure rate was slightly higher where process concerns were identified, many remedies that experienced process concerns nevertheless succeeded, either fully or in a qualified manner.

**TABLE 6: Remedy Outcomes and Presence or Absence of Process Concerns**

| Ratings | | Remedy Outcome | | |
|---|---|---|---|---|
| | | Success | Qualified Success | Failure |
| Process Concerns | No | 78% | 7% | 15% |
| | Yes | 56% | 24% | 20% |

## D. Specific Concerns Regarding the Remedy Process

As discussed above, most of the Commission's remedies in the 50 orders examined using the case study method were successful, supporting the Commission's general approach to merger remedies. But the interviewees did raise some specific concerns about the Commission's practices relating to designing, drafting, and implementing its remedies. Although these concerns did not generally prevent buyers from maintaining competition in the relevant markets, as shown in Table 6 above, addressing these concerns would improve the remedy process and could improve the success rate of Commission orders. This section discusses these concerns, classifying them in three categories: defining the scope of the asset package, selecting the buyer, and implementing the remedy.

### 1. Defining the Asset Package

#### a. Introduction

The study found that all divestitures of ongoing businesses succeeded, whether the divestiture was to an upfront buyer or a post-order buyer. This finding reinforces what the Commission and staff have long known: divestiture of an ongoing business, which includes all assets necessary for the buyer to begin operations immediately, maximizes the chances that the market will maintain the same level of

competition post-divestiture. In other words, these divestitures pose little risk. That was the conclusion drawn in the 1999 Divestiture Study,[39] and this study confirmed it.

Although the Commission prefers divesting an ongoing business, respondents often offer to divest a more limited package of assets, which they assert will provide the right buyer with the necessary assets to maintain or restore competition in the relevant market. In general, the scope of selected asset packages varies widely. The selected assets may include everything but a manufacturing facility, which the right buyer will already have, or they may include only intellectual property that will enable a buyer to overcome barriers to entry. With such a selected asset package, the buyer could overcome entry barriers but may not necessarily replace the lost competition quickly. The buyer will need to integrate the divested assets into its own operation or make additional arrangements with third parties. These uncertainties inject risk into the remedy that does not exist when divesting an ongoing business that has operated successfully in the past.

Staff carefully scrutinizes these proposals and attempts to ensure that selected asset packages include all assets necessary to facilitate the buyer's entry into the relevant market. Since the last divestiture study, the Commission has typically required an upfront buyer when the asset package is less than an ongoing business to minimize the risk of failure. Identifying an upfront buyer ensures that an approvable firm exists to acquire the defined assets. It does not, however, guarantee that the identified buyer will or can become a robust competitor. As Table 7 reflects, the majority of selected asset divestitures succeeded. Even with an upfront buyer, however, they succeeded at a lower rate than divestitures of ongoing businesses.

**TABLE 7: Remedy Outcomes for Horizontal, Structural, Non-consummated Mergers, by Asset Package**

| Asset Package | Remedy Outcome | | |
| --- | --- | --- | --- |
| | Success | Qualified Success | Failure |
| Ongoing Business (14.3, 14)* | 100%, 100% | 0%, 0% | 0%, 0% |
| Selected Assets (18, 25)* | 56%, 60% | 11%, 12% | 33%, 28% |
| All (32.3, 39)* | 75%, 74% | 6%, 7% | 19%, 18% |

(*orders, buyers)

---

[39] In the earlier study, "[o]f the 37 divestitures that were studied, 22 were of assets that comprised an on-going business. Of those 22, 19 were viable in the relevant market virtually immediately after the divestiture…. Of the 15 divestitures of selected assets, nine resulted in viable firms." 1999 Divestiture Study at 11-12. The earlier study concludes that "divestiture of an on-going business is more likely to result in a viable operation than divestiture of a more narrowly defined package of assets and provides support for the common sense conclusion that the Commission should prefer the divestiture of an on-going business." *Id.* at 12.

### b.  Divestiture of an Ongoing Business Poses Little Risk

Fifteen orders in the study required divestiture of an ongoing business to 15 buyers equally distributed between upfront and post-order buyers. All of these divestitures of ongoing businesses succeeded and raised few concerns. The orders defined the asset packages properly to include all necessary assets, including, in several orders, out-of-market assets. The transition from respondents to buyers in these divestitures tended to be straightforward. Employees remained with the businesses, and customers continued to purchase the divested products resulting in little change in the relevant markets other than ownership.

Although successful, several buyers of ongoing businesses raised remedy process concerns relating to back-office functions. One buyer said it took longer to transition back-office functions than anticipated. Another had difficulties transitioning information technology systems. In none of these cases were the difficulties serious enough to interfere with the operations of the ongoing business.

### c.  Divesting Selected Assets Poses More Risk than Divesting an Ongoing Business, Even With an Upfront Buyer

Twenty-eight orders required the divestiture of 33 packages of selected assets to 32 different buyers.[40] Nine of the buyers of selected assets succeeded with few, if any, difficulties. Seven were upfront buyers; two were post-order. Divestitures of selected assets tended to succeed when buyers had similar existing operations, were knowledgeable about the relevant markets, and were familiar with customers. In some cases, the buyers possessed similar manufacturing facilities prior to the divestiture or had a complementary product line into which the divested business could easily fit. Successful buyers also acquired brand names, and key employees were transferred.

Fourteen additional buyers of selected assets succeeded to varying degrees but experienced complications. Eleven were upfront buyers; three were post-order. Some suffered from unanticipated gaps in the order or the purchase agreement, but these buyers were largely able to adjust their business plans to address these gaps and move forward. For example, one buyer noted that the order required a supply agreement, but did not specify where the respondent had to deliver the supplied product. As a result, the respondent delivered the product to a site that inconvenienced the buyer. Another buyer raised concerns about the limitations placed on its use of the intellectual property it acquired.

Some buyers identified limitations with respect to the scope of the asset package. One buyer felt that the respondent was able to bundle multiple related products, which the buyer could not do with its more limited product line, hindering its ability to compete for customers. Another buyer also stated that it was disadvantaged because it lacked a full line of products to compete with respondent. These buyers ultimately competed in the market, but they believe it took them longer than it might have with a fuller line.

[40] Seven of these 28 orders addressed the effects of mergers that were consummated when the Commission orders issued; the Commission approved eight buyers under these seven orders.

In nine orders requiring divestiture of selected assets to ten buyers, the divestitures did not maintain competition. All involved upfront buyers. The reasons why the divestitures failed vary. In some cases, the selected asset package may have been too limited, preventing these buyers from competing with respondents offering a wider range of products, a difficulty the buyers could not overcome. In others, brand loyalty was greater than had been anticipated and the divestiture of only selected assets was insufficient to persuade customers to switch. In one case, operating the business using the divested assets as a new entrant in one market was so different from the buyer's operations in other markets that the buyer quickly exited the relevant market. Finally, in another case, employees and inventory did not transfer with the selected assets, and the buyer was unable to hire the right employees or obtain inventory under advantageous terms.

## 2. Selecting the Buyer

Under any order requiring a divestiture, the respondent's obligation is to divest to a buyer that the Commission approves. The 1999 Divestiture Study revealed that respondents sometimes proposed marginally acceptable buyers unlikely to offer robust competition. This study shows that respondents are now proposing stronger buyers that, in most cases, fully satisfy the Commission's criteria. Overall, respondents proposed buyers that were familiar with the market, dealt with many of the same customers and suppliers, had developed thoughtful business plans with realistic financial expectations and sufficient backing, and were well received by market participants.

A proposed buyer's commitment to the market is also essential. Although this can be difficult to assess, the Commission routinely attempts to do so by evaluating the proposed buyer's business plans for the divested assets as well as its historical results. The Commission looks for current involvement in adjacent or related markets, past efforts to enter the same or related markets, and the proposed buyer's employees' involvement with and knowledge of the same or related markets.

The Commission also examines the buyer's financial commitment to the market. It routinely evaluates the ability and means by which the proposed buyer intends to finance the acquisition of the assets, as well as its plans to compete in the market. The Commission examines any outside sources of funds, including private equity and investment firms, and the extent of their involvement and financial commitment. The study revealed that there were cases where the buyer's flexibility in investment strategy, commitment to the divestiture, and willingness to invest more when necessary were important to the success of the remedy. There were also cases where a buyer's lack of flexibility in financing contributed significantly to the failure of the divestiture.

## 3. Implementing the Remedy

Defining the package of divestiture assets and selecting the buyer are the most critical elements of a divestiture remedy. But interviewees contacted during the study raised concerns, many unforeseen at the time the orders were issued, with respect to other factors involved in the implementation of the remedy, specifically: the buyer's ability to conduct adequate due diligence; the transfer and retention of customers; and respondent's obligation to provide supply, transition services, and employee access. In addition, the study confirmed the importance of hold separates, but market participants raised some questions about the operation of the business during the hold separate period.

### a. Due Diligence

Due diligence concerns are particularly troublesome in the divestiture context because of the expected competitive rivalry between the buyer and seller post-divestiture. In a more typical arm's length transaction, the seller cedes its position in the market and therefore may be more cooperative in resolving issues that arise during the process, especially because more complete due diligence can lead to a higher sales price. In a Commission-ordered divestiture, however, the buyer and seller will compete after the sale, and there are many reasons why the seller might not cooperate in resolving issues. It is thus critically important that the buyer conduct adequate due diligence to avoid surprises.

In both upfront and post-order divestitures, staff asks proposed buyers about their access to data, facilities, and employees during the divestiture process. Buyers have not typically raised problems with staff during the divestiture process itself. In the study, most buyers were satisfied with the due diligence process, but several buyers did raise concerns ranging from a lack of time for adequate due diligence to a lack of access to facilities and employees.[41] One buyer needed additional due diligence to enable it to learn major customers' buying patterns, which turned out to be a significant obstacle to winning sales. Some buyers did not have access to employees who understood the relevant products. Several other buyers of selected assets lacked adequate financial information—notably cost information—because the assets to be divested did not constitute a separately reporting business unit and the respondents had produced only pro forma, unaudited, financial statements.

The majority of these concerns arose in upfront divestitures of the acquired firm's assets. In several of these cases, the acquiring firm's counsel led the negotiations and buyers viewed the acquiring firm's counsel as limiting their access to information, facilities, and employees.

### b. Attracting and Retaining Customers and Other Third-Party Relationships

Some divestiture buyers were unable to attract or retain customers. This failure sometimes resulted from a misunderstanding of customer buying behavior. In one case, customers evaluated suppliers of the relevant product only every few years. Because respondent had a broader portfolio of products, it made sales calls on important customers more frequently than the buyer, which had only the divested product, allowing the respondent to maintain closer relationships with customers who also purchased the relevant product. Another buyer anticipated slow growth because customer contracts in the relevant product opened only every few years. In another divestiture, sales were cyclical, and the buyer missed the year's buying cycle and could not make sales for almost another year.

Several buyers in the case study underestimated the strength of brand loyalty and the difficulty customers encountered in switching suppliers. In one case, the buyer did not receive the rights to either brand name from the merging parties and could not attract customers, even after lowering its price. For other buyers, the divestiture required that customers requalify the product, which delayed their efforts to win customers. Buyers that succeeded did so because they were able to solicit new customers when they were unable to persuade respondents' existing customers to switch.

---

[41] The previous study also raised concerns about the adequacy of buyers' due diligence. *See* 1999 Divestiture Study at 23, 32.

Because in some cases, customers might need to be persuaded to switch from a recognized supplier to a new one, some Commission orders imposed obligations on respondents aimed at encouraging customers to switch. Some orders required respondents to assign customer contracts to the buyer, and, if not assignable, to otherwise facilitate moving the customers to the buyer. In one such order, the respondent's efforts were not effective, but the buyer nonetheless was able to persuade customers to switch to it. Other orders required respondents to notify recently signed customers of their right to terminate their contracts early and without penalty or prohibited respondents from attempting to win back customers from the buyers by soliciting, inducing, or attempting to induce any customer transferred to the buyers pursuant to the order provisions for two years. Customers were most likely to switch when the buyers were familiar with the customers or had a prior relationship with them.

Sometimes the obstacles buyers faced stemmed from the need to rely on third parties in ways that were unknown at the time of the divestiture. In some cases, these third-party relationships complicated the buyers' abilities to compete, and, in certain cases, may have contributed to the buyers' failures. In several cases, the buyers needed approvals by governmental entities. In one case, this requirement slowed down the buyer's entry into the relevant markets despite the respondent's efforts to assist in the process. In another case, the respondent attempted to assist the buyer in securing third-party approvals, but the buyer was more adept at securing them than the respondent was because of its previous relationships with the regulators. In several cases, the buyer stepped into pre-existing relationships with third-party suppliers or landlords that may have included disadvantageous terms.

### c. Other Obligations

Most merger orders impose additional obligations on the respondent beyond the divestiture to facilitate its success. For example, where a respondent is not required to divest back-office functions, it may be required to provide such services to the buyer on a transitional basis until the buyer can perform those functions on its own.

In orders requiring the divestiture of selected assets, when the buyer cannot enter the market immediately on its own, the respondent may be required to provide supply for a specific time while the buyer develops the capacity to produce the product or can independently source it from a third party. The respondent may also be required to supply a necessary input until the buyer can arrange to source it independently.

The Commission has always recognized that some of these additional obligations create short-term ongoing entanglements between the respondent and the buyer and has therefore tried to minimize them as much as possible in order to preserve competitive vigor between the two firms.[42] Buyers in the study expressed similar reservations with respect to continuing post-divestiture relationships with respondents. Several buyers said they wanted to terminate these obligations as quickly as possible, and, in at least one case, the buyer did not take advantage of post-divestiture supply obligations at all, specifically to minimize its dependence on the respondent. On the other hand, other buyers said that these agreements were too short.

---

[42] *See, e.g.*, *id.* at 12-14.

### i.    Transition Services Agreements

When back-office functions are not part of the divested assets, a buyer must transition to its own systems or obtain them from a third party. Pending the transition, respondent is required to provide these services for a limited period. In most cases, the orders limited the time that respondent had to provide these services to a period staff determined was adequate but not so long as to perpetuate an undesirable continuing entanglement between the respondent and the buyer. Several buyers, however, said that, after they acquired the divested assets, they discovered they needed more time than anticipated to transition to their own systems, particularly when the transition required merging or replacing information technology systems.

### ii.    Supply Agreements

Many Commission merger orders require that respondents supply buyers with input or finished products for a specified period at no more than the cost incurred by the respondent. As noted above, supply agreements offer mixed incentives for buyers and respondents, and the study contained examples of the wide range of possible outcomes.

Supply agreements can provide the buyer with the ability to compete immediately in situations in which competition might otherwise be delayed or less effective; this was the typical outcome in matters that included these agreements. In one matter, the absence of a short-term product supply agreement may have slowed the buyer's competitive response. The buyer initially was unable to make significant sales of its own product and struggled as a competitor, in part because many large customers required lengthy product qualification testing before making purchases. Although the buyer eventually became a successful competitor, a short-term supply agreement with the respondent may have allowed it to compete more successfully while it obtained customer qualifications for its own product.

In a few instances, it appeared that buyers may have benefited from greater flexibility to lengthen the time respondents had to provide supply. Nevertheless, it is generally inappropriate to allow a buyer to become little more than a distributor for the respondent.

### d.   Hold Separate Orders

A hold separate order preserves the viability, marketability, and competitiveness of the assets to be divested pending divestiture. The hold separate order appoints individuals to oversee and manage the business independently of the respondent to eliminate the possibility that respondent can manipulate the assets pending divestiture.[43] It prevents the wasting or deterioration of the assets and the transfer of competitively sensitive information.

---

[43] In a standard hold separate order, the Commission appoints a hold separate monitor, appoints (or enables the monitor to appoint) a hold separate manager, and identifies employees whose responsibilities include the held separate business. The monitor is an independent third party that monitors respondent's obligations under the hold separate order and oversees both the hold separate manager and the overall business pending divestiture. The hold separate manager manages the hold separate business on a day-to-day basis and is typically the same employee that managed the business of the hold separate assets prior

While hold separates for the most part succeeded, several buyers identified problems with the hold separate arrangement that may have diminished the competitiveness of the business during this period. One buyer believed that the hold separate business did not respond to market pressures, resulting in lost sales. Another buyer noted that the hold separate manager focused on production, not sales, and that even production occurred only on a per-order basis. This caused inventory depletion, which required the new buyer to quickly build up inventory to historical levels.

Another buyer indicated that it received outdated and inaccurate information about production and sales because the hold separate business had not updated the information in an accessible manner after the respondent closed on the underlying deal and transitioned its information to a single system. A different buyer could not identify historical customer prices and resorted to asking the customers what they had paid for the products.

Even when successful, buyers confirmed that the hold separate period can be a time of uncertainty. In particular, the risk of losing key employees during this period rises. While incentives paid to employees to remain during the hold separate period helped, they did not always ensure that important employees remained with the buyer after the divestiture. Another buyer found that the hold separate period was unsettling to employees and believed that the order's non-solicit provision, which prohibited respondent from re-hiring employees, helped retain employees. A monitor noted that the uncertainty around the business made it vulnerable to competitive pressure from rivals, especially during a critical renewal period that would determine the business's success in the following year.

Although respondents generally appeared to comply with their obligations under the hold separate orders, several respondents expressed concerns about order obligations. One respondent noted that the hold separate required it to negotiate additional transition services agreements and fulfill obligations under those agreements. Other respondents commented that, as is typical in any hold separate order, they had to establish systems that kept the hold separate employees from sharing information with respondents' other employees. They had to sequester employee teams and restrict organizational access and provide sophisticated employee training so that the employees understood the confidentiality provisions of the orders. Respondents indicated that segregating the appropriate information was difficult because, until implementation of the hold separate order, the same employees had been sharing information and technology with each other in a manner that the order now prohibited.

## 4. Communication

The interviews made clear that the remedy process could benefit from more communication among FTC staff, monitors when appointed, and buyers. Interviews with both buyers and monitors suggested that increased communication could help monitors be more effective. One buyer urged that staff more fully explain the monitor's role to the buyer and the circumstances under which the buyer should contact the monitor. Other buyers suggested that monitors should be encouraged to proactively and more regularly contact the buyers, rather than wait for buyers to raise problems. One monitor suggested that

to the enforcement action. Hold separate managers frequently become part of the buyer's management team after the divestiture.

respondents provide a business person point of contact, with decision-making authority to address concerns promptly.

Finally, the study also revealed that many buyers still do not raise concerns with staff or monitors when they arise. Some buyers appeared to have tried to overcome concerns without involving, or informing, the staff or the monitors. The 1999 Divestiture Study had a similar finding, and staff has attempted to be clear and consistent in advising buyers to contact staff if they have concerns that staff may be able to address. Therefore, staff was surprised to learn that buyers remain reluctant to raise concerns with them or with the monitors when they arise.

Overall, the interviews revealed the need for greater transparency regarding the remedy process. Specifically, participants suggested that the Commission publicize the criteria for approving buyers, for requiring buyers upfront, and for approving monitors.

# V. Orders Examined Using Reponses to Questionnaires

Fifteen of the 89 orders in the study required divestitures of supermarkets, retail pharmacies, nuclear pharmacies, funeral homes and cemeteries, inpatient psychiatric hospitals, outpatient dialysis clinics, surgical centers, and imaging centers. As noted above, the Commission has considerable experience with remedies in these industries. Staff sent a focused questionnaire to each of the 43 buyers in these 15 orders. The questionnaire addressed several areas of concern, including the due diligence process, the scope of the asset package, transition services, and post-divestiture operations. It also asked for suggestions for improving the FTC merger remedy process. Compliance with the questionnaire was voluntary, and 27 buyers responded either in writing or through an interview.

Staff categorized a remedy as a success if the divested assets are still operating in the market identified in the complaint based on responses received and a review of publicly available sources. Thirty-four of the original 43 buyers continue to operate the divested assets, and some have even expanded, renovated, or otherwise improved those assets. Of the nine buyers that no longer own or operate the divested assets, five sold the assets to independent third-party firms that continue to operate the assets in the manner contemplated by the order. Overall, 39 of the divested businesses remain in the market.

Several buyers in different industries reported some of the same due diligence concerns as the case study buyers. They reported receiving limited information during the due diligence process or receiving information too late in the process. Some post-order buyers reported delays in the due diligence process, but attributed those delays to the process of working through a hold separate monitor rather than the respondent directly or because communications went through the acquiring firm even when the target held the assets pre-merger.

Buyers also reported concerns regarding the impact of an extended hold separate period on the competitiveness of the divestiture assets. This view is consistent with the Commission's concerns about extended hold separates and responses from buyers in the case studies. Several buyers noted that the lengthy hold separate period caused uncertainty among employees, resulting in low morale. Another buyer explained that a lengthy hold separate period can degrade the divestiture business making it more difficult for the business to continue as a viable competitor in the market.

Finally, several buyers considered the amount of information the FTC required to complete its review of the buyers and approve the divestitures to be burdensome.

# VI. Pharmaceutical Orders Examined Using Information Already Available to the Commission

The remaining 24 orders involved pharmaceutical mergers, primarily manufacturers of prescription generic drugs. The divestiture of products marketed by both parties to the merger at the time of the divestiture—on-market products—was considered successful if the buyer sold the product in the market post-divestiture. Staff determined that after divestiture, buyers sold about three-quarters of the divested products in the market. For each divestiture relating to pipeline products, i.e. products in development, the divestiture was considered successful if all assets relating to those products were successfully transferred.[44] Staff determined that the assets relating to those pipeline products were all successfully transferred.

Of the total products divested in the 24 orders, 60 were on-market products, sold by both parties to the merger at the time of the merger. When neither party to the merger manufactured the divested product, and instead relied on a third-party contract manufacturer, the divestiture of marketing or distribution rights allowed the buyer to immediately replace the selling firm. Of the 60 on-market products, 18 involved contract manufacturing that did not require transferring manufacturing capability. In each of these 18 cases, the buyer was assigned the selling firm's distribution agreement or it found a replacement third-party manufacturer with available supply capacity. For all divestitures of an existing marketing or distribution agreement that did not transfer manufacturing capabilities, the buyers continued to sell the product in the market.

Of the remaining 42 on-market products that required manufacturing transfer, 31 were in tablet or capsule form. Buyers of 24 of these products continued to sell the products in the market, but the buyers of the remaining seven did not. Several of the buyers that were unable to sell the products faced ingredient supply problems; in other cases, the buyers decided not to invest in post-divestiture production and never completed the transfer to market a product of their own.

Eleven of the 42 on-market products in the study that required manufacturing transfer involved more specialized production facilities than those for oral solids. Buyers were able to sell only three of these 11 products in the market.

Table 8 shows that, for all of the divestitures that involved a transfer of manufacturing capabilities, the buyer replaced the acquired firm as to 27 products and failed to do so as to 15 products.

---

[44] Staff did not attempt to assess whether the buyer of assets related to pipeline products replaced the acquired firm, in part because there was no but-for baseline from which to compare the buyer's efforts with those of the acquired firm, nor did staff measure success by determining if the buyer succeeded in launching a product.

**Table 8: On-Market Pharmaceutical Remedies**

| | Successful, no manufacturing transfer required | Successful, manufacturing transfer required | Failure, manufacturing transfer required |
|---|---|---|---|
| Oral Solid Generics (38) | 18% (7) | 63% (24) | 18% (7) |
| Complex Generics (22) | 50% (11) | 14% (3) | 36% (8) |
| All (60) | 30% (18) | 45% (27) | 25% (15) |

For 32 pharmaceutical product divestitures in the study, one or both of the merging parties had products in development. The goal of divestiture is to put the product development effort (including any pending regulatory filings) in the hands of a new firm with the same ability and incentive to bring the pipeline product to market. For all 32 of these products, there was a successful transfer.

For the majority of divestitures involving on-market drugs that were included in the study, buyers replaced suppliers and competed in the market. There were more risks, however, when the remedy required the buyer to establish a new production source, and the risk was higher still when the manufacturing process was more difficult.

As outlined in more detail in the Best Practices section below, staff has been incorporating its ongoing learning with respect to divestitures in the pharmaceutical industry. For example, in more recent orders involving generic drug overlaps, when evaluating whether proposed respondents should be required to divest the assets of the acquiring firm or the target firm, the Commission has required divestiture of the easier-to-divest products where possible, particularly when the product was manufactured under a third-party agreement that could transfer to a buyer.

# VII.  Best Practices

Incorporating learning from the study, these best practices describe what respondents and proposed buyers can expect during the remedy process. While not exhaustive, they specifically respond to concerns raised during the study and incorporate suggestions made by buyers, respondents, and monitors. They do not reflect significant changes to the Commission's current practice, but rather further refine the Commission's approach to remedies and the remedy process. In particular, the aim is to make clear to respondents and buyers what they will be required to do and show as the Commission evaluates proposed remedy proposals. Respondents proposing a remedy must demonstrate that the proposal will solve the likely competitive problem identified by the Commission. The Commission will not accept a remedy unless it determines that the remedy will address the competitive harm caused by the merger and serve the public interest.

# A. Defining the Asset Package

## 1. Scope of Asset Package

Divestitures of selected assets in the study, even with upfront buyers, succeeded less often and raised more concerns than divestitures of ongoing businesses. This confirms the Commission's preference for divestitures of ongoing businesses. When parties propose divestiture of an ongoing business, the Commission must confirm that all aspects of an ongoing business are being divested. The respondent should:

- explain how the proposed business contains all aspects needed for it to operate on its own;
- explain how a buyer can acquire the ongoing business and begin competing right away;
- identify at least three potential buyers that it believes are interested and approvable if it proposes to divest an ongoing business in a post-order divestiture; and
- be aware that staff will talk with potential buyers and other market participants.

While parties may propose a divestiture of selected assets rather than a divestiture of an ongoing business, the Commission will accept such a proposal only if the respondent and the buyer demonstrate that divesting the more limited asset package is likely to maintain or restore competition. In a merger where the respondent proposes a selected asset divestiture as a remedy, the respondent should:

- explain why an alternative ongoing business divestiture is inappropriate or infeasible;
- demonstrate how the selected assets can operate as a viable and competitive business in the relevant market;
- explain what aspects of an ongoing business are excluded from the package and, for each aspect that is excluded, how a proposed buyer would be able to address that gap, at what cost, and how quickly; and
- provide the buyer with adequate time and access to employees, facilities, and information to conduct due diligence.

Where the respondent proposes a selected asset divestiture, a proposed buyer will need to demonstrate that it will be able to compete effectively in all affected relevant markets without all of the assets relating to an ongoing business. The buyer should:

- explain how it plans to maintain or restore competition with a selected asset package;
- assess what additional assets and services it will need to operate the selected assets as a viable and competitive business in the relevant market;
- explain how it will obtain these additional assets and services, at what cost, and how quickly; and
- document its cost and time estimates to obtain these additional assets and services.

The Commission will accept only a divestiture package that it deems sufficient to enable a buyer to maintain or restore competition. Accordingly, a proposal to divest selected assets as a remedy may need to include, for example, assets relating to complementary products outside of the relevant market; manufacturing facilities, even if the facilities also manufacture products outside of the relevant market; or use of applicable brands or trade names. The Commission may also require the respondent to engage

in certain other conduct, including, for example, facilitating the transfer of customers. If the Commission determines that a proposed asset package is inadequate to restore or maintain competition, it may consider alternative settlement proposals or seek to block or undo the merger.

## 2. Transfer of Back-Office Functions

The provision of back-office functions that relate to the product market and the assets being divested is often more important and more complicated than parties anticipate. Those functions must be assessed to determine whether a proposed buyer can perform them on its own or if they are otherwise easily obtainable. If a proposed buyer does not already have the capability to perform the functions itself or will not be able to access them through, for example, third parties, then the respondent will be required to provide them on a transitional basis. If the buyer does not have access to them because they are specialized and not readily available from third parties, then the respondent will have to divest the assets relating to the provision of these functions. Even if the respondent must divest assets that provide these functions, there may be a transitional period while the respondent is completing the transfer of the assets to the buyer, during which the respondent may be required to provide those services to the buyer while the buyer integrates the assets.

The successful transfer of these back-office functions is often essential for a divestiture buyer to compete in the affected market. To help assess the scope of back-office functions that the buyer will need and to ensure that the buyer has these functions, the respondent should:

- explain to staff and the buyer all back-office functions related to all relevant products, as well as all necessary personnel and documentation;
- ensure that the proposed buyer can conduct adequate due diligence to understand what back-office functions will be needed and the complexities involved in the transfer of such functions;
- make its information technology employees available to discuss and plan the transfer of the back-office functions with the buyer; and
- provide back-office functions to the buyer as needed on a transitional basis for a period sufficient to allow the buyer to transition all services, at no more than respondent's cost.

The buyer should:

- explain to staff the scope of back-office functions it will need to support the asset package and how it will provide or obtain these functions and at what cost; and
- explain the length of time it will need transition services and its options if the transition takes longer than expected.

## B. Reviewing the Proposed Buyer

In general, the study revealed that respondents appeared to understand the remedy process and usually proposed approvable buyers. When proposing a buyer to staff, the respondent should:

- explain to staff how it selected the proposed buyer;
- share with staff any offering memoranda or other documents it intends to provide to potential buyers, prior to distribution; and

- be aware that staff will talk to potential buyers as well as other market participants.

In its communications with staff, the proposed buyer should:

- identify all sources of financing for the acquisition of the divested assets, including private equity or other investors, and explain the criteria it used for evaluating such sources;
- explain how it, and all entities providing financing for the transaction, reviewed and evaluated the transaction and formed the basis for authorizing it;
- provide detailed financial and business plans, with supporting documentation, to demonstrate its competitive and financial viability;
- explain the underlying assumptions of its financial and business plans, including contingency plans if sales and other financials do not meet projections;
- make management, sales and marketing representatives, and accounting and other representatives available to staff;
- explain the structure of the funding for the investment, including any limitations of the funds; and
- make representatives from the entities providing financing available for discussions with staff.

# C. Implementing the Remedy

Some buyers raised concerns about implementation of the remedy. Some of these concerns could have been allayed with more time to conduct thorough due diligence. Other concerns included difficulty attracting and retaining customers, the length of transition services and supply agreements, and the operation of hold separate orders.

## 1. Due Diligence

The respondent should provide adequate opportunity for the buyer to conduct due diligence. Specifically, the respondent should:

- provide access to information, facilities, and employees at least to the extent it would in a typical arm's length transaction;
- provide staff information regarding the extent to which the buyer has taken advantage of due diligence opportunities;
- provide direct access to key employees who are identified in the order;
- if the acquired firm's assets are being divested to an upfront buyer, provide the upfront buyer direct access to the acquired firm's information, facilities, and employees; in this circumstance, the upfront buyer should not be required to work through the respondent's representatives; and
- in the case of a post-order buyer, provide the post-order buyer direct access to the hold separate business, including the hold separate monitor and the hold separate manager.

The buyer should ensure that it takes advantage of the due diligence process and conducts adequate due diligence. In particular, the buyer should:

- provide staff information regarding the specific due diligence efforts it undertakes and any concerns about any aspect of the diligence process;
- in the case of an upfront divestiture, access the acquired firm's information, facilities, and employees, directly, without going through the respondent's representatives; and
- in the case of a post-order divestiture, access the hold separate business, including the hold separate monitor and the hold separate manager directly, pending divestiture to a post-order buyer.

## 2. Customer and Other Third-Party Relationships

Some buyers in the study had difficulty attracting and retaining customers, while others stepped into complicated third-party relationships. Respondents and buyers should be prepared to take certain steps to facilitate the transition in these relationships. The respondent should:

- provide the buyer access to customers, and relevant third parties, early in the process;
- inform customers of the divestiture, of the buyer's identity, and, if applicable, of their right to terminate their contracts with the divesting firms, incorporating input from the buyer into such communication;
- when customer contracts are assignable, assign customer contracts to the buyer;
- when customer consent is required to assign contracts, take steps to assist the buyer in obtaining those consents, including encouraging customers to consent;
- when required, waive contract restrictions that prevent customers from switching to the buyer and allow customers to terminate their contracts early and without penalty; and
- assist the buyer in obtaining any necessary governmental and other regulatory approvals.

The buyer should:

- take advantage of its access to all third parties involved, including customers, suppliers, landlords, and others;
- review and understand customer and other third-party relationships, including customers' buying patterns, customer brand and product loyalty, and customer switching costs; and
- when the order allows customers to terminate their contracts with the respondent, provide input into the respondent's communication with the customers that informs customers of such right.

## 3. Transition Services Agreements

As discussed above, the respondent should be prepared to provide back-office and other functions for a limited period until the buyer can provide them itself. The respondent will be required to provide those services pursuant to an agreement between the respondent and the buyer that the Commission has approved and that the Commission will monitor. The respondent will be required to:

- provide transition services for a sufficient period until the buyer can perform these services on its own, at no more than respondent's costs, which respondent will be required to document;
- enable the buyer to extend the agreement for a reasonable period, when appropriate;
- enable the buyer to terminate such agreement early, without financial penalty; and

- provide for monitor oversight, when necessary.

The study found that buyers seek to end their reliance on respondents' transition services quickly. Despite this, a few buyers needed the full term of the agreements and one needed the transition services agreement extended beyond what was provided by the order. The buyer should thus keep staff apprised of its progress in transitioning services from the respondent.

## 4. Supply Agreements

As with transition services agreements, the Commission seeks to minimize the length of time that buyers rely on respondents. The study confirmed that buyers are also wary of relying on respondents for supply of product or inputs. At the same time, supply agreements can be critical, enabling buyers to enter the affected markets quickly. To provide a buyer with supply of product or input for a sufficient period, but not so long as to diminish the buyer's competitive incentives, a respondent will be required to:

- provide supply for a term that extends at least for the length of the product qualification process or the time needed to enable the buyer to manufacture the product on its own or obtain the inputs; and
- allow for an extension when it is clear that the buyer needs additional supply on a transitional basis.

The buyer should keep staff apprised of its progress in transitioning off the supply agreement.

## 5. Hold Separates

Where there is a need for a hold separate, the assets to be divested are vulnerable to growing stale and the possibility that competitors may make potential inroads during the hold separate period. The hold separate manager, typically experienced in operating the assets, is critical to the success of the ongoing business during the hold separate period. To help the hold separate assets stay competitive during this period, the respondent should:

- allow the hold separate manager open and direct access to staff, independent of the respondent and respondent's counsel; and
- authorize hold separate managers to respond to competitive pricing in the market, maintain levels of production that best position the business to compete in the long term, implement all planned capital investments, and otherwise compete in the market.

The respondent and hold separate monitor should work with staff, beginning as early as possible, to ensure that hold separate operations can be structured efficiently and effectively.

## D. Orders in the Pharmaceutical Industry

To ensure the success of divestitures in the pharmaceutical industry, the respondent should:

- divest the easier-to-divest product wherever possible, such as products already made at a third-party manufacturing site;

- provide complete information upfront to the proposed buyer so that the buyer can be prepared to step into the respondent's place with key customers, including regarding any production problems or supply chain issues and more in-depth sales and costs figures;
- work with the proposed buyer to develop a comprehensive technology transfer plan and identify specific employees to oversee respondent's transfer to the new manufacturing facility; and
- retain a Commission-approved monitor prior to entry of the order to facilitate development of the technology transfer plan.

The proposed buyer should identify any necessary third-party contract manufacturers for divested products that the buyer will not manufacture in its own facilities, and provide detailed business plans for investment in products in development, including internal hurdle rates.

## E. Communication

Communication with staff is critical at every stage of the remedy process. A buyer, or any other affected party, should bring issues or concerns to the attention of the staff or the monitor as soon as they arise. A buyer should:

- stay in contact with staff and the monitor, if appointed; and
- raise issues as they arise with staff or the monitor.

Respondents should be aware that staff will remain in contact with buyers at least until the respondents have fully divested all required assets and have provided all required supply and transitional services.