**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** **STATE OF ILLINOIS,** and **STATE OF MINNESOTA,** *Plaintiffs,* v. **GTCR, LLC,** **GTCR BC HOLDINGS, LLC,** and **SURMODICS, INC.,** *Defendants.* | **Case No. 1:25-cv-02391** **Hon. Jeffrey I. Cummings** |

**PLAINTIFFS' REPLY
IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

I.    Legal Standard ............................................................................................................. 3

II.   Defendants Cannot Meet Their Burden to Show Their Proposed Remedy Offsets the Likely
      Competitive Harm of the Proposed Acquisition ....................................................................... 5

  A.  The Proposed Remedy Excludes Key Assets and Personnel Necessary to A Divestiture
      Buyer's Success ................................................................................................................ 7

  B.  The "License Back" Provision Immediately Hinders Integer's Ability to Compete ........... 9

  C.  Integer is Not Well-Positioned to Compete ...................................................................... 11

  D.  The Divestiture Agreement and Commercial Realities Would Leave Integer Dependent on
      the Merged Firm ............................................................................................................. 14

III.  Defendants' Proposed Acquisition is Anticompetitive ......................................................... 15

  A.  Defendants Ignore Key Facets of Competition ................................................................ 15

  B.  Defendants' Purported Market Dynamics Do Not Reflect Reality ................................... 18

    i.    The Relevant Market Includes Both UV-Cured and Thermal-Cured Coatings Because
          These Products Are Reasonable Substitutes ............................................................... 18

    ii.   The Relevant Market Properly Excludes Hydrophobic and In-House Coatings .......... 23

    iii.  The HMT Supports an Outsourced Hydrophilic Coatings Market .............................. 24

  C.  The Proposed Acquisition is Presumptively Unlawful, Even Accounting for Defendants'
      Proposed Remedy ............................................................................................................ 25

  D.  Defendants Cannot Rebut the Proposed Acquisition's Competitive Effects ..................... 27

IV.   Defendants Have Failed to Otherwise Rebut Plaintiffs' Strong Prima Facie Case .............. 28

    i.    Entry and Expansion are Unlikely ............................................................................ 29

    ii.   Defendants Have Not Demonstrated Any Measurable Efficiencies From the Proposed
          Acquisition ................................................................................................................ 29

V.    Equities Favor a Preliminary Injunction .............................................................................. 30

i

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Brown Shoe v. United States*, 370 U.S. 294 (1962).................................................................*passim*

*FTC v. Advoc. Health Care Network*, 841 F.3d 460 (7th Cir. 2016)................................................ 3

*FTC v. Advoc. Health Care*, 2017 WL 1022015 (N.D. Ill. Mar. 16, 2017)................................... 30

*FTC v. Arch Coal Inc.*, 329 F. Supp. 2d 109 (D.D.C. 2004) ..................................................... 4, 22

*FTC v. Elders Grain, Inc.*, 868 F.2d 901 (7th Cir. 1989) .......................................................... 3, 28

*FTC v. H.J. Heinz*, 246 F. 3d 708 (D.C. Circ 2001)................................................................ 22, 24

*FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329 (S.D.N.Y. 2024) ........................................ 3, 25

*FTC v. Kroger Co.*, 2024 WL 5053016 (D. Or. Dec. 10, 2024)....................................... 3, 6, 7, 14

*FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069 (N.D. Cal. 2023)................................................... 4

*FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069 (N.D. Ill. 2012) ............................................ 3

*FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865 (E.D. Mo. 2020) ....................................... 23

*FTC v. Staples, Inc.*, 970 F. Supp. 1066 (D.D.C. 1997).............................................................. 19

*FTC v. Sysco Corp.*, 113 F. Supp. 3d 1 (D.D.C. 2015) .................................................. 5, 6, 7, 19

*FTC v. Tapestry, Inc.*, 2024 WL 4647809 (S.D.N.Y. 2024) ................................................... 25, 29

*FTC v. Tempur Sealy Int'l*, 768 F. Supp. 3d 787 (S.D. Tex. 2025) .......................................... 4, 19

*FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27 (D.D.C. 2018)............................... 19

*Hospital Corp. of Am. v. FTC*, 807 F.2d 1381 (7th Cir. 1986)..................................................... 28

*Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023) ........................................................ 5, 19, 29

*McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603
   (S.D. Ind. Feb. 18, 2004) ....................................................................................................... 19

*Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951 (10th Cir. 1990)...................... 29

*Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024)....................................................................... 3

*United States v. Aetna Inc.*, 240 F. Supp. 3d 1 (D.D.C. 2017) ................................................. 4, 5, 13

*United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242 (8th Cir. 1989) ........................ 19, 22

*United States v. Bazaarvoice, Inc.*, 2014 WL 203966 (N.D. Cal. Jan. 8, 2014) ........................... 25

*United States v. Continental Can Company*, 378 U.S. 441 (1964) ................................................. 20

*United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665 (1964) ...................... 17

*United States v. General Dynamics*, 415 U.S. 486 (1974) ...................................................... 25, 26

*United States v. H&R Block*, 833 F. Supp. 2d 36 (D.D.C 2011) .................................................... 25

*United States v. UnitedHealth Group Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022) ............................ 4

**Statutes**

Section 7 of the Clayton Act, 15 U.S.C. § 18 .......................................................................... 3, 28

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) ..................................................................... 3, 28

**Other Authorities**

Brent Kendall & Peg Brickley, *Albertsons to Buy Back 33 Stores It Sold as Part of Merger With Safeway*, Wall St. J., Nov. 24, 2015 ............................................................................................ 6

David McLaughlin et al., *Hertz Fix in Dollar Thrifty Deal Fails as Insider Warned*, Bloomberg, Nov. 29, 2013 ........................................................................................................................... 6

FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics," (Jan. 2017) ............................................................................................................................... 6

U.S. Dep't of Justice & Fed. Trade Comm'n, Merger Guidelines (2023) .................................... 23

Defendants GTCR, LLC, GTCR BC Holdings, LLC (together, "GTCR"), and Surmodics, Inc. (collectively, "Defendants") rely heavily on their flawed remedy and warped view of competition to steer the Court's attention from the simple fact that the second-largest outsourced hydrophilic coatings supplier in the United States is attempting to acquire the largest outsourced hydrophilic coatings supplier in the United States in a move that would eliminate substantial head-to-head competition between those two companies and result in a dominant firm with nearly 60% market share.

Faced with a record that is replete with evidence of competition between Biocoat and Surmodics, Defendants now make an eleventh-hour attempt to remedy their anticompetitive deal by unilaterally proposing to divest a small fraction of Biocoat's hydrophilic coatings business to Integer (the "Proposed Remedy"), months after Plaintiffs' challenge.[1] Following the accelerated discovery process necessitated by Defendants' untimely and hastily assembled proposal, it is clear that Defendants' Proposed Remedy suffers from fatal shortcomings and does not offset the likely competitive harm that would result from the Proposed Acquisition. *First*, it would provide only a piecemeal set of assets that are insufficient to enable a new entrant to compete with the merged firm, while leaving a combined Biocoat and Surmodics with the vast majority of customers, revenues, employees, and facilities, as well as a commanding market share in the outsourced hydrophilic coatings market. *Second*, it provides for certain intellectual property and know-how to be licensed back to the merged firm, leaving Integer to compete against a merged firm with the same products and putting Integer at an immediate competitive disadvantage. *Third*, Integer has previously tried and failed to develop its own hydrophilic coating, and it is not meaningfully better positioned or incentivized to compete as a hydrophilic coating supplier

---

[1] ECF 204-4 Ex. 14 (Asset Purchase Agreement ("APA"), July 29, 2025).

today. *Fourth*, under the terms of the Proposed Remedy, Integer will remain unduly reliant upon and entangled with a combined Biocoat and Surmodics—with which it would also be expected to compete—for years to come.

Moreover, because they cannot rebut Plaintiffs' strong prima facie case, Defendants present a counterfactual view of competition in this industry that is at odds with the documentary record and testimony from both Defendants and third-party witnesses. The evidence will show, however, that hydrophilic coating suppliers like Biocoat and Surmodics are in constant competition to develop innovative coatings that will attract new customers and to secure and win business throughout the lifecycle of the products to which their hydrophilic coatings are applied. Defendants claim, contrary to the overwhelming weight of the evidence, that most of these competitive interactions do not qualify as competition at all, and that competition instead occurs only in a very narrow window between feasibility testing and coating optimization. Even within that window, Defendants wave away many of the competitive interactions between Biocoat and Surmodics, including head-to-head interactions that customers and Defendants' own executives identify as competition. In doing so, Defendants ignore the commercial realities of the outsourced hydrophilic coatings industry.

Based on this artificially narrow view of competition, Defendants conclude that most of Biocoat's hydrophilic coatings are not reasonable substitutes for Surmodics' hydrophilic coatings and that an outsourced hydrophilic coatings market is improper because it is both too broad and too narrow. Once again, the evidentiary record tells a different story. The record is clear that customers can, and often do, choose between thermal-cured coatings and UV-cured coatings, which are substitutable for the vast majority of use cases. Defendants' attempts to shoehorn other forms of coatings into the relevant market fare no better; market participants consistently

2

testified that they would not consider non-hydrophilic coatings for their devices nor forego coatings altogether.

Neither Defendants' last-minute Proposed Remedy nor their counterfactual version of the relevant market are sufficient to rebut the presumption that the Proposed Acquisition is substantially likely to lessen competition in the market for outsourced hydrophilic coatings in the United States. Even accounting for Defendants' Proposed Remedy, the Proposed Acquisition is presumptively illegal and is likely to eliminate competition that benefits the makers of life-saving medical devices.

## I. Legal Standard

To warrant a preliminary injunction, Plaintiffs must show they are likely to succeed on the merits of their claim that "the effect of [the Proposed Acquisition] may be substantially to lessen competition" and that such preliminary relief would be in the public interest. 15 U.S.C. § 18; *see also* 15 U.S.C. § 53(b). The Seventh Circuit and courts around the country have consistently held that Plaintiffs need not demonstrate "certainty" or "even a high probability" of anticompetitive harm to establish likelihood of success on the merits. *FTC v. Elders Grain, Inc.*, 868 F.2d 901, 906 (7th Cir. 1989); *see also FTC v. Advoc. Health Care Network*, 841 F.3d 460, 467 (7th Cir. 2016); *FTC v. OSF Healthcare Sys.*, 852 F. Supp. 2d 1069, 1074 (N.D. Ill. 2012); *cf. FTC v. Kroger Co.*, 2024 WL 5053016, at *1 (D. Or. Dec. 10, 2024); *FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 347-350 (S.D.N.Y. 2024). Defendants' reliance on the higher standard set forth for other types of preliminary injunctions in *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024), is misplaced, as even Defendants concede that a showing of irreparable injury is not required under Section 13(b). *See* ECF 202 (Defendants Opposition to Motion for Preliminary Injunction) ("Opp.") 11.

3

Contrary to established law, Defendants also argue that Plaintiffs bear the burden of addressing Defendants' Proposed Remedy as part of Plaintiffs' prima facie case. This is not the standard courts apply where, as here, the parties propose a conditional remedy months after their proposed merger has been challenged. *See, e.g.*, *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 17 (D.D.C. 2017) (considering divestiture as part of Defendants' rebuttal where divestiture was proposed after complaint was filed).

Defendants' reliance on *Arch Coal* and *Microsoft* to support their distorted burden-shifting framework, Opp. 13 n.25, is inapposite. Defendants cite a pre-hearing decision in *Arch Coal* denying the FTC's motion *in limine* to exclude divestiture-related evidence. 2004 WL 7389952, at *1 (D.D.C. July 7, 2004). In the *Arch Coal* preliminary injunction opinion, however, the court considered remedy evidence as part of "defendants' burden." *FTC v. Arch Coal Inc.*, 329 F. Supp. 2d 109, 147 (D.D.C. 2004). *Microsoft*, a vertical merger case, involved unilateral behavioral commitments regardless of the outcome of the merger. *FTC v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1090-91 (N.D. Cal. 2023).

Defendants also inappropriately rely on dicta from *United Health* to argue that it is Plaintiffs' burden to incorporate a divestiture into the prima facie case. *United States v. UnitedHealth Group Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022). When evaluating the horizontal theories of harm, however, the court applied the burden-shifting framework to conclude that the Government was entitled to a presumption of reduced competition based on pre-divestiture market shares, *id.* at 134, and required defendants to "prove in rebuttal that the proposed divestiture . . . will 'restore the competition lost by the merger,'" *id.* at 135 (quoting *Aetna*, 240 F. Supp. 3d at 60). The court in *FTC v. Tempur Sealy Int'l*, likewise explained that it would

consider any "remedial commitments" such as divestiture separate from the FTC's prima facie case. 768 F. Supp. 3d 787, 834 (S.D. Tex. 2025).

## II.    Defendants Cannot Meet Their Burden to Show Their Proposed Remedy Offsets the Likely Competitive Harm of the Proposed Acquisition

Defendants' Proposed Acquisition is likely to substantially lessen competition in the market for outsourced hydrophilic coatings. Defendants offer their Proposed Remedy to cure the Proposed Acquisition's illegality, but cannot show, as they must, that the divestiture would "'replac[e] the competitive intensity lost as a result of the merger.'" *Aetna*, 240 F. Supp. 3d at 60 (quoting *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 72 (D.D.C. 2015)).[2]

Defendants propose to divest only a █████████ of Biocoat's hydrophilic coatings business. PX7076 ██████████████████████ 34:14-18. Biocoat currently boasts approximately 45 hydrophilic coatings products. PX1633 at 005-009 (Term Sheet, Apr. 2025).

███████████████████████████████████████████████████████████████

██████████████████████████. PX1840 at 001 (██████████████████████

██████). Biocoat also has a multi-decade reputation as a leader in the hydrophilic coatings industry and an extensive track record of FDA-approved devices that use Biocoat's hydrophilic coatings. *See* PX7026 (██████████████████) 89:9-90:11.

Defendants' Proposed Remedy would carve out a small part of this business to sell to Integer, a contract development and manufacturing organization ("CDMO") that provides product development and manufacturing services to medical device companies. *See* PX1633 at 005-009; *infra* at 7-9. Integer will pay approximately $██████████ for the divested assets

---

[2] The more lenient standard Defendants advocate would not change the outcome as Defendants' Proposed Remedy also would not "sufficiently mitigate[] the merger's effect such that it [is] no longer likely to substantially lessen competition." *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1059 (5th Cir. 2023).

(███████████████████████████████████████████████████████

███████████████████████████████████████████████. *See*

APA at -730-732, -784; PX1520 at 004. The Proposed Remedy includes: 10 of Biocoat's ██

hydrophilic coating products; 11 of Biocoat's ██ employees; Biocoat's former production

facility, which is now used primarily for research and development rather than coatings

production; and a small fraction of Biocoat's customer contracts. PX1633 at 005-009 (Term

Sheet, Apr. 2025); APA at -785-786; PX3266 at 006 (███████████); PX7067 █████

███████ 55:1-56:4, 125:9-126:6. Integer, which does not have a hydrophilic coating

production business today and has failed in its attempts to build this business in the past, will be

forced to cobble together a new hydrophilic coating business with these spare parts. *See* PX7067

██████████ 134:7-12; *infra* at 11.

Past experience has shown that partial divestitures, such as the one proposed here,

"increase[] the risk that a remedy will not succeed,"[3] and as a result, courts treat them

skeptically. *See Kroger*, 2024 WL 5053016, at *26-28 (criticizing proposed divestiture that did

"not represent a standalone, fully functioning company"); *Sysco*, 113 F. Supp. 3d at 76

(considering "disadvantages" the divestiture buyer would face from having fewer than half the

salespeople of the existing business). Defendants' Proposed Remedy is no exception. It will not

offset the likely competitive harm of the Proposed Acquisition because: (1) the Proposed

Remedy excludes key assets and personnel that would be critical to Integer's ability to compete

effectively; (2) several of the coatings that would be "divested" would be subject to a license

---

[3] "FTC's Merger Remedies 2006-2012: A Report of the Bureaus of Competition and Economics," at 5 (Jan. 2017), *available at* https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf; *see also* Brent Kendall & Peg Brickley, *Albertsons to Buy Back 33 Stores It Sold as Part of Merger With Safeway*, Wall St. J., Nov. 24, 2015; David McLaughlin et al., *Hertz Fix in Dollar Thrifty Deal Fails as Insider Warned*, Bloomberg, Nov. 29, 2013.

back to the merged firm, leaving Integer without differentiated products with which to compete; (3) Integer previously tried but failed to market its own hydrophilic coating line, and the divestiture does not provide sufficient assets for Integer to succeed now where it has failed previously; and (4) the Proposed Remedy leaves Integer reliant on a combined Biocoat and Surmodics, with which it would also be expected to compete.

### A. The Proposed Remedy Excludes Key Assets and Personnel Necessary to A Divestiture Buyer's Success

The Proposed Remedy would divest a limited segment of Biocoat's hydrophilic coatings business and is far from the type of standalone business or product line that courts favor when assessing proposed divestitures. *See Kroger*, 2024 WL 5053016, at *26-28. In addition to only including some of Biocoat's hydrophilic coatings products, Defendants' Proposed Remedy also excludes key personnel and facilities that Integer would need to compete effectively against a combined Biocoat and Surmodics. *See Sysco*, 113 F. Supp. 3d at 74 (considering whether facilities included as part of proposed divestiture would enable buyer to compete with merged firm). The only way for Defendants to divest a standalone business would be to divest the entirety of Biocoat. ██████████████████████████████████████████ ███████████████████████████████████████████████████. *See* PX1840 at 002 (███████████████████); PX7024 (███████████████████) 64:16-20; PX7070 (███████████████) 244:16-245:17.

Specialized personnel and know-how are essential to winning business in the hydrophilic coatings industry, where customers value suppliers that can help them optimize coatings and navigate the FDA approval process. ECF 173-1 (Plaintiffs' Memorandum of Law in Support of Motion for Preliminary Injunction) ("PI Br.") 23. The Proposed Remedy includes 11 non-management Biocoat employees—███████████████████████████████████████

PX7067 (████████████████.) 55:5-56:4, 96:21-97:54;

147:17-24; *see also* PX1840 (████████████). ████████████

████████████████████████████████████

████████████████████████████.” PX7067 ████

████████ 98:18-25, 295:14-25. ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████. *See* PX7026 (████████████)

58:7-59:23; Welsh (Alembic) Dep. 118:9-17; ████████████. 104:10-105:1.

The Proposed Remedy also excludes the main production facility where Biocoat

manufactures its hydrophilic coatings. ████████████████

████████████████████████████████████

████████████████ 81:19-24; PX7015 (████████

████████) 22:7-23:12; PX7067 (████████.) 81:15-84:2 (████████

████████████████████████████████

████). ████████████████████████

████████████████████. PX7067 ████████

████ 80:2-81:14; PX3258 at 001. Even with Integer's own facilities, however, moving

production of hydrophilic coatings to a new facility is risky, as it may require additional

certifications and approvals by customers or regulators. *See* PX7070 (████████.)

308:18-22, 310:4-15, 322:9-323:4 (████████████████); PX7058

████████████ 80:9-80:22 ████████████████

████████████████.

8

Defendants' insistence that the Proposed Remedy would divest "the entire Biocoat UV-cured coatings business," Opp. 1, is misleading. As discussed *supra*, there is no separate "UV-cured coatings business" to divest. Thermal and UV curing are two methods that Biocoat uses to service customers of its hydrophilic coatings business, ███████████████████████ ██████████████. *See* PX7015 (████████████) 15:9-16:12, 22:4-6 ████████████████████████████████████████████. Moreover, under the terms of the APA, Integer would not receive all of Biocoat's UV-cured hydrophilic coatings assets or personnel. Rather, Integer would receive only a small number of Biocoat's ███████████████████ employees and a facility that is not currently used to manufacture hydrophilic coatings ████████████████████ ███████ PX7067 (████████████.) 147:1-11, 123:16-124:6.

## B. The "License Back" Provision Immediately Hinders Integer's Ability to Compete

Defendants' Proposed Remedy not only does not include the full suite of Biocoat's offerings, it also would require Integer to "license back" to the merged firm the intellectual property or know-how for four coatings. *See* PX1633 at 005-009 (Term Sheet, Apr. 2025); ECF 204-2 Ex. 10 at 247; APA -755-756, -857-859, -872. This means that Integer would be attempting to enter and compete with some of the same products as the merged firm, while the merged firm keeps producing and selling those "divested" products, placing Integer at an immediate competitive disadvantage. ████████████████████████████ ████████████████████████ PX3254 ████████████████ at 007; PX7067 (████████████) 125:9-126:6. The merged firm, however, would boast more coatings options, an established manufacturing facility, and far more application development engineers to optimize coatings for the customer. Customers will have little reason to choose a new and

9

untested supplier when they can get many of the same coatings from the merged firm. *See* PX7039 (Welsh (Alembic) Dep.) 161:2-24 ██████████████

██████ PX7076 (████████████) 42:11-43:12 (███████████████████

████████████████████████████

████████████████████████████████

████████████████████████████████

████████████). ████████████████████████

████████████████████████████████

██████████████████ PX3264 at 013 (████████████████).

Defendants' argument that the license-back provision will create an additional competitor is simply incorrect. The merged firm is keeping most of the products and business it claims to be "divesting," and the divestiture buyer would be a much weaker competitor than Biocoat prior to the Proposed Acquisition.

Defendants attempt to obfuscate the importance of the licensed-back coatings, arguing that Biocoat would retain only "legacy" coatings it does not use to compete for new customers. Opp. 1. Nonetheless, those "legacy coatings" would remain part of Biocoat's competitive ██████████ and are available as an option that customers can test and choose for new devices. *See* PX3003 at 013 (██████ Presentation, Oct. 2024) (selecting ████████████████

████████████████); PX7015 (████████████.) 67:19-68:12 (████████

████████████████████████████████

████████████████). They also represented almost ██% of Biocoat's coating product sales in the relevant market in 2024. *See* PX4013 (Rebuttal Report of Dr. Aaron Fix) ("Fix Rebuttal") ¶ 208.

### C. Integer is Not Well-Positioned to Compete

Integer's prior failure to develop a hydrophilic coating provides additional cause for concern about Defendants' Proposed Remedy. Integer previously spent *eight years* trying to develop a hydrophilic coating that could compete with Biocoat's and Surmodics' offerings, and ultimately abandoned the project ███████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████ PX7067 (███████████.) 132:15-133:22. There is no reason to believe Integer will be more successful now, principally because (1) it is difficult for newcomers to compete in the outsourced hydrophilic coatings market, and Integer would be competing with an incomplete set of assets and undifferentiated products; and (2) Integer will benefit from the Proposed Remedy regardless of whether it competes for new outsourced hydrophilic coatings customers.

*First*, entry as a supplier in the relevant market is difficult and can take many years, even when successful. *See* PX7034 (███████████.) 235:20-236:16 (███████████ ██████████████████████████████████████████████). Developing a new hydrophilic coating demands years of work by a highly specialized research and development team and major financial investment. PI Br. 47. Much of Integer's success in hydrophilic coatings will rely on its ability to develop new hydrophilic coatings to compete with the combined Biocoat and Surmodics. *See* PX3257 ███████████████ at 033 ██████████████████████████████████████████████████████████████ ██████████████████ Given that Integer previously failed to enter the market as a supplier of hydrophilic coatings ███████████████████████████████████ the limited set of assets it would acquire from the Proposed Remedy do not position Integer to be successful now.

*See* PX7067 ███████████ 132:15-133:22; PX7076 (███████████) 52:9-53:6

(███████████████████████

███████████████████████████

███████████████████████████████).

 Integer's size—which Defendants tout as an indication of its strength as a divestiture

buyer, Opp. 13—is a flawed barometer of its likely success as a hydrophilic coating supplier. █

████████████████████████████

████████████████████████████

█ PX7058 (███████████.) 45:19-47:17; *see also id.* at 47:15-47:17 ████████████

██████████████████████.

 Defendants also point to Integer's existing medical device business as a benefit to its

competitive prospects as an outsourced hydrophilic coatings supplier. Opp. 13-14. Hydrophilic

coatings customers, such as medical device manufacturers and rival CDMOs, however, are less

likely to choose Integer as a hydrophilic coatings supplier because Integer also manufactures

competing medical devices. *See* PX7022 (███████████) 151:1-152:17 (████

████████████████████████████

████████████████████████████

███); PX7054 (███████████) 16:3-17:1; PX1704 at 014 (███████████

████████████████████████████

████████████████████████████

███████████████).

 *Second*, beyond the factors that will affirmatively hinder Integer's ability to compete

effectively, Integer also does not have the same incentives as Biocoat to innovate and offer new

hydrophilic coatings products to customers beyond the coatings they receive via the divestiture.

███████████████████████████████████████████████████

███████████████████████████████████████████. PX7067 ██████

█████████████ 65:20-66:10 (████████████████████████████████

█████████████████████████████████████); PX3266 (█████████████████

█████████) at 008. This alone provides significant value to Integer regardless of how its

broader hydrophilic coatings business may or may not develop. *See* PX3264 at 013 (██████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████). ██████████████████████████████████████████

███████████████████████████████ PX3255 Tab 2.1 (██████████

████████████████████████████████████). Because Integer will benefit from

the Proposed Remedy regardless of whether it attempts to win new outsourced hydrophilic

coating customers, the chances that the Proposed Remedy will actually benefit *competition* in the

outsourced hydrophilic coatings market are uncertain at best.

The low price Integer would pay for the partial divestiture—at most, ███████—

underscores these risks. Defendants concede that the purchase price is relevant to evaluating the

Proposed Remedy's sufficiency. Opp. 15; *see also Aetna*, 240 F. Supp. 3d at 72 ("An extremely

low purchase price reveals the divergent interest between the divestiture purchaser and the

consumer."). ████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████ PX3256 at 001; *see also* PX7067 (████████████

██████) 74:5-76:2.

### D. The Divestiture Agreement and Commercial Realities Would Leave Integer Dependent on the Merged Firm

The Proposed Remedy also does not position Integer as an independent competitor to a combined Biocoat and Surmodics. *See Kroger*, 2024 WL 5053016, at *24 ("the independence of the divestiture buyer from the merging seller" is relevant to "whether a proposed divestiture will restore competition"). Integer would be forced to rely on a broad range of transition services from the merged firm, inhibiting Integer's independence from its future competitor. *See* PX7067

███████████████ 257:4-21. For example, Integer would rely on the merged firm to █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████ APA -822. Integer would also depend on the merged firm to ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████. APA -823-825. ████████████████████

████████████████████████████████████████████████

█████████████████████████ PX7067 (█████████████.) 106:25-107:3 ████

████████████████████████████████████████████████████

███████████. These are only a few examples of the myriad services for which Integer would be dependent on the merged firm in order to merely start a hydrophilic coatings business.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ *See* PX7067 (███████████████) 138:18-139:4 ████████████

███████████████████████████████ Hydrophilic coatings

like those Integer buys from Biocoat and Surmodics are part of the device specifications submitted to the FDA and cannot be easily switched out. PI Br. 28-29.

Finally, the merged firm would have few incentives to provide robust support to enable a strong new competitor. Under the terms of the divestiture agreement, if Integer fails to ██████ ████████████████████████████████████████ within 365 days, GTCR will forfeit only ██ ████ of the purchase price █████████████████████████████████████████ ████████████████████ APA at -732, -785-786; *id.* Ex. F, at -864. Beyond that small payment, the combined firm has little reason to help a new competitor succeed.

## III. Defendants' Proposed Acquisition is Anticompetitive

### A. Defendants Ignore Key Facets of Competition

Industry participants—including Defendants and their proposed divestiture buyer—overwhelmingly view Biocoat and Surmodics as direct competitors. *See* PI Br. 33-36; PX3257 at 027 (█████████████████ PX2049 at 002 (2022 Surmodics email identifying "formulations that equal [best-in-class] with Biocoat" was part of Surmodics' "[c]ritical success list for . . . next-generation technology"); PX1256 at 003 (███████████████████████ ████████████████████████). Biocoat and Surmodics compete in myriad ways, most of which Defendants ignore. Before hydrophilic coatings are even tested on a device, Biocoat and Surmodics compete to innovate their hydrophilic coatings and showcase their products to customers. PX7023 (██████████████) 73:2-13; PX7026 (██████████ ████████) 234:23-235:8 (███████████████████); PI Br. 34, 36-37. They also reach out to customers proactively to tout their ability to meet customers' needs with specific coatings, *see, e.g.*, PX1694 (████████████████████████), ████ ████████████████████████, PX1659 at 013 (█████████████████),

and ▮▮▮▮▮▮▮▮▮▮▮. PX1691 at 002 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX2303 at 005 (▮▮▮▮▮▮▮▮▮▮); PX1715 at 015 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮); PX7057 ▮▮▮▮▮ (▮▮▮▮▮▮▮▮▮) 79:13-80:7, 109:20-110:14; PX1690 at 003 (▮▮▮▮▮▮▮▮▮▮▮▮▮).

To win business for specific devices, Biocoat and Surmodics compete on services and turnaround time, offer discounted feasibility testing and better pricing, and work with customers during and after feasibility testing to optimize coating performance on the customer's device. *See* PI Br. 36-41; *see also e.g.,* PX1222 at 002 (Biocoat sales representative offering free feasibility testing to better compete with Surmodics and Harland).

Biocoat and Surmodics also leverage their positions as well-known industry veterans when competing for customers, who value established, stable partners that can provide reliable coatings services for the lifetime of a product. PX7045 ▮▮▮▮▮▮▮▮▮ at 90:19-91:18; PX7076 (▮▮▮▮▮▮▮▮▮▮▮) at 126:1-126:18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Even after a supplier is chosen to coat a specific medical device, Biocoat and Surmodics continue competing for the next generation of products. *See, e.g.*, PX1077 at 001 (Biocoat CEO reaching out to a CDMO "to see if there is interest in lowering costs by switching to Biocoat versus using Surmodics coatings").

Moreover, contrary to Defendants' assertions, Biocoat and Surmodics compete on price and pricing terms. For example, a 2020 Biocoat presentation created for customers conducted a detailed side-by-side analysis of Surmodics' and Biocoat's pricing. PX1571 at 016 (Biocoat, Coating Product Pricing Economic Consideration, Aug. 2020); *see also* PX1672 at 002 ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Customers' testimony and documents

likewise show that they compared Biocoat's and Surmodics' pricing in selecting a hydrophilic coating. PX2256 at 001 (2024 email from customer to Surmodics, comparing pricing between Surmodics' and Biocoat's coatings); PX7025 (████████████) 89:19-90:5. Defendants' overly restrictive definition of competition misses many of the ways that hydrophilic coatings suppliers compete in the real world.

Defendants claim that the presence of other smaller hydrophilic coatings suppliers would mitigate the loss of direct competition between Biocoat and Surmodics but fail to account for these suppliers' lack of competitive strength. Again and again, Defendants attempt to substitute counting competitors for an analysis of market *concentration* and competitive effects. Many of these smaller hydrophilic coatings suppliers lack the services, expertise, reputation, and longevity of the Defendants, all criteria that customers consider crucial in choosing a supplier. *See, e.g.*, PX7039



████████; PX7055 (████████████ 46:21-47:1; PX7051 (██████ ██████) 108:24-109:4 (████████████ ██████). ████████████ ████████████ PX7067 ████████ ████ 31:7-10.[4]

---

[4] Defendants' contention that Plaintiffs cannot meet their prima facie case by showing a loss of head-to-head competition alone is misplaced. Although the elimination of head-to-head competition can be an independent basis to find a transaction unlawful, *United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 669-70 (1964), Plaintiffs here *have* defined a proper relevant market: outsourced hydrophilic coatings for medical devices.

**B. Defendants' Purported Market Dynamics Do Not Reflect Reality[5]**

Defendants acknowledge that market definition is a "pragmatic, factual" inquiry that should reflect "the commercial realities of the industry," Opp. 20 (quoting *Brown Shoe*, 370 U.S. at 336), and then proceed to ignore voluminous ordinary course evidence and testimony that support an outsourced hydrophilic coatings market that includes both UV-cured and thermal-cured coatings and excludes hydrophobic and in-house coatings. The two commonly used tests for defining a relevant market—the *Brown Shoe* factors and the Hypothetical Monopolist Test ("HMT")—bear this out.

> i.    *The Relevant Market Includes Both UV-Cured and Thermal-Cured Coatings Because These Products Are Reasonable Substitutes*

Defendants' attempt to characterize Plaintiffs' market definition as "too broad" for including both UV-cured and thermal-cured coatings, ignores voluminous evidence from customers and Defendants demonstrating that UV-cured coatings and thermal-cured coatings are reasonably interchangeable for the vast majority of use cases. PX7027 (███████████) 41:22-42:3; PX7024 (███████████████) 168:10-170:18; PI Br. 13-18; *see Brown Shoe v. United States*, 370 U.S. at 325 (1962) (relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it"). These two methods of applying hydrophilic coatings yield similar baseline performances and are similarly priced. PX7024 (███████████████) 168:10-170:18. A former Senior Director of Business Development at Biocoat and ███████████ ███████ stated earlier this year that based on his "16 years" in this industry, "the end application" for UV-cured and thermal-cured hydrophilic coatings is "the same and

---

[5] Defendants do not dispute that the relevant geographic market is the United States.

interchangeable." PX6084 at 003 (AlphaSense Interview, Jan. 31, 2025); PX7068 

) 114:5-115:13.

Customers agree and testified that they regularly consider both UV-cured and thermal-cured hydrophilic coatings for their devices. PX7045 ▮▮▮▮ 44:12-45:12



); PX7021 ▮▮▮▮ 163:6-11 (▮▮▮▮

); *see also FTC v. Wilh. Wilhelmsen Holding ASA*, 341 F. Supp. 3d 27, 45 (D.D.C. 2018) ("demand substitution" is a "touchstone" of defining a relevant product market).

Defendants' arguments would require Plaintiffs to show "perfect fungibility" between Biocoat's and Surmodics' products, but that is not what the law requires. *Tempur Sealy*, 768 F. Supp. 3d at 815 (citation omitted); *see also McLaughlin Equip. Co. v. Servaas*, No. IP98-0127-C-T/K, 2004 WL 1629603, at *17 (S.D. Ind. Feb. 18, 2004). Rather, where, as here, "a product market includes all goods that are reasonable substitutes, even though the products themselves are not entirely the same," courts have found that the products are within the same relevant market. *See Sysco*, 113 F. Supp. 3d at 1, 25; *see also FTC v. Staples, Inc.*, 970 F. Supp. at 1074 (D.D.C. 1997) (framing the question as "whether two products can be used for the same purpose, and if so, whether, and to what extent purchasers are willing to substitute one for the other") (citation omitted). Courts routinely find that products with similar "characteristics and uses" belong to the same market, even if they are not identical. *Illumina*, 88 F.4th at 1049 ("[T]wo products need not be identical to be in the same market; rather, the question is merely whether they are similar in character or use." (quotations and citation omitted)); *see also See United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1989) (holding that that sugar

and high fructose corn syrup were "functionally interchangeable" despite differences in source and production).

In addition to overlooking the mountain of real-world evidence of substitutability between UV-cured and thermal-cured coatings for the vast majority of use cases, Defendants focus on edge cases, contending that UV-cured and thermal-cured coatings are not substitutable because some areas of a device may be heat-sensitive or unreachable by UV light, *see* Opp. 21, or because the medical devices they are used to coat each have "unique performance specifications." Opp. 24-25. But just as courts have rejected the need for perfect fungibility, they have also held that products do not have to be in competition for every possible end use to belong to the same product market. *United States v. Continental Can Company*, 378 U.S. 441, 457 (1964) (acknowledging that "[t]here may be some end uses for which glass and metal do not and could not compete," but concluding that "complete interindustry competitive overlap need not be shown" for them to be part of the same product market); *see also Brown Shoe*, 370 U.S. at 325 (holding that the product market may include "well-defined submarkets").

Defendants' assertions about how customers select hydrophilic coatings are largely divorced from evidence provided by actual customers. For example, Defendants' claim that when customers test both UV-cured and thermal-cured hydrophilic coatings on a device, "most often one or the other fails" due to their different chemistries, is based on no evidence at all. Opp. 21 (citing nothing to support this claim). The evidence shows that customers often consider both UV-cured and thermal-cured coatings as viable options, even after testing. ███████ Senior Director of R&D testified about a recent instance of testing hydrophilic coatings for a new device, where █████ tested both thermal-cured and UV-cured coatings—although █████ ultimately chose █████ thermal-cured coating, the UV-cured options that █████ tested were

20

also "[t]echnically feasible" and "came close in terms of performance." PX7023 (███████

███████.) 67:10-25. ████████████████████████████

███████████████████████████████████████

███████████████████████ PX3009 ██████████████████

████████ This is consistent with testimony from other customers. *See, e.g.*, PX7044 (████

███████) 108:15-109:5 ███████████████████████

███); PX7045 ████████████ 47:17-48:4 (████████████

███████████████████████████); *see also* PI Br.

5, 13-20, 34-35.

In addition, evidence from both Defendants and other industry participants demonstrates

that UV-cured and thermal-cured coatings are similarly priced, *see* PI Br. 24-25, belying

Defendants' incorrect assertion that "UV and thermal . . . have distinct prices and pricing

models." Opp. 26. Defendants' confusing focus on the ways coatings may be sold—including

that they are sometimes sold in different quantities such as gram or liter, Opp. 26, is inapposite

and does not negate the fact that their similar pricing supports the existence of a relevant market

that contains both under *Brown Shoe*. Defendants ignore that hydrophilic coatings cost

approximately six times as much as hydrophobic coatings. PX7022 (████████████.)

145:7-24; PX7040 (██████████) 181:20-182:13.

Because Defendants are unable to rebut evidence that customers view UV- and thermal-

cured hydrophilic coatings as substitutes, they attempt to confuse the market definition analysis

by pointing out that the coatings "have different production methods because they are applied

differently." Opp. 25. But ordinary course documents and testimony do not support that this is a

meaningful distinction. Instead, customers have consistently testified that performance is their

primary consideration in choosing a hydrophilic coating. *See, e.g.*, PX7023 (

) 41:13-44:13; PX7051 (           ) 24:13-25:13 (

). Moreover, production and

application methods are not among the *Brown Shoe* practical indicia and have no bearing on

whether UV- and thermal-cured hydrophilic coatings are part of the same market. *See Archer-*

*Daniels-Midland*, 866 F.2d at 246 ("The three most relevant factors used to determine reasonable

interchangeability are use, quality, and price.") (citations omitted); *FTC v. H.J. Heinz*, 246 F. 3d

708 (D.C. Circ 2001) at 711-12 (focusing on customer perception of product substitutability, not

production method, to determine whether products belonged to same market); *Brown Shoe*, 370

U.S. at 325.

Defendants misuse the language of *Arch Coal* to justify their insupportably narrow

market. Opp. 21. The "narrowest market" principle articulated in that case simply instructs that

the market definition exercise should begin narrowly and expand as necessary until the relevant

market is identified, rather than start with the most expansive market possible and narrow until

the relevant one is found. *See Arch Coal*, 329 F. Supp. 2d at 120. Nowhere does *Arch Coal*

suggest that the narrowest possible market is necessarily the correct or only market. *Arch Coal*

acknowledges that "the general question" in market definition is "whether two products can be

used for the same purpose and, if so, whether and to what extent purchasers are willing to

substitute one for another." 329 F. Supp. 2d at 118 (quoting *Staples*, 970 F. Supp. at 1074). The

2023 Merger Guidelines reflect this precedent, explaining that "multiple overlapping markets can be appropriately defined relevant markets." Merger Guidelines, § 4.3 fn 77.

> ii.  *The Relevant Market Properly Excludes Hydrophobic and In-House Coatings*

Defendants' assertion that Plaintiffs' market definition is too narrow because it does not include hydrophobic coatings or hydrophilic coatings produced in-house by medical device companies is unsupported by the evidence. Opp. 22-23. The purpose of defining a relevant product market is to identify "the functionally similar products to which customers could turn" in the event of a post-acquisition price increase. *FTC v. Peabody Energy Corp.*, 492 F. Supp. 3d 865, 884 (E.D. Mo. 2020).

Defendants do little to engage with or otherwise rebut significant customer testimony and other evidence that customers do not view hydrophobic coatings as substitutes for hydrophilic coatings due to significant performance and price differences. Due to the differences in the characteristics and applications of hydrophilic and hydrophobic coatings, they are generally used on different devices, or on different parts of the same device requiring different degrees of lubricity. PI Br. 15-16. Testimony and ordinary course documents from the parties and their competitors are consistent with this assessment. *See* PX7024 (██████████████████████) 233:8-236:22, 243:22-245:25, 240:19-241:15 (████████████████████████████████████████████████████████████████); PX7034 (████████████████) 227:13-24. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ PX7067 (████████████) 68:19-69:1.

Defendants point to no evidence from customers to support their contention that hydrophobic coatings, silicone, or "no coating at all" are considered substitutes for hydrophilic coatings. Instead, Defendants cite testimony indicating that some catheters and guidewires do not require the friction reduction offered by hydrophilic coatings, Opp. 29, fn 59, but the referenced testimony does not indicate that hydrophobic coatings can be used *in place of* hydrophilic coatings on the devices that today rely on the dramatically improved lubricity added by hydrophilic coatings. *See H.J. Heinz*, 246 F.3d at 718 (explaining that products should only be included in the market if "consumers regard the products as substitutes").

In-house coatings must likewise be excluded from the relevant market. Few customers make their own coatings in-house, and if they do, those coatings are not available for other medical device manufactures to purchase; the vast majority of customers accordingly do not view them as an option. PX1201 at 014 (████████████████████████████) ████████ ███████████████████████████████████████████████████████ ████████); *see also* PI Br. 20-21. Because in-house coatings are not available to most customers, they are not reasonably interchangeable with outsourced coatings. *See H.J. Heinz*, 246 F.3d at 718 n.15.

iii. *The HMT Supports an Outsourced Hydrophilic Coatings Market*

Application of the HMT also reveals that the relevant "market of outsourced hydrophilic coatings for U.S. medical devices unambiguously passes the HMT." *See* PX4013 (Fix Rebuttal) ¶ 59. Here, Dr. Fix performs empirical analysis that allows him to quantify the degree of diversion that would be sufficient to satisfy the HMT, *see* PX4000 (Fix Report) at Table 2, and

has shown that the HMT is likely satisfied even using Dr. Wong's flawed method, PX4013 (Fix Rebuttal) ¶ 70, further supporting a relevant market of outsourced hydrophilic coatings. *See United States v. H&R Block*, 833 F. Supp. 2d at 62 (D.D.C 2011) (accepting plaintiff's expert's analysis, noting that although the data used was "not without its limitations," it was "at least somewhat indicative of likely diversion ratios"); *see also United States v. Bazaarvoice, Inc.*, 2014 WL 203966, at *32 (N.D. Cal. Jan. 8, 2014) (accepting plaintiff's HMT despite data limitations because the calculations "sufficiently reflected the state of the market" and where defendants failed to offer their own HMT); *FTC v. Tapestry, Inc.*, 2024 WL 4647809, *33 (S.D.N.Y. 2024).

### C. The Proposed Acquisition is Presumptively Unlawful, Even Accounting for Defendants' Proposed Remedy

Dr. Fix's market share analysis supports a presumption of illegality and is consistent with the real-world competitive dynamics of the market. PX4013 (Fix Rebuttal) ¶¶ 104-116. *See IQVIA*, 710 F. Supp. 3d at 390 (relying on historical revenues to guide market share analysis).

Defendants' reliance on *United States v. General Dynamics*, 415 U.S. 486 (1974), to argue that current sales cannot be used to calculate reliable market shares, Opp. 35-37, mischaracterizes the facts underlying that decision and of the relevant market here. *General Dynamics* addressed the significance of capacity constraints in cases where markets are defined based on production volume and where past sales commitments limited future sales opportunities. 415 U.S. at 500-02. In contrast, past and current sales in the outsourced hydrophilic coatings market do not limit future opportunities, and there are no similar capacity constraints here. Indeed, the *General Dynamics* Court noted that past revenues are "relevant as a prediction of future competitive strength" when factors such as "brand recognition" and "distribution systems" built through past success are likely to significantly influence firms' future

success. *General Dynamics*, 415 U.S. at 501. That is the case here, where the evidence shows that reputation, long-term stability, FDA experience, and a successful track record with customers are all critical factors for suppliers of outsourced hydrophilic coatings.

Defendants' argument that publicly available data on FDA approvals is the "superior methodology" for calculating market shares suffers from the same flaw they attribute to Plaintiffs' analysis: it is also backward-looking. Dr. Wong's calculated market shares, moreover, use an inflated denominator that includes an amorphous set of "eligible" customers for hydrophilic coatings, including uncoated devices. PX4013 (Fix Rebuttal) ¶¶ 132-40. In any event, properly calculated, market shares based on FDA approved devices in 2024 demonstrate that the Proposed Acquisition remains presumptively illegal even under this methodology. PX4013 (Fix Rebuttal) ¶¶ 129, 147-50.

Dr. Fix's rebuttal report also re-calculates market shares to account for Integer's hypothetical presence in the relevant market, and the result is nearly the same: a presumptively illegal merger where Defendants would maintain a 57.6% share of the relevant market:



*PX4013 (Fix Rebuttal) ¶ 221*

Thus, even if it were Plaintiffs' burden to account for the Proposed Remedy in its prima facie case, Defendants' post-merger market shares would still easily surpass the threshold required to render the Proposed Acquisition presumptively anticompetitive. PI Br. 30-31.

### D. Defendants Cannot Rebut the Proposed Acquisition's Competitive Effects

Unable to meaningfully respond to voluminous evidence showing that Biocoat and Surmodics are significant competitors, Defendants instead offer alternative "natural experiments" of competitive effects from Dr. Wong's report to claim that head-to-head competition between Biocoat and Surmodics "hardly existed in the first place." Opp. 43. In addition to being economically unsound, *see* Fix Rebuttal ¶¶ 192-93, 196-98, Defendants' assertion ignores the countless ordinary course documents and customer testimony clearly showing that Biocoat and Surmodics are head-to-head competitors. The unavoidable loss of competition between Biocoat and Surmodics that will result from the Proposed Acquisition, with

or without the Proposed Remedy, will ultimately harm customers of outsourced hydrophilic coatings by reducing choice, reducing innovation, and enabling the combined firm to charge higher prices as a direct result of its dominant market share. *See generally* PI Br.

Defendants further complain Plaintiffs have not shown that the Proposed Acquisition will definitively harm customers. Opp. 39. But that is not the standard for showing competitive effects. Section 7 prohibits mergers, the effect of which "may" be to substantially lessen competition. 15 U.S.C. § 18. Congress specifically chose the word "may" to convey "that its concern was with probabilities, not certainties." *Brown Shoe*, 370 U.S. at 323. The Seventh Circuit has likewise acknowledged that Section 7 necessarily "requires a prediction" and that in making that prediction "doubts are to be resolved against the transaction." *Elders Grain*, 868 F.2d at 906; *see also Hospital Corp. of Am. v. FTC*, 807 F.2d 1381, 1389 (7th Cir. 1986). Moreover, at this preliminary phase Plaintiffs need only show that they are likely to succeed on the merits of their claim that the Proposed Transaction "may" substantially lessen competition. 15 U.S.C. § 18; 15 U.S.C. § 53(b); *see also Elders Grain*, 868 F.2d at 903, 906. Plaintiffs have met that burden here.[6]

## IV. Defendants Have Failed to Otherwise Rebut Plaintiffs' Strong Prima Facie Case

Defendants have not presented either an alternative relevant product market or evidence sufficient to rebut Plaintiffs' proposed market. Defendants' attempted rebuttal arguments regarding entry and efficiencies are likewise deficient.

---

[6] Defendants' suggestion that Plaintiffs cannot demonstrate a likelihood of success on the merits because they have not presented the kind of 'smoking gun' evidence that has been present in a select few past Section 7 cases, Opp. 40-41, is inapposite. Such evidence of party cognizance of anticompetitive effects is not required, and Defendants have not cited any case that demands this additional burden.

i.      *Entry and Expansion are Unlikely*

Defendants do not dispute that entry and expansion in the market for outsourced hydrophilic coatings require years of intense research and development and millions of dollars in investment. *See* Opp. 37-38. Evidence of "substantial" barriers to entry shows that the merged firm "may be able to achieve or maintain market power or monopoly power and use that power anticompetitively because its actions can go unchecked by new competitors." *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 974 (10th Cir. 1990). The massive investment of resources needed simply to bring a new coating to market—let alone wait for it to become profitable—shows that entry and expansion in the outsourced hydrophilic coatings market will not suffice "to deter the anticompetitive effects of the merger and overcome [Plaintiffs'] strong prima facie case." *Tapestry*, 755 F. Supp. 3d at 472; *see generally* PI Br. 46-50.

ii.      *Defendants Have Not Demonstrated Any Measurable Efficiencies From the Proposed Acquisition*

Defendants appear to concede there are no efficiencies that could offset Plaintiffs' prima facie evidence of anticompetitive harm posed by the Proposed Acquisition. To overcome evidence of anticompetitive effects, any proffered efficiency must be "(1) merger specific, (2) verifiable in its existence and magnitude, and (3) likely to be passed through, at least in part, to consumers." *Illumina*, 88 F.4th at 1059. Defendants have presented no evidence that comes close to meeting this standard. To the contrary, their documents show they understand the Proposed Acquisition is unlikely to result in any efficiencies. *See, e.g.*, PX1611 at 001 (Email from Marker (GTCR), stating, "deal is not predicated on a bunch of synergies"); PX7032 (█████████ ███) 141:3-4 ███████████████████████████████████.

### V.       Equities Favor a Preliminary Injunction

Defendants rely entirely on their flawed remedy to justify equities in their favor. For the reasons stated in Plaintiffs' opening brief, and herein with respect to Defendants' Proposed Remedy, nothing in the Proposed Acquisition or Proposed Remedy outweighs the public's "strong interests in the effective enforcement of the antitrust laws and in preserving its ability to order effective relief if it succeeds after a trial on the merits." *FTC v. Advoc. Health Care*, 2017 WL 1022015, *16 (N.D. Ill. Mar. 16, 2017) (citations omitted).

***

For the reasons stated herein, and in Plaintiffs' opening brief, Plaintiffs respectfully request that the Court grant a preliminary injunction preserving the status quo.

Dated: August 14, 2025

Of counsel:

DANIEL GUARNERA
Director
Bureau of Competition

DAVID J. SHAW
Principal Deputy Director
Bureau of Competition

JORDAN S. ANDREW
Acting Assistant Director
Mergers I Division

JAMES R. WEISS
Deputy Assistant Director
Mergers I Division

Respectfully submitted,

*/s/ Maia Perez*
MAIA PEREZ
Lead Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel: (202) 326-3522
Email: mperez@ftc.gov

YAN GAO
R. TYLER SANBORN
EVELYN HOPKINS
DYLAN G. BROWN
WILLIAM M. MACCI
LAUREN GASKIN
ELIZABETH KLINGER
LILIANA P. VARGAS
NICHOLAS WIDNELL
MEGAN MCKINLEY
LILY VERBECK
LEONARDO CHINGCUANCO
JESSICA WEINER

*Counsel for Plaintiff*
*Federal Trade Commission*

LE'ORA TYREE (IL Bar ID 6288669)
Federal Trade Commission
Midwest Regional Office
230 S. Dearborn Street, Room 3030
Chicago, IL 60604
Tel.: (312) 927-7660
Cell: (312) 960-5612
Email: ltyree@ftc.gov
*Local Counsel for Plaintiff*
*Federal Trade Commission*

*/s/ John Milligan*
JOHN MILLIGAN
Assistant Attorney General
Office of the Illinois Attorney General 115
S. LaSalle Street, Floor 23
Chicago, IL 60603

31

Tel.: (773) 505-5937
Email: John.Milligan@ilag.gov
*Counsel for Plaintiff State of Illinois*

*/s/ Elizabeth Odette*
ELIZABETH ODETTE
Manager, Assistant Attorney General
Antitrust Division
Email: elizabeth.odette@ag.state.mn.us

*/s/ Zach Biesanz*
ZACH BIESANZ
Senior Enforcement Counsel Antitrust
Division
Email: zach.biesanz@ag.state.mn.us
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
Saint Paul, MN 55101 Tel.: (651) 757-1257
*Counsel for Plaintiff State of Minnesota*

## LOCAL RULE 37.2 CERTIFICATION

Pursuant to Local Rule 37.2, Plaintiffs Federal Trade Commission ("FTC" or "Commission") and the States of Illinois and Minnesota have met and conferred with Defendants GTCR, LLC, GTCR BC Holdings, LLC ("BC Holdings") and Surmodics, Inc. (collectively, "Defendants"). Defendants oppose the relief sought herein.

/s/ *Maia Perez*
Maia Perez
Jordan S. Andrew
James Weiss
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Avenue, NW
Washington, DC 20580
Tel.: (202) 322-8971
Email: mperez@ftc.gov

*Counsel for Plaintiff Federal Trade Commission*

Le'Ora Tyree (IL Bar ID 6288669)
Federal Trade Commission
Bureau of Competition
Midwest Regional Office
230 S. Dearborn Street, Room 3030
Chicago, IL 60604

*Local Counsel for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 14th day of August, 2025, I filed the foregoing with the Clerk of the Court.

_____*/s/ Maia Perez*_____
Maia Perez
Attorney for Plaintiff Federal Trade Commission

Pursuant to Local Rule 5.9, I hereby certify that on this 14th day of August 2025, the foregoing was electronically filed using the Court's CM/ECF system and constitutes service to the attorneys of record who have consented to accept service by electronic means and that GTCR, LLC's, GTCR BC Holdings, LLC's, and Surmodics, Inc.'s counsel of record are being served with a copy of this document via electronic mail.

_____*/s/ Maia Perez*_____
Maia Perez
Attorney for Plaintiff Federal Trade Commission