1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


FEDERAL TRADE COMMISSION,        )  Case No. 25 C 2391
STATE OF ILLINOIS, and STATE     )
OF MINNESOTA,                    )
                                 )
                  Plaintiffs,    )
                                 )
            v.                   )
                                 )
GTCR LLC, GTCR BC HOLDINGS,      )
LLC, and SURMODICS, INC.,        )  Chicago, Illinois
                                 )  November 10, 2025
                  Defendants.    )  2:00 p.m.

        TRANSCRIPT OF TELEPHONIC PROCEEDINGS - RULING
          BEFORE THE HONORABLE JEFFREY I. CUMMINGS

APPEARANCES:

For the Plaintiffs    FEDERAL TRADE COMMISSION
Via Telephone:        BY:  MS. MAIA PEREZ
                           MS. JESSICA B. WEINER
                      600 Pennsylvania Avenue NW
                      Washington, D.C.  20580


For the Plaintiff     OFFICE OF THE ILLINOIS ATTORNEY GENERAL
State of Illinois     BY:  MR. JOHN R. MILLIGAN
Via Telephone:        115 S. LaSalle Street
                      Chicago, Illinois  60603


For the Plaintiff     OFFICE OF THE MINNESOTA ATTORNEY GENERAL
State of Minnesota    BY:  MS. ELIZABETH R. ODETTE
Via Telephone:             MR. JON WOODRUFF
                           MR. ZACH BIESANZ
                      445 Minnesota Street
                      St. Paul, Minnesota  55101


For Defendants        CLEARY GOTTLIEB STEEN & HAMILTON, LLP
GTCR, LLC, and        BY:  MR. DANIEL P. CULLEY
GTCR BC Holdings,     2112 Pennsylvania Avenue, NW
LLC Via Telephone:    Washington, D.C.  20037

APPEARANCES (Continued):

For Defendants          LATHAM & WATKINS, LLP
GTCR, LLC, and          BY:  MS. HEATHER A. WALLER
GTCR BC Holdings,            MR. GARY FEINERMAN
LLC Via Telephone:      330 N. Wabash Avenue, Suite 2800
                        Chicago, Illinois  60611

                        LATHAM & WATKINS, LLP
                        BY:  MR. LAWRENCE E. BUTERMAN
                        1271 Avenue of the Americas
                        New York, New York  10020

                        LATHAM & WATKINS, LLP
                        BY:  MS. MARGUERITE MITCHELL SULLIVAN
                        555 Eleventh Street NW, Suite 1000
                        Washington, D.C.  20004

For Defendant           FAEGRE DRINKER BIDDLE & REATH, LLP
Surmodics, Inc.         BY:  MR. PAUL H. SAINT-ANTIONE
Via Telephone:               MS. JOANNE LEWERS
                        One Logan Square, Suite 2000
                        Philadelphia, Pennsylvania  19103

                        FAEGRE DRINKER BIDDLE & REATH, LLP
                        BY:  MR. JOSHUA P. MAHONEY
                        311 S. Wacker Drive, Suite 4400
                        Chicago, Illinois  60606

                        FAEGRE DRINKER BIDDLE & REATH, LLP
                        BY:  MR. JONATHAN HAROLD TODT
                        1500 K Street NW
                        Washington, D.C.  20005

Court Reporter:         JOENE HANHARDT, CSR, RPR
                        Official Court Reporter
                        219 S. Dearborn Street, Room 1222
                        Chicago, Illinois  60604
                        Telephone: (312) 435-6874
                        joene_hanhardt@ilnd.uscourts.gov

                    *    *    *    *    *

              PROCEEDINGS REPORTED BY STENOTYPE
    TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

THE CLERK: 25 C 2391, Federal Trade Commission vs. GTCR BC Holdings, LLC, et al.

For the counsel who wish to speak today, can you please state your name for the record?

MS. PEREZ (Via Telephone): Good afternoon, your Honor, Maia Perez on behalf of the FTC.

MR. BUTERMAN (Via Telephone): Good afternoon, this is Lawrence Buterman, from Latham & Watkins, on behalf of GTCR and BC Holdings.

MR. SAINT-ANTOINE (Via Telephone): Good afternoon, this is Paul Saint-Antoine from Faegre Drinker Biddle & Reath on half of Surmodics.

(Telephonic Interference.)

THE COURT: Good afternoon, everyone. What I am going to do is issue my opinion on the preliminary injunction in this case.

Plaintiffs, the Federal Trade Commission, and the States of Illinois and Minnesota, acting through their respective Attorneys General, bring this case against defendants GTCR, LLC, GCTR BC Holdings, LLC, and Surmodics, Inc.

Currently before the Court is plaintiffs' motion for a preliminary injunction, pursuant to Section 7 of the Clayton Act, 15 U.S.C. Section 18, and Section 13(b) of the FTC Act, 15 U.S.C. Section 53(b), seeking to enjoin GTCR, LLC, GTCR BC

Holdings, LLC, and their affiliates and subsidiaries, from consummating their intended acquisition of Surmodics, which includes a fully executed divestiture agreement with non-party Integer Holdings Corporation.

For background, the FTC is an agency of the United States government, vested with the authority and responsibility for enforcing, among other things, provisions of the Clayton Act and the FTC Act. The Attorneys General of the States of Illinois and Minnesota are the chief legal officers for their respective states.

For purposes of this ruling, and unless otherwise indicated, the Court will refer to the FTC, the states of Illinois and Minnesota collectively as "plaintiffs," or, simply, "the FTC."

Defendant GTCR, LLC, is a private equity firm founded in 1980 and based in Chicago, Illinois. Defendant GTCR BC Holdings, LLC -- "BC Holdings," for short -- is an affiliate of GTCR. Although GTCR, LLC, is not a party to the merger agreement at issue here -- and, thus, argues that plaintiffs lack standing against it -- GTCR, LLC, agreed to be bound to the same extent as BC Holdings in these preliminary injunction proceedings.

For purposes of this ruling, unless otherwise indicated, the Court will refer to GTCR, LLC, and GTCR BC Holdings collectively as "GTCR."

On November 2nd, 2022, GTCR announced that it had made a majority investment, to the tune of about $210 million, in a company called Biocoat, Inc. Biocoat, founded in 1991, is a hydrophilic coating provider headquartered in Horsham, Pennsylvania.

Defendant Surmodics is a publicly traded company founded in 1979 and headquartered in Eden Prairie, Minnesota. Surmodics sells medical devices, in-vitro diagnostics and, like Biocoat, hydrophilic coatings.

Integer, the divestiture buyer, is a contract development and manufacturing organization -- which may be referred to as a "CDMO" -- within the medical device industry.

Specifically, Integer partners with customers to develop and manufacture medical devices; and, for the past twenty-plus years, has offered the application, though not the sale of, hydrophilic coatings.

Integer has 11,000 employees, including 6,000 in the Cardio and Vascular division; 500 employees in Research and Development; and, 50 in sales and marketing. Integer has over twenty facilities worldwide and its annual revenue in 2024 was a little over $1.7 billion.

Lubricious Coatings in General. Lubricious coatings are applied to interventional medical devices, such as catheters, guidewires, sheaths and stents that are inserted into confined spaces in the human body. It is undisputed that

lubricious coatings help physicians navigate tortuous pathways in the body, while minimizing trauma and injury, and are, thus, integral to patient safety.

Lubricious coatings are primarily purchased by original equipment manufacturers -- or "OEMs" -- that design, develop and manufacture medical devices. OEMs can purchase lubricious coatings from suppliers, such as Biocoat or Surmodics, among others.

Alternatively, some OEMs have developed their own in-house coatings business as an alternative to purchasing from outsourced suppliers.

There are a number of ways to add lubricity to medical devices, including through the use of hydrophilic coatings and hydrophobic coatings. As the parties agree, however, not all lubricious coatings work on all medical devices.

Hydrophilic -- or "water loving" -- coatings reduce friction by absorbing water. Hydrophobic coatings, on the other hand, repel water.

With respect to hydrophilic coatings, there are two types: UV-cured and thermal-cured. Curing refers to the process of attaching the coating to the surface of a medical device. UV-cured coatings are cured with UV light, while thermal-cured coatings are cured in an oven with heat.

Currently -- or pre-acquisition -- Biocoat offers both thermal-cured and UV-cured hydrophilic coatings under the brand

names "Biocoat," "Hydak" and "Hydak UV," respectively. Surmodics currently offers only UV coatings under the brand names "Serene" and "Preside."

When an OEM sets out to find a coating to use in a medical device, it first determines the coating supplier -- or, more often, coating suppliers -- it wants to send the device to for the initial feasibility testing. During the feasibility phase, the coating suppliers apply their coatings to the OEM's medical device and various tests are run, including a lubricity test, a pinch test and a dye test.

If a coating passes the feasibility phase, the parties enter the optimization phase, during which the supplier refines the coating to best serve the OEM's device. After optimization, the parties proceed to the design-lock phase, during which the supplier attempts to show the reliability and the ability to reproduce the coating at a larger scale.

After optimization, the supplier and the OEM move together towards commercialization, which requires additional testing and, ultimately, FDA approval.

On May 28, 2024, BC Holdings, which, again, owns Biocoat, entered into a written agreement to acquire Surmodics for approximately $627 million and form a "Merged Firm" between Biocoat and Surmodics. This will be referred to as the "Original Transaction."

The FTC initiated an investigation into the Original

Transaction. On March 6, 2025, after it found reason to believe that the Original Transaction would violate antirust laws, the FTC filed an administrative complaint pursuant to Sections 7 and 11 of the Clayton Act; 15 U.S.C. Sections 18 and 21; and, Section 5 of the FTC Act, 15 U.S.C. Section 45.

On the same day, the FTC initiated this action in the Federal District Court seeking to preliminary enjoin defendants from consummating the Original Transaction pending resolution of the administrative proceeding.

Illinois and Minnesota, through their Attorneys General, later joined as plaintiffs.

Shortly after the FTC filed this matter, the parties stipulated to the entry of a temporary restraining order. Under the terms of the TRO, as amended, the parties agreed to maintain the status quo pending preliminary injunction proceedings, and stipulated as follows:

"GTCR BC Holdings, LLC, and Surmodics shall not consummate the Acquisition until after 11:59 p.m. Eastern Time on: (A), November 11, 2025; or, (B), the fifth business day after the district court rules on the FTC's motion for a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act and Section 16 of the Clayton Act, whichever occurs earlier in time."

Thereafter, the parties engaged in extensive and, largely, cooperative expedited discovery, including written

discovery, depositions and expert discovery, which also included depositions and the production of expert reports.

While expedited discovery was ongoing, the parties also engaged in settlement negotiations. To that end, on April 24, 2025, GTCR provided an initial term sheet to the FTC proposing a divestiture of certain of Biocoat's assets to a qualified buyer in an effort to maintain the competitive vigor in the market.

On June 4, 2025, GTCR confirmed that Integer was the proposed divestiture buyer; and, on July 29, 2025, BC Holdings executed an agreement to sell certain of Biocoat's business to Integer. This is the Modified Transaction or the Proposed Divestiture.

The fully executed Divestiture Agreement will become effective upon the closing of the Original Transaction if the plaintiffs' motion for a preliminary injunction is not granted. In other words, there is no world in which the Original Transaction closes, but Biocoat does not go through with the divestiture to Integer.

Under the terms of the Divestiture, Integer will acquire, among other things, Biocoat's entire UV-cured hydrophilic coatings business and its currently marketed thermal-cured coatings, including two legacy coatings, along with the corresponding FDA master files; that is, the IP and the know-how for the divested products.

They will also acquire Biocoat's Brands, "Biocoat" and "Hydak;" a Biocoat facility in Pennsylvania, and the manufacturing equipment; and, eleven full-time employees, including PhD polymer chemist Dr. Tyler Long, who helped invent Biocoat's UV coatings and shepherd those coatings to FDA approval; as well as production technicians, application development engineers, coating technicians, quality assurance and control technicians, process engineers, and an individual tasked with back of the office and warehouse operations.

The Divestiture also includes a license-back, whereby Integer will license-back the thermal coatings to the Merged Firm. Under the terms of the agreement, Integer will pay approximately $8 million up front for the divested assets and an additional $7 million if it is able to stand up its full coatings business after a year.

The FTC declined to accept GTCR's proposed divestiture, through the Modified Transaction, as a resolution to this case.

Consequently, between August 21st, 2025, and September 2nd, 2025, the Court held a multi-day evidentiary hearing on the FTC's motion for a preliminary injunction. During that hearing, the parties presented hundreds of exhibits and the testimony of eighteen live witnesses.

The parties also presented additional deposition testimony through video and written deposition designations.

The majority of the witnesses were lay witnesses and included company executives from GTCR, Biocoat, Surmodics, Integer, other coating suppliers and coating customers; namely, the OEMs that purchase lubricious coatings.

At the outset, the Court wishes to note that it found the testimony of these lay witnesses to be, for the most part, credible and largely not in dispute. The Court found that these witnesses were impressive representatives of their respective companies and very knowledgeable individuals.

Indeed, each witness, ranging from individuals from startup companies to those from long-established companies, shared their own unique experiences and perspectives in the lubricious coating industry.

The parties also presented expert testimony. The FTC presented the direct and rebuttal expert testimony of its witness, Dr. Aaron Fix. The defendants presented the testimony of expert witness Dr. Paul Wong.

Following the hearing, each side submitted their proposed findings of fact and conclusions of law.

To resolve plaintiffs' motion, in addition to the transcript of the evidentiary hearing and the exhibits relied on by the parties, the Court has reviewed and considered the plaintiffs' amended complaint; the defendants' answers to the amended complaint; the plaintiffs' motion for a preliminary injunction; the defendants' response; the plaintiffs' reply;

and, the parties' post-hearing proposed findings of fact and conclusions of law.

The following represents the Court's findings of fact and conclusions of law.

First, with respect to the applicable laws, Section 7 of the Clayton Act, 15 U.S.C. Section 18, prohibits any merger or acquisition, "where in any line of commerce or in any activity affecting commerce, in any section of the country, the effect of such acquisition may be to substantially lessen competition or to tend to create a monopoly."

Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. Section 53(b), authorizes the FTC to bring in the federal district court to preliminarily enjoin a merger or acquisition, pending the FTC's administrative adjudication, when the FTC has reason to believe that a person or entity is about to violate any provision of law enforced by the FTC, including Section 7 of the Clayton Act, and an injunction would be in the interest of the public.

The parties dispute the legal standard that the Court should apply when determining whether a preliminary injunction should be granted. In reliance on the Supreme Court's decision in Starbucks Corp. v. McKinney, 602 United States Reporter at 346 to 347, 2024, the defendants assert that plaintiffs aren't entitled to receive or to be awarded a preliminary injunction unless they satisfy the following default four factor test:

Namely, that plaintiffs must make a clear showing that they are likely to succeed on the merits; that they are likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tip in their favor; and, that an injunction is in the public interest.

However, the Court notes that the Supreme Court, in the Starbucks decision, stated that the test that I just quoted should apply only "absent a clear command from Congress."

As the Seventh Circuit has recognized in FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, at 1028 to 1029, Seventh Circuit 1988, Congress has given a clear command regarding the standard that governs when the FTC is seeking to preliminarily enjoin a merger under Section 13(b) of the FTC Act.

In particular, on Pages 1028 and 1029 of the World Travel decision, the Seventh Circuit stated:  "We believe that the legislative history of Section 13(b) makes it quite clear that the public interest test is the correct approach.  The Conferees did not intend, nor did they consider it appropriate, to burden the Commission with the requirements imposed by the traditional equity standard, which the common law applies to private litigants."

Under this approach, it is not necessary for the FTC to demonstrate irreparable injury.  Rather, "In determining whether to grant a preliminary injunction under Section 13(b),

a court must:  One, determine the likelihood that the Commission will ultimately succeed on the merits; and, Two, balance the equities."

Furthermore, when considering whether to grant a preliminary injunction, the Court is not asked to make a final determination on whether the proposed merger violates Section 7, but, rather, to make only a preliminary assessment of the merger's impact on competition.

Section 7 forbids mergers and other acquisitions, the effect of which "may" be to lessen competition substantially. A certainty, or even a high probability, need not be shown.

Of course, the word "may" should not be taken literally, for, if it were, every acquisition would be unlawful.  But the statute requires a prediction.  And doubts are to be resolved against the transaction.

Nonetheless, the district court may not simply rubber stamp an injunction whenever the FTC provides some threshold evidence, and a showing of a fair or tenable chance of success on the merits will not suffice for injunctive relief.

Ultimately, the government meets its burden for obtaining a preliminary injunction if it raises questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for a thorough investigation, study, deliberation and determination by the FTC, in the first instance, and, ultimately, by the Court of Appeals.

In addition to the World Travel decision, other cases articulating this standard include Federal Trade Commission v. Advocate Health Care Network, 841 F.3d 460, at Page 467, Seventh Circuit 2016; FTC v. Elders Grain, Inc., 868 F.2d 901, at Pages 902, 903 and 906, Seventh Circuit 1989; Federal Trade Commission v. Kroger Company, 2024 Westlaw 5053016, at 1, District of Oregon, December 10, 2024; Federal Trade Commission v. IQVIA Holdings, Inc., 710 F. Supp. 3d 329, at Page 377, Southern District of New York 2024; FTC v. OSF Healthcare Systems, 852 F. Supp. 2d 1069, at Page 1074, Northern District of Illinois 2012; FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, at Pages 115 through 116, District of D.C. 2004.

The Court determines whether to grant a preliminary injunction in its discretion with a consideration of all of the evidence before it, that has been offered by both plaintiffs and defendants. The World Travel decision at 861 F.2d, at Page 1031, stands for that proposition; as does FTC v. IAB Marketing Associates, LP, 746 F.3d 1228, at Page 1232, Eleventh Circuit 2014.

Because this case comes before the Court on a motion for a preliminary injunction, the Court serves as the factfinder. Thus, the Court decides whose testimony to credit and which of permissible inferences to draw, regardless of whether those findings are based on witness testimony or on

documentary evidence or on inferences from other facts.  The question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder.

The Court is also entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness.  That said, the Court's findings of fact and conclusions of law are not binding at a trial on the merits, and the FTC remains free to reach its own legal conclusions and develop its own record in its administrative proceedings.

That standard was articulated in Federal Trade Commission v. Tapestry, Inc., 755 F. Supp. 3d, Page 386, at Pages 410 and 411, Southern District of New York 2024.

To determine whether plaintiffs have shown a likelihood of success on the merits, the Court will apply the burden-shifting framework promulgated in United States v. Baker Hughes, Inc., 908 F.2d 981, at Pages 982 to 983, D.C. Circuit 1990.

Under the Baker Hughes framework, plaintiffs bear the initial burden of making a prima facie case.  To do so, plaintiffs must first determine the relevant product and geographic markets.  The definition of the relevant market is, basically, a fact question dependent upon the special characteristics of the industry involved.

Second, plaintiffs must show that the merger will

probably lead to anticompetitive effects by creating an undue concentration in the relevant market. This creates a presumption that the merger will substantially lessen competition.

The burden then shifts to the defendants to rebut the presumption. The more compelling the prima facie case, the more evidence defendants must present to rebut it successfully.

If the defendants successfully rebut the presumption, the burden then shifts back to the plaintiffs to produce additional evidence of anticompetitive effects. The ultimate burden of persuasion is with the plaintiffs at all times. This standard comes from the Kroger Company case, 2024 Westlaw 5053016, at Page 2; Pennsylvania v. Center Lane Partners, LLC, 2024 Westlaw 4792043, at Pages 3 through 4, Western District of Pennsylvania November 14, 2024; Federal Trade Commission v. Microsoft Corp., 681 F. Supp. 3d 1069, at Page 1085, Northern District of California 2023, affirmed, 136 F.4th at Page 954, by the Ninth Circuit in 2025.

The IQVIA Holdings Inc., 710 F. Supp. 3d at Page 352, "The parties agree that the relevant geographic market is the United States, given that the devices that the coating is applied to must receive FDA approval." However, the parties dispute whether plaintiffs have identified and defined the relevant product market.

Plaintiffs assert that the relevant product market

consists of outsourced hydrophilic coatings.

Defendants assert that plaintiffs have failed to define the relevant market because their proposed market is both too broad and too narrow.

In particular, defendants assert that it is improper to include both UV and thermal hydrophilic coatings in the same market because the two types of coatings do not work on all medical devices, and industry trends predict growth in applications where one of either UV or thermal hydrophilic coatings are unavailable.

Defendants assert that plaintiffs' proposed market is also too narrow because it excludes hydrophobic coatings that can serve as an alternative coating for many devices that also use the hydrophilic coatings.

Defendants also assert that plaintiffs' proposed market wrongfully excludes in-sourced hydrophilic coatings that are prepared by the OEMs, themselves, and occasionally applied to their own devices.

As prior decisions have explained, the relevant product market is defined by the reasonable interchangeability of use or the cross-elasticity of demand between the product, itself, and substitutes for it.

The goal is to identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.

A relevant product market includes all goods that are reasonable substitutes, even though the products, themselves, are not entirely the same.

A properly defined product market includes the functionally similar products to which customers could turn in the event of a post-acquisition price increase. The general question is whether two products can be used for the same purpose; and, if so, whether and to what extent purchasers are willing to substitute one for the other.

Market definition is guided by the narrowest market principle in that the product market must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.

The relevant market need only include the competitors that would substantially constrain the merged firm's price-increasing ability.

Courts consider both quantitative and qualitative evidence in defining the relevant product market, including ordinary course documents, testimony from those in the industry and expert economic testimony. This standard from cases including the IQVIA Holdings Inc., 710 F. Supp. 3d, at Pages 352 to 354. It cites multiple decisions, including Brown Shoe Co. v United States, 370 U.S., at Page 294, at Page 325, decided in 1962; FTC v. Advocate Health Care Network, 841 F.3d 460, at Page 469, Seventh Circuit 2016; and, also, Federal

Trade Commission v. Meta Platforms, Inc., 775 F. Supp. 3d, Page 16, at Pages 35 through 36, District of Columbia, 2024.

After consideration of the relevant evidence, the Court agrees with plaintiffs that the relevant market should include both UV and thermal outsourced hydrophilic coatings.

Although it is undisputed that there are certain devices that can use only UV coating, and other devices that can use only thermal coating, the market need not be limited to products which are identical in nature. This is a fact in Kaiser Aluminum & Chemical Corporation v. FTC, 652 F.2d 1324, at Page 1330, Seventh Circuit 1981.

Moreover, multiple industry executives testified that both thermal and UV are options for a majority of medical devices. These executives include Andrew Juntenen from Medronics, who testified in the Transcript at Page 141, that approximately 75% of projects can be satisfied with either thermal or UV coating; Ann Gronda from Medronics, who testified at Pages 728 and 729; Robert Hergenrother from Biocoat, who testified at Page 1471 to this effect; and, Dhruv Patel from Integer, who testified in the deposition at Pages 114 through 115.

The Court also agrees with defendants, though, that plaintiffs' proposed product market is too narrow because it excludes in-source hydrophilic coatings.

Dr. Wong identified at least 19 medical device

customers that either have in-house coatings or are in the process of developing them.  This is at his trial testimony at Page 1576 to 1577.

According to Dr. Wong, the 19 customers with in-house coatings accounted for more than 36% of coating eligible medical devices between 2014 to 2024.  This is in his report, Defense Exhibit 736.156.

Also in his report Dr. Wong noted that the economic theory is clear that customers need not always pick in-house coatings for those in-house coatings to nonetheless be important to competitive constraints.  Manufacturers can simply threaten to move to in-house coatings, or threaten future changes, as a competitive discipline on coating suppliers.

The fact that customers with in-house capabilities sometimes select their in-house coating and sometimes select a third-party supplier shows competition at work.  This is in Dr. Wong's report, DX 736.155.

He also cites some articles by Miller -- Nathan Miller -- "Modeling the Effects of Mergers in Procurement," International Journal of Industrial Organization, Volume 37, 2014, at Pages 2001 through 2080.  The Court notes that Dr. Fix also cited to that particular article.

Although Daniella Petra from DSM testified she did not consider in-house coatings as competition, at Page 327 of the transcript, ordinary course documents reflect DSM acknowledges

their place in the market; Defense Exhibit 52.003 indicating that, "Future long-term revenues from Hollister will most likely disappear; Hollister has developed an in-house coating;" and another exhibit, DX 52.004, which noted, among other things, that, "Hollister's moving towards in-house coating."

Ms. Petra further testified that Hollister did, in fact, transition away from DSM to its in-house coating.

"Harland has competed against internal coatings in the past, and it has been told by certain customers that they were evaluating some internal coating alternatives against what we were working on," so testified Phillip Ankeny of Harland at Page 264 of the transcript.

See, also, Defense Exhibit 103.003, where Harland acknowledging that, "Competitive hydrophilic coating supplies include Biocoat Hydak coating and several coatings proprietary to medical device manufacturers."

Finally, Josh de Freitas of Biocoat was asked: "Does Biocoat compete against in-house coatings?"

And he testified at the hearing: "I feel we do."

"How so?

"We compete for development opportunities. These are projects that have a need for a coating and have not yet submitted to the FDA. So, to me, that's absolutely who we compete with."

That is at Page 669 of the transcript.

The Court, however, does not agree that hydrophobic coatings should be included in the relevant product market. As Dr. Fix noted, hydrophobic coatings are quite a bit cheaper than hydrophilic coatings, and it stands to reason that customers who could accept the lower lubricity of a hydrophobic coating are already making use of one. He testified at Pages 1090 through 1091 of the transcript.

The Court further observes that although it largely agrees with Dr. Wong's criticism of Dr. Fix's hypothetical monopolist test, there is no requirement for plaintiffs to use any specific methodology in defining the relevant product market. And the courts have determined relevant antitrust markets using, for example, only the Brown Shoe factors, or a combination of the Brown Shoe factors and the Hypothetical Monopolist Test, HMT. It is from the Microsoft decision, at Page 681 F. Supp. 3d at Page 1086.

Courts have also noted that it bears emphasis that Congress "prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." That is from the Brown Shoe decision, 370 U.S. at 336; and, Federal Trade Commission v. Tapestry, Inc., 755 F. Supp. 3d 386, at Page 415, Southern District of New York 2024.

So, the Court finds that plaintiffs have established, for purposes of a prima facie case, a relevant product market.

Plaintiffs rely on Dr. Fix's analysis to support their

argument that the proposed transaction will produce a merged firm that controls an undue percentage share of the relevant market and would result in a significant increase in the concentration of firms in that market.

A merger is presumptively unlawful if it would result in a market share for the combined firm greater than 30%, or if it would cause a change in the Herfindahl-Herschman Index, "HHI," greater than 100, and a post-merger HHI that would exceed 1,800. It comes from United States v. Philadelphia National Bank, 374 U.S. 321, at Page 364, 1963; the IQVIA Holdings Inc., case, 710 F. Supp. 3d at Pages 377 through 380; Kroger, 2024 Westlaw 5053016, at Pages 15 and 16; and, United States v. Oracle Corp., 331 F. Supp. 2d 1098, at Pages 1110 through 1012, Northern District of California 2004.

Dr. Fix relies on the 2024 total revenue, which shows that Surmodics has a 42.6% share of the relevant market and Biocoat has a 17.8% share of the market, making defendants' combined market share 60.4%.

The estimated market shares imply a pre-merger HHI of 2,483, a post-merger HHI of 3,998, and a change in HHI of 1,515. This comes from Plaintiffs' Exhibit 4000, Paragraphs 113 to 114, and trial testimony at Pages 1107 to 1108.

The Court notes that this analysis by Dr. Fix considers the proposed transaction without consideration of the divestiture, under the plaintiffs' theory that the divestiture

should be ignored at the prima facie stage given that it was not part of the original transaction.

Defendants assert, with citation to United States v. UnitedHealth Group. Inc., 630 F. Supp. 3d, at Page 118, at Pages 133 through 134, and Footnote 5, District of Columbia 2022, that the transaction should be considered with the divestiture because the divestiture is not contingent and will take place if the transaction proceeds.

The Court agrees with the observation in Footnote 5 of the UnitedHealth Group decision, to the effect that the relevant transaction is the proposed acquisition agreement with the proposed divestiture, given that there is no contingency with the proposed divestiture if the transaction is not enjoined.

However, the proposed divestiture, as part of the relevant transaction, would not materially change Dr. Fix's analysis.

Allocating the portion of Biocoat's 2024 revenue that is associated with the divested coatings to Integer would leave Integer a 2.8% of the market. It would leave Biocoat with 15% market share, which, combined with Surmodics' 42.6% market share, would leave the merged firm with a market share of 57.6%, which is still well above the 30% threshold.

As such, per Dr. Fix's analysis, the proposed transaction would create an undue concentration in the relevant

market. This creates a presumption that the merger would substantially lessen competition and the Court finds that plaintiffs have met their initial burden of establishing a prima facie case.

Plaintiffs also argue that Biocoat and Surmodics are viewed as the top suppliers in the industry; that customers, as well as Biocoat and Surmodics, themselves, view Biocoat and Surmodics as head-to-head competitors; and, that the proposed transaction would eliminate the competition between the two firms, with citation to the testimony and documentary evidence referenced in plaintiffs' proposed findings of fact, Paragraphs 112 through 125.

Testimonial evidence and other ordinary course documents can indicate that firms are close competitors; and, a showing of the elimination of head-to-head competition between the merging defendants can bolster plaintiffs' case with additional evidence that the merger will have uncompetitive effects. The IQVIA Holdings Inc., case at 710 F. Supp. 3d, at Pages 382 and 384; and, the Kroger case, 2024 Westlaw 5053016, at Page 17 support that proposition.

At the rebuttal stage of the Section 7 analysis, defendants bear the burden to present evidence that the prima facie case inaccurately predicts the relevant transaction's probable effect on future competition.

Defendants' burden is only one of production and not

persuasion.  The Court notes the burden of persuasion remains with plaintiffs at all times.

The Illumina, Inc., v. Federal Trade Commission, 88 F.4th Page 1036, at Page 1058, Fifth Circuit 2023, supports this proposition.

To rebut this presumption, defendants may show that the market-share statistics give an inaccurate account of the merger's probable effects on competition in the relevant market.  United States v. Citizens & S. National Bank, 422 U.S. 86, at Page 120, 1975; Lektro-Vend Corp. v. Vendo Company, 660 F.2d 255, at Page 275, Seventh Circuit 1981; and, United States v. Oracle Corp., 331 F. Supp. 2d 1098, at Page 1110, Northern District of California 2004, support that proposition.

As the Supreme Court has cautioned that statistics concerning market share and concentration, while of great significance, are not conclusive indicators of anticompetitive effects.

Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but, only a further examination of the particular market, its structure, history and probable future can provide the appropriate setting for judging the probable anticompetitive effect of the merger.  That's United States v. General Dynamics Corporation, 415 U.S. 486, at Page 498, 1974; Brown Shoe, 370

U.S. at 322, Note 38; FTC v. Swedish Match, 131 F. Supp. 2d 151, at Page 167, District of Columbia 2000.

As the Seventh Circuit has observed in Hospital Corporation of America v. FTC, 807 F.2d 1381, at Page 1385, Seventh Circuit 1986, the Supreme Court has refused to adopt a categorical rule equating the possession of a significant market share with a significant threat to competition. And, in that case, the Supreme Court cited to the General Dynamics Corporation decision, which I just referenced, and the United States v. Citizens & Southern National Bank decision, 422 U.S. 86, decided in 1975.

As the Seventh Circuit further observed in Ball Memorial Hospital, Inc., v. Mutual Hospital Insurance, Inc., 784 F.2d 1325, at Page 1336, Seventh Circuit 1986, market share is just a way of estimating market power, which is the ultimate consideration. When there are better ways to estimate market power, the Court should use them. Market share reflects current sales, but today's sales do not always indicate power over sales and price tomorrow.

In this case, defendants assert that Dr. Fix's market share analysis, with his use of 2024 revenue, presents an inaccurate picture of the present state of competition in the hydrophilic coating market, given the unique nature of that market.

Defendants further assert that Dr. Wong's analysis,

which focuses on the 2024 FDA approved coating eligible devices that could be won by a coating supplier, gives an accurate picture of the state of present competition in the hydrophilic coating market and shows that the merged firm has a maximum market share, depending on how you calculate it, of 27.4%, without consideration of the divestiture, and a maximum share of 23.9%, with consideration of the divestiture.

For the reasons stated below, and as explained below, the Court agrees with defendants on both points, in reliance on the testimony and analyses presented by Dr. Wong at Pages 1538 through 1567, and Page 1682 through 1700 of the transcript, in addition to his report.

The market share analysis by Dr. Fix isn't informative about the competitiveness of the market because the market share is biased by legacy revenue. Legacy revenue is revenue derived from the old device opportunities won and lost in the past.

This industry, Dr. Wong testified, is very unique in terms of how much revenue is legacy revenue and how long it lasts. For example, Biocoat's contracts are 15-year contracts that automatically renew.

Dr. Wong concluded that Dr. Fix's analysis was flawed and he characterized it as a fundamental flaw because of his inclusion of legacy revenue in his market share estimates.

Revenue does not capture present competition.

Competition occurs when devices are under development. The devices then have to get FDA approval and be commercialized before they generate revenue for the coating supplier.

If they generate revenue in the future, it is past the point where the competition has occurred.

Biocoat and Surmodics are two of the oldest firms in the industry and it is natural that they would have a substantial amount of legacy revenue. It does not necessarily reflect present day competitive significance relative to other firms.

In particular, of Biocoat's revenue, 90% is legacy revenue, as I have defined it above, and 10% relates to new opportunities. In fact, 93% of Biocoat's revenue is driven by customers who were first won at least give years ago.

Similarly, with Surmodics, 99% of Surmodics' revenue is driven by projects that are more than five years old.

Dr. Fix's analysis does not give a picture of how much business that the parties are getting today. There was presentation of the overall revenue that the parties received in 2024.

To illustrate this point -- and I find that this particular exhibit was a striking illustration of the point -- Dr. Wong found instances for particular customers where 100% of 2024 revenue came from legacy revenue, as opposed to current competition.

In his Slide No. 17, which overall accounts for 5% of the 60% market share that Biocoat and Surmodics have by 2024 revenue, there are four customers presented. Biocoat and Surmodics each had two customers. For Biocoat's customers, it took in a total revenue of 1,770,794. It had eight opportunities in 2024 to obtain new coating opportunities on devices. And with those two customers, out of the eight opportunities, it had zero wins.

Surmodics' total revenue for its two customers in 2024 was $4,374,494. Like Biocoat, Surmodics had eight opportunities to obtain new coating -- to quote new offered devices -- and out of those eight opportunities, like Biocoat, it had zero wins.

So, despite the fact that both Biocoat and Surmodics have a sterling reputation in the industry; have a long track record of providing service to their customers; and, from all that I can ascertain through the testimony, offered top notch coating, their market revenue did not lead to success with these opportunities in 2024, so that the annual revenue obtained did not translate into competitive success.

To assess competition, it is better to look at data that is reflective of new opportunities and current competition. Both experts agree that looking at data from the FDA is appropriate for this purpose.

Dr. Wong looked at devices in 2024 that received FDA

approval to determine how many new opportunities the parties won recently. To select the devices that he looked at, he focused on catheters, guidewires and introducers, and characterized these devices as coating eligible, and all of the devices needed FDA approval.

In 2024, there were 213 such devices. Ninety-one of these devices had hydrophilic coating, both experts agree. Both experts also agree that 45 of these devices had hydrophobic material or were uncoated.

There were 77 devices that were identified as catheters and guidewires, but the coating options were not identified.

Dr. Wong estimated that 52 of these devices would have hydrophilic coating. And he did that simply by looking at the ratio between the number of -- percentage of -- devices with hydrophilic coating versus those that had hydrophobic coating or no coating, in the number of devices that were actually known, and applying that percentage, which was about two-thirds, to the unknown universe of devices -- the 77 devices -- and he came up with 52.

Dr. Fix's analysis, I will point out, had some other issues with it. No. 1, his analysis was limited to 15 suppliers. And that would miss wins by others suppliers that were outside that group of 15.

Dr, Fix, his analysis also ignored situations where a

supplier would win a competition, but the device, itself, never generated any revenue. So, in other words, a coating supplier could actually win a competition; get its coating all on a device; and, for one reason or the other, even if the device received FDA approval, perhaps it was not being commercialized, it would, therefore, not generate any revenue.

Would that win be evidence of competitive strength? Yes, it would be.

Would that win generate revenue? No, it wouldn't.

And that sort of situation would not be captured by Dr. Fix's focus on revenue.

Another point to make about this industry is the unique nature of this industry, which a number of lay witnesses pointed out, and Dr. Wong confirmed, is that once a coating supplier gets his coating on a device and that device receives FDA approval, that coating supplier is essentially locked into that device for the life of the device. The reason for this is because if a manufacturer decided it wanted to change coating, it would have to do additional testing and go through another round of FDA approval.

And there really is no evidence in the record of any manufacturer switching coatings from one supplier to the other and going through a second round of FDA approval to use with that particular device. There is no evidence in the record to that effect. And it is understandable. As I have often heard,

"If it ain't broke, don't fix it." And if the coating is working, there is really no incentive for a manufacturer to change up.

Now, based on the facts in the analysis that Dr. Wong performed, as I indicated, he would determine that 52 of those 77 devices, for which the type of coating is unknown, would have had hydrophilic coating.

Dr. Fix, in his rebuttal, in his critique of Dr. Wong, took the position that none of the 77 devices that are unknown would have hydrophilic coatings. And Dr. Wong responded to Dr. Fix's critique by noting that, with respect, he found that Dr. Fix's approach was unreasonable. And I agree for several reasons.

First of all, these devices are catheters and guidewires and there is a very high frequency of them being likely to use hydrophilic coatings.

Secondly is Dr. Fix acknowledged in his testimony, upon cross-examination and during his rebuttal testimony, that, in fact, he uncovered at least two other devices in that 77, that, in fact, did have hydrophilic coating. And defense counsel was able to establish on cross-examination of Dr. Fix there were two additional devices in that 77 that had hydrophilic coating. And, so, that is four out of the 77, for which we know.

In fairness to Dr. Fix, he found seven examples in the

77 that did not have hydrophilic coating.  But to say that none of the 77 had hydrophilic coating -- and it is undisputed that at least four did -- the Court finds that to be unreasonable.

And, again, as I stated, based upon the nature of these devices, it would be highly unlikely that none of the 77 would have hydrophilic coating.

Defendants also pointed to plaintiffs' complaint which alleges, in part, that hydrophilic coatings are applied to a wide range of interventional medical devices used inside the human body, such as catheters and guidewires, to perform high-stakes neurological, cardiovascular and peripheral vascular procedures.  These devices require hydrophilic coatings to reduce friction during use, so that the devices function as intended.

That allegation, which I believe is true, also cuts against the idea that all 77 of these devices would -- that none of them would have hydrophilic coatings.

There is also evidence in the record that it is possible that the reason that some of these devices were not identified as having any particular coating is because device manufacturers have an option of submitting to the FDA a 510(k) summary, which contains information about the coating, or to submit a 510(k) statement and submit later clinical data to the FDA.

A number of these devices were stated to be follow-up

-- let me put it precisely. A number of these devices were indicated to be -- where they were applicant devices to be -- substantially equivalent to an existing predicate device. And defense counsel was able to establish that one or two of the 77 that he presented evidence had hydrophilic coatings, were substantially -- he stated to be substantially -- equivalent to other devices. So, that could be a reason why the coating is not stated.

But, in essence, we have three choices with respect to this data because if you take Dr. Fix's approach of 77, he just ignores 77 devices where the coating is unknown. Then you will have a situation where, by his count, the number of coating opportunities that Biocoat and Surmodics received, of the 91 devices where they were known to be hydrophilic coating, would exceed the 30% threshold, if you only look at the 91 devices where the coatings is known.

If, however, you take Dr. Wong's estimate of 52 and add them to the 91, then the threshold of a combined market share of Biocoat and Surmodics falls well below the 30%.

And if you take a third alternative, which you can do from the additional information we know, which is that out of the 77 devices, there are seven without hydrophilic coating and there are four with hydrophilic coating, if you add seven to four, that would mean 36% of those 11 devices had hydrophilic coating; and, if you apply that percentage to 77, then you

would get approximately 27 or 28 devices in the 77 that had hydrophilic coating.

It is undisputed in the record that if, at least, 16 of the devices in the 77 universe have hydrophilic coating, then Biocoat and Surmodics' share would fall below the 30% threshold.

And, so, whether you go with Dr. Wong's estimate of 52% or go with a more conservative estimate that is based upon what the parties have learned about the 77, which would add an additional 27 or 28 in, if you adopt either of those alternatives, then Biocoat's and Surmodics' market share, as measured by the 2024 opportunities that they won, would fall below the 30% threshold of market concentration.

And, so, the Court, based upon that, finds that the defense has rebutted Dr. Fix's market share analysis with the use of something that better reflects the state of actual competition in the here and now, which is the 2024 data regarding the coating eligible devices that received FDA approval.

Next, the Court addresses plaintiffs' argument that the elimination of head-to-head competition between Biocoat and Surmodics bolsters their case with additional evidence that the merger will have anticompetitive effects.

As stated earlier, plaintiffs has submitted testimony from industry participants, including executives of Biocoat and

Surmodics, and ordinary course documentation to the effect that Biocoat and Surmodics are head-to-head competitors.

This evidence, however, is tempered by a lack of transparency within the industry as to the identity of competitors for the various opportunities to win coating business.

For, example, Josh de Freitas of Biocoat testified, in response to the question, "Do you even know who you're up against typically in these competitions?"

He testified, "Typically, we do not."

Jim Moran of Biocoat testified -- and Mr. de Freitas' testimony was on Page 649 of the transcript.

Jim Moran testified, in response to this question, "Do you know in any new opportunity situation which of those companies is, in fact, being considered?"

"No, we do not.  That's kept very confidential by the engineers on the team."

That is at Page 817 of the transcript.

Joe Ventura of Harland, at Pages 382 through 383 of the transcript, testified, "For a majority of the cases, we don't know if there's an external supplier that's in the mix, or even, for certain companies, whether the in-house hydrophilic coating is also in play.  That's a disadvantage for us.  But, unfortunately, for a majority of cases, we do not know what other coatings a customer is considering."

Similarly, Phillip Ankeny of Harland testified at Page 290, in response to these questions, "You would agree that you often don't know what coating you're competing against, right?"

"Correct.

"In fact, about 70 or 80 percent of the time, you don't know whether you're competing against anyone or not, right?

"Yeah, that can be true."

So, we have those anecdotal examples, just to point out that this is not -- this particular industry is not -- an industry where the identity of the competitors is always known or readily known by those that they are competing against.

But, more fundamentally, we have Dr. Wong's testimony regarding two analyses that he performed. The first was to ascertain the percentage of overlapping customers between Biocoat and Surmodics based on feasibility testing only between January of 2020 and March of 2025. This is found at Pages 1582 through 1588, and Defendants' Exhibit 8.040. There were an average of 217 opportunities per year. 67.5% did not involve either Biocoat or Surmodics. 28% of the opportunities involved one firm or the other. 4.1% of the opportunities, or a total of 51, overlapped. But even with these, one firm or the other dropped out because its coating was not performing adequately.

All but five of the remaining opportunities were ruled out for head-to-head competition. And the five would total .4%

of the industry opportunities, because the customers were looking at other possible suppliers, as well.

More broadly, Dr. Wong concluded, by looking at the percentage of overlapping customers between Biocoat and Surmodics, already contracted customers for all products and services excluding feasibility testing between January of 2020 and March of 2025, that only 15 pre-existing customers -- or 14.4% -- overlap; and, that the vast majority of the firms 85.6% either did not use the two firms as substitutes or did not use the two firms at all.  That is at DX736.287 and DX 1002.

Ultimately, Dr. Wong concluded that when properly analyzed and contextualized, he doesn't believe that there is a significant amount of competition between the two companies and he doesn't believe that the transaction would cause a substantial lessening of that competition.

The Court finds that Dr. Wong's analytics in his analysis of the overall data to be credible and informative.

With respect to the divestiture, itself, defendants have the burden to show that the proposed divestiture to Integer will replace the merging firm's competitive intensity. To evaluate whether a divestiture will do so, the courts consider the likelihood of the divestiture; the experience of the divestiture buyer; the scope of the divestiture; the independence of the divestiture buyer from the merging seller;

and, the purchase price.

A divestiture is successful rebuttal evidence if it sufficiently mitigates the merger's effect, such that it is no longer likely to substantially lessen competition.

The Court notes that defendants are only required to show that the proposed divestiture sufficiently mitigated the merger's effect, such that it was no longer likely to substantially lessen competition. The defendants are not required to show that the divestiture would negate the anti-competitive effects of the merger entirely.

That is in the Illumina, Inc., v. Federal Trade Commission case, 88 F.4th 1036, at Page 1059, Fifth Circuit 2023; and, the Kroger decision, 2024 Westlaw 5053016, at Page 17.

A consideration of the relevant factors here demonstrates as follows: First, with respect to the likelihood of divestiture, as I noted near the beginning of this ruling, the divestiture is signed and will become effective upon the closing of the Original Transaction.

As Luke Marker stated in his testimony at Page 956, "Put another way, there is no world in which the Original Transaction closes but Biocoat does not go through with the divestiture to Integer."

The experience of the divestiture buyer. The evidence shows that Integer, a CDMO with over 11,000 employees and $1.7

billion in annual revenue, is an experienced buyer. And it has relevant experience to this particular area of the industry. Among other things, Integer has manufactured and applied hydrophobic coatings for over 40 years; it has applied and tested both UV and thermal hydrophilic coatings for over 20 years; and, thus, has the coating application and testing equipment to do so.

Integer also has an established sales force and it employs a gentleman named Dhruv Patel, who worked for Biocoat for over 15 years as its Principal Technical Sales Engineer.

Currently, Integer applies hydrophilic coatings to over $2 million worth of products annually, mostly at its Chaska, Minnesota, facility, where it employs close to 800 associates. Integer also has vast experience in submitting 510(k) applications for medical devices, with at least 28 of its own FDA-approved medical devices, and familiarity with the cardiovascular, peripheral vascular, structural heart and neurovascular fields, among others.

The full record before the Court, thus, clearly reflects, as Dr. Wong has found, that Integer is an exceptionally well-qualified divestiture buyer, in Dr. Wong's testimony at Page 1529.

The scope of the divestiture. Again, under the terms of the divestiture, Integer will acquire Biocoat's entire UV-cured hydrophilic coatings business and its currently

marketed thermal-cured coatings, plus two legacy coatings that Integer currently purchases from Biocoat, along with the corresponding FDA master files; that is, the IP and the know-how for the divested products. It will acquire Biocoat's brands, Biocoat and Hydak; a Biocoat facility in Pennsylvania, and the manufacturing equipment; eleven full-time employees, including PhD chemist Dr. Tyler Long, who helped invent Biocoat's UV coatings, as well as various other personnel that I have named before.

Furthermore, the divestiture includes the license-back, whereby Integer will license-back the thermal coatings to the Merged Firm, so that Biocoat can continue to sell the thermal coatings, as well -- the thermal coatings that have been divested.

Although this is a partial and not a full divestiture, the evidence reflects that the divested assets, information, employees, facility and equipment will fill an important capability gap in Integer's business; and, with the addition of the assets, personnel, information and equipment that will come by virtue of the divestiture, it will allow Integer to serve as a one stop shop for the manufacturing and application of hydrophilic coatings.

Now, plaintiffs' point out that Integer has twice in the past attempted to develop a hydrophilic coating business and those two efforts were not successful. That is correct and

that is undisputed.

What that experience tells me, though, is that Integer is interested in the business of developing a hydrophilic business; and, what it lacked in those two prior instances, it will be getting by virtue of this proposed divestiture; namely, it will be getting coatings that are FDA approved; that already have some customers; and, will be getting the know-how and the experience, through the Transition Services Agreement, in which to develop the capacity to move the manufacturing of those coatings to its facility in Chaska, Minnesota.

Indeed, in sum, the divested assets, along with its current experience and capabilities, are all the inputs Integer needs to complete the picture and be an effective competitor. That is Dr. Wong's testimony at 1530.

The independence of the divestiture buyer from the merging seller. There is little concern that Integer, a global entity with $1.7 billion in annual revenue, will lack the independence from the merged firm necessary to compete. Although it is true that from Day One -- at least on Day One -- that Biocoat will still be manufacturing all of the coatings that Integer will be selling, and continue the manufacture of those coatings until Integer is able to stand up the manufacturing in its Chaska facility.

The divestiture includes a Transition Services Agreement, that are standard in such acquisitions, and the

Transition Services Agreement serves to ensure that Integer and Biocoat will work to transfer specific processes and qualify coatings at the Integer facility within a year; though, notably, Integer hopes to be up and running in six months.

Plaintiffs' assert that it is not interested -- the merged firm -- to help Integer get up and running with the manufacture of these coatings because it will, effectively, be helping another competitor.

Well, that is certainly something to think about. But another consideration that the parties built into the divestiture agreement is that there is a $7 million payment that is contingent upon Biocoat's successful assistance in performing the Transition Services Agreement.

And, notably, Biocoat's personnel have testified that they intend to perform this Transition Services Agreement. And Integer's Executive, Mr. Senn, fully expects that the Transition Services Agreement will be performed.

Dr. Fix, nonetheless, speculates that Biocoat won't perform its duties, but that is what it is. It is speculation. There is a financial incentive -- a $7 million financial incentive -- for Biocoat to perform its duties.

And I will point out, as well, that Dr. Fix's expertise -- he has expertise, but this is the first divestiture that he has analyzed, per his testimony. And his expertise, it really doesn't extend in this particular area.

46

Now, finally, I turn to the purchase price. And, again, plaintiffs point out that the price that Integer is paying for the divested assets is a fraction of the purchase price that was paid for Biocoat in 2022. And, again, that purchase price was $210 million in 2022; whereas, the Divestiture agreement requires Integer to pay $8 million up front for the divested assets, with an additional $7 million if the Transition Services Agreement is successfully executed.

So, the plaintiffs are correct. That is, indeed, a fraction of the purchase price to Biocoat. However, the price differential can be attributed to the fact that the divested Biocoat coatings represent, roughly, 10% of Biocoat's revenue, while the remaining legacy coatings represent 90% of its revenue, per the testimony of Mr. Hance at Pages 1331 through 1332 of the transcript.

And, so, effectively -- and this really is one of the values of having the legacy revenue -- and I do not mean to suggest in any way, by my ruling here today, that the legacy revenue doesn't have value. It has a tremendous amount of value. It gives value to Biocoat because those payments reflect -- they are almost in the nature of an annuity; and, it provides Biocoat and the merged firm, if the transaction proceeds, with financial resources with which to perform research and development and to effectively compete in this coating market that they are in.

And it was kind of striking to me, when I heard Dr. Wong testify that it was actually a good thing that more of the legacy revenue was not included with the divestiture package. But, as I thought about it, it did kind of make sense. Integer has borrowed a tremendous amount of financial resources, to get it to folks currently to research and development. And Dr. Wong's point was that Biocoat and Surmodics, and the merged firm, would need to retain that legacy revenue in order to have the funds for research and development they will need to effectively compete.

So, in his view, having this purchase price the way it is, is actually something that will promote the competition in the market in the future.

Now, more broadly, one of the facts that is undisputed when you take a step back from these numbers and you just look at the situation, the way it is right now is that you have Surmodics, which is a UV-coating provider; and, you have Biocoat, which provides primarily thermal, but, also, UV right now.

If the transaction takes place, you will also have two firms that provide UV and thermal. Because of the divested assets, Integer will have UV and thermal hydrophilic coatings to sell. The merged firm will, likewise, have UV and hydrophilic coatings. And, so, effectively, with this transaction, you won't be -- numbers-wise, anyway --

diminishing the number of competitors.

There is a question raised about whether Integer will instantly be up and running and be able to effectively compete in the same way that Biocoat currently competes; but, as I indicated earlier, defendants do not have to show that Integer will instantly be a clone of Biocoat, in terms of its ability to compete in the market and to align with plaintiffs' prima facie case.

But I am persuaded by the testimony of Mr. Senn that Integer -- and this is another critique that Dr. Fix had of the proposed divestiture, because Integer currently purchases, roughly, $2 million worth of coating from Biocoat, with the two legacy coatings -- thermal legacy coatings that it purchases -- and those two legacy coatings will come over to Integer by virtue of the divestiture, that will enable Integer to save, it was estimated, roughly, a million of that $2 million cost, once they take that manufacturing in-house.

And Dr. Fix's hypothesis is that Integer will be satisfied with those savings and not work to really compete very hard with respect to the UV and thermal hydrophilic coating to try to get new business.

Dr. Senn -- or Mr. Senn -- vigorously disagrees with that. And I think, based upon the nature of Integer and its size, it is a company, Mr. Senn testified, that was built on acquisitions. They have an existing plan for the coating

business; and, with assets, personnel and equipment that are coming with this divestiture, will enable Integer to fill the remaining gap in its plan.

And whether it will succeed in effectively competing or not is something that we will see in the future. But I believe -- I am persuaded -- that Integer will vigorously attempt to compete in this space and become another competitor, to mitigate any loss competition that might otherwise result from the merger of Surmodics and Biocoat.

So, in consideration of this evidence, the Court finds that defendants have met their burden of production to rebut the presumption that the proposed transaction will substantially lessen competition.

The burden now shifts back to plaintiffs to produce additional evidence of anticompetitive effects if the proposed transaction goes forward.

Plaintiffs don't explicitly address this prong of the analysis because they have argued, albeit unsuccessfully, that defendants cannot rebut their prima facie case.

Nonetheless, plaintiffs have offered another potentially significant piece of evidence, and that is Dr. Fix's merger simulation that he performed, and he described at Page 1143 of the transcript, where he indicated that the removal of the constraint provided by Surmodics would provide Biocoat with incentive to increase prices by 28% or more; and,

along these lines, removal of the constraint provided by Biocoat would give Surmodics an incentive to increase prices by almost 13%.

However, Dr. Fix's merger simulation did not consider how the proposed divestiture to Integer would have an impact on the merged firm's inclination to raise prices to such a degree. That is at Transcript Page 1144.

Although Dr. Fix has doubts about how Integer will proceed and how aggressively it will compete for new business if the transaction goes forward, the Court disagrees with him on this for the reasons I've already discussed.

Moreover, Dr. Fix fails to consider how the in-house coating capacity acts as a constraint on the merged firm. As I have discussed earlier, Dr. Wong noted in his report that the economic theory is clear that customers need not always pick in-house coatings for those in-house coatings to, nonetheless, be important to competitive constraints, which means that if Biocoat and Surmodics raise their prices along the lines that Dr. Fix hypothesizes, it could lead you to manufacturers -- and there are many substantial manufacturers with the in-house coating -- to simply explore and possibly move other business in-house rather than relying on other suppliers.

I have also referenced evidence of customers with in-house coating capacity threatening to move their coating

procurement in-house, as it is; and, at least one example where a supplier, DSM, lost a coating opportunity to an in-house move.

No Biocoat, Surmodics or GTCR executive testified that Biocoat and Surmodics planned to raise prices by any specific level, let alone to the degree hypothesized by Dr. Fix.

Moreover, no customer has expressed any fear of such price increases or, to my recollection, has expressed concerns about this proposed transaction in general.

As such, the Court finds that plaintiffs have proffered no other potentially persuasive evidence of anti-competitive effect, other than what I have covered already.

Now, finally, the Court must balance the equities. There are two types of equities which the Court must consider in all Section 13(b) cases: Private equities and public equities. In this case, the private equities include the corporate interests of defendants. The public equities are the interests of the public, either in having the merger go through or in preventing the merger. An analysis of the equities includes the potential benefits, both public and private, that may be lost by enjoining a merger.

In addition, the Court notes that in balancing the equities, it is important to keep in mind that while private equities are important, when the Commission demonstrates a

likelihood of ultimate success, a counter showing of private equities alone would not suffice to justify the denial of a preliminary injunction barring the merger.

That is in the Swedish Match case, 131 F. Supp. 2d, at Page 172.

Thus, as the Seventh Circuit has made clear in the Elders Grain decision, 868 F.2d at Page 903, while not giving controlling weight to private equities, the cases give them some weight, and private injuries are entitled to serious consideration.

In this case, the balance of the equities weigh in defendants' favor for the following reasons: As the court stated and the Seventh Circuit stated in the Ball Memorial Hospital case, 784 F.2d at Page 1334, in attempting to weigh the equities of granting or denying a preliminary injunction in the antitrust setting, the pro or anti-competitive effects on the market at large should be an important factor in the district court's analysis.

As I have stated above, the plaintiffs have not demonstrated a likelihood of success on the merits under the applicable test.

Moreover, defendants have offered some evidence through Dr. Wong's testimony that the proposed transaction, which includes its divestiture, may benefit the hydrophilic coating customers and, therefore, the public generally, by

providing a new competitor -- namely, Integer -- with FDA approved coating and related brand names, key employees, including Dr. Long, the renowned polymer chemist, along with the equipment and know-how to enable it to manufacture the divested Biocoat hydrophilic coating within the year timeframe specified by the Transition Services Agreement.

Finally, the Court, as the Seventh Circuit has discussed in the Ball Memorial Hospital case, 784 F.2d at Page 1333, considers the harms to the private equities that may be caused because defendants will likely abandon the proposed transaction in the event that an injunction is granted, rather than facing the costs and uncertainties of lengthy litigation to vindicate their position.

In sum, for all of these reasons, the Court, in its discretion, finds that plaintiffs have failed to meet their burden for obtaining a preliminary injunction, by raising questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for a thorough investigation, study, deliberation and determination by the FTC in the first instance and, ultimately, by the Court of Appeals.

Accordingly, plaintiffs' motion for a preliminary injunction is hereby denied.

The parties are ordered to provide by November 14th, 2025, a joint status report as to what further action, if any,

that I may need to take with this case.

In closing, I want to thank counsel from all the parties for their vigorous, zealous and powerful advocacy in this important case and for your patience here today during this oral ruling, which I wanted to get to you in a timely fashion.

The court stands in recess.

MS. PEREZ (Via Telephone): Your Honor?

THE COURT: Yes?

MS. PEREZ (Via Telephone): This is Maia Perez on behalf of the FTC.

Will the Court be issuing a written opinion or should we be relying on the transcript?

THE COURT: Well, Ms. Perez, I went into consider detail and tried to provide you with the citations because I intend for the transcript to stand as my ruling in the case.

MS. PEREZ (Via Telephone): Understood. Thank you, your Honor.

In that case, your Honor, plaintiffs respectfully move this Court for an extension of the temporary restraining for five business days, which is the same period as the parties' prior stipulation, so that we may assess certain appellate considerations and seek an appropriate appellate relief on an expedited basis, if we make that determination.

Plaintiffs would note that courts have routinely

granted such extensions in merger cases to allow an opportunity for appellate review.

In some recent examples, the district court in FTC vs. Meta Platforms and FTC vs. Temperate Philly International, both granted extensions of seven days. Both courts noted that the Federal Rule of Civil Procedure 65(b)(2) allows the Court to extend the temporary restraining order for a period not to exceed fourteen days for good cause.

In another recent case, FTC vs. Novant Health, the district court denied the FTC's motion pending for an injunction pending appeal, but extended the temporary restraining order to allow the FTC to move the Circuit Court for an injunction pending appeal, which the Circuit Court granted.

Plaintiffs believe there is good cause for a short extension of the temporary restraining order here. Without an extension, defendants will be able to consummate the proposed transaction after 11:59 p.m. tomorrow, preventing plaintiffs to obtain full and effective relief at the conclusion of any further proceedings, and undermining the public interest in effective enforcement of the antitrust laws.

It will also deprive the judiciary of the opportunity to review any potential appellate-related motions, and could even make the status report that the Court just requested on November 14th somewhat moot.

So, plaintiffs have sought to stipulate to an extension of time with defendants, in preparation for this hearing, but the parties were unable to agree on a time that would be sufficient for appellate review.

FTC vs. Advocate Health Network -- Healthcare Network -- Judge Alonso of the Northern District held -- of Illinois, sorry, the Northern District of Illinois -- granted the FTC's motion for an injunction pending appeal, finding, in part, that such an injunction was necessary to avert irreparable harm because restoring competition would be very difficult, if not impossible, if the parties did merge and then there was a successful appeal.

And, also, because -- and Judge Alonso also found that defendants would not be substantially injured by maintenance of the status quo until appellate review was complete.

Judge Alonso concluded that the balance of harm ways heavily in the plaintiffs' favor and that the appeal had some merit.

In the court here, your Honor, plaintiffs are merely seeking a short extension of the temporary restraining order in order to assess appellate considerations. But many of those same points -- the need for additional time to avert irreparable harm and the lack of harm to defendants -- are present here.

Defendants will not be harmed by a short extension, as

they have until November 25th to consummate this deal.

Defendants have been and will continue to be able to make any appropriate preparations for that closure and they will still be able to consummate the deal on that timeline unless plaintiffs are successful in seeking further relief.

But, first, a short extension is needed to allow plaintiffs to assess whether to seek such relief and to allow the Court and the Circuit Court sufficient time to review and rule on any potential motion.

And this additional time is particularly critical, your Honor, given the unforeseen circumstances of the continued government shutdown and the limited judiciary operations, and given that the temporary restraining order will expire tomorrow, which is a federal holiday.

MR. BUTERMAN (Via Telephone): Your Honor, this is Lawrence Buterman from Latham & Watkins. May I be heard on this issue?

THE COURT: Yes. Just one second, Mr. Buterman.

So, Ms. Perez, are you seeking until the 17th?

MS. PEREZ (Via Telephone): Your Honor, I was asking for five business days, which technically would be the 18th.

THE COURT: The 18th? Okay. Five business days. Okay.

Go ahead, Mr. Buterman.

MR. BUTERMAN (Via Telephone): Thank you, your Honor.

Let me begin by noting, as your Honor did, that we had previously agreed with the FTC that there would be a temporary restraining order in place that would prevent us from closing until either November 11th, or five days after the Court's decision, whichever comes sooner.

Obviously, the decision has now come down. In conversations with the Federal Trade Commission, we agreed that we would allow the -- we would not close before Friday, which would give them today, tomorrow, Wednesday, Thursday and Friday to decide what they want to do.

Respectfully, your Honor, the cases that Ms. Perez cited are all inapplicable because of the fact that we do have an outside date of November 25th.

Ms. Perez's arguments about irreparable harm simply have no place, in light of the Court's finding that there will be no irreparable harm, and that this transaction does not substantially lessen competition.

Furthermore, nothing that will happen with respect to closing this transaction will remove appellate review or impact appellate review. This is all about the FTC trying to crater this deal now that this Court has ruled that it does not substantially lessen competition and that the injunction should not be issued.

And, so, therefore, while we are comfortable agreeing to an extension and an agreement not to close until Friday,

anything beyond Friday, your Honor, runs the risk that we may butt up against the outside date.

And the reason is, your Honor, because as typically happens in these cases, the FTC will seek a stay of the decision before your Honor. And, then, assuming that is not successful, they will then make a motion for an emergency stay in front of the Seventh Circuit.

And if this goes on until next week, before they have to even approach your Honor, that is going to make it more likely that the FTC will not be giving the Seventh Circuit enough time to analyze their stay motion.

And, again, your Honor, the FTC has been aware of the pendency of this decision for some time. And I, respectfully, disagree that there is anything in this decision that is causing them to have to now ruminate for a week to decide whether they want to appeal.

MS. PEREZ (Via Telephone): Your Honor, if I may? This is Maia Perez, again.

The extension of the temporary restraining order is not simply for plaintiffs to ruminate on whether to move for appellate relief, but, rather, also, for this Court, as Mr. Buterman just said, for this Court and for, potentially, the Circuit Court of Appeals, to rule -- to consider and rule -- on any briefing on that, any potential motion seeking appellate relief.

So, your Honor, there is much more that needs to happen before the temporary restraining order than simply for plaintiffs to make up their minds about whether to seek appellate relief.

And we are asking for this relief in order to avoid potentially jamming up both your Honor and, then, in turn, the Circuit Court of Appeals, during a shutdown on a week with a federal holiday. And, for that reason, we are asking for slightly more time -- mostly, for sufficient time -- to review.

MR. BUTERMAN (Via Telephone): Your Honor, the courts are all operational, as your Honor's thorough work on this opinion shows. The Seventh Circuit is operational. This is about the FTC keeping open the optionality, to try to run out the clock on us. And given the Court's decision, it is time for the FTC to let this one go.

And if they want to appeal, they can appeal, but there is no reason to further keep us from beginning consummating this transaction.

THE COURT: Well, Mr. Buterman, you have heard my ruling. And I think that I am right, but I could be wrong. And I don't think it is unreasonable to give the plaintiffs until Monday, which I believe would be the 17th, in light of the fact that we have a federal holiday tomorrow.

And although many of my colleagues and myself have

been quite busy over the past number of weeks with a lot of different things going on, not the least of which, of course, is your case, I think it is reasonable to give the FTC some more time.

I don't know how their personnel are even -- if they have been working during the shutdown or -- obviously, there is representation here today, but it may take them a little bit of time. And I don't see how giving them until Monday is going to harm your clients' position.

I have full confidence -- and I can promise you, and all counsel -- that if I get any sort of a motion from the plaintiffs to stay, I want an immediate response and I will rule promptly so the case can move forward -- if it moves forward, wherever it needs to go -- there won't be any delays on my account.

And I have full confidence that the Court of Appeals will act expeditiously to grant any sort of relief that needs to be granted, so that if the transaction goes forward, it can do so in a timely manner.

So, I am going to grant the plaintiffs' request and give them until Monday, and extend the temporary restraining order until Monday at 5:00 p.m., Central Standard Time.

Is there anything further from the parties?

MS. PEREZ (Via Telephone): Nothing further from plaintiffs, your Honor. Thank you.

62

THE COURT: Okay.

MR. BUTERMAN (Via Telephone): No, your Honor. Thank you very much.

THE COURT: Thank you all for your patience.

You might be tired of the sound of my voice by now, but I thought it was important to give this the sort of consideration that I have spent with your materials.

And, again, I thank you, everyone, for their excellent presentations in this case.

The Court will stand in recess. Good night.

(Concluded at 3:53 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Joene Hanhardt* *November 11, 2025*
Joene Hanhardt
Official Court Reporter